# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

**OM SHARMA,**
**VAUGHN & DIANE RIFFE,**
**VIRGINIA BROWN,** AND
**SUSAN GEISELMAN**
  *On Behalf of Three Classes and One*
  *Subclass of Similarly Situated Persons*

        Plaintiffs

v.                                                    Case No: 8:18-cv-00656-GJH

**RUSHMORE    LOAN    MANAGEMENT**
**SERVICES LLC,** *et al.*

                                                      **JURY DEMAND**

        Defendants

## AMENDED CLASS ACTION COMPLAINT[1,2]

Plaintiffs Vaughn & Diane Riffe, Om Sharma, Virginia Brown, and Susan Geiselman

(collectively "Named Plaintiffs"), each on their individual behalf and each on behalf of a three

classes and one subclass of similarly situated persons, through their attorneys Phillip R. Robinson

and the Consumer Law Center LLC and Scott Borison and the Legg Law Firm LLP, hereby brings

---

[1]      Attached hereto as Exhibit 1 is a comparison copy of the changes made herein from the
original Complaint.  ECF. 1.

[2]      None of the Defendants have filed an Answer to the Plaintiffs' original Complaint.  ECF.
2.  The Court previously granted Rushmore's and BCAT 2014-4TT's motions to extend time to
respond to Plaintiff's original Complaint.  ECF. 13 & 20.  Defendant RMAC TRUST 2016-CTT
has contested the Plaintiffs' service and not answered.  ECF. 9, 16 (ECF. Pages 18-22) & 19.  Since
the Defendants have not filed any Answer to the original complaint and the Court otherwise
extended that time, Plaintiffs are permitted as a matter of course to file this amending pleading.
Fed. R. Civ. P. 15(a)(1)(B).  Pursuant to the Local Rules and as a courtesy Plaintiffs provided a
draft copy of this pleading to the Defendants more than a month ago seeking their position on its
filing, but as of this filing none of the Defendants has received any response to that request.

this Amended Class Action Complaint and Jury Demand against Defendant Rushmore Loan Management Services LLC ("Rushmore"), Wilmington Savings Fund Society, FSB, Doing Business as Christiana Trust, Not in its Individual Capacity but Solely as Trustee for BCAT 2014-4TT ("BCAT 2014-4TT"), and U.S. Bank, National Association, Not in its Individual Capacity but Solely as Trustee for the RMAC Trust, Series 2016-CTT ("RMAC TRUST 2016-CTT"). In support thereof, Named Plaintiffs state as follows:

## I. INTRODUCTION

1.      The claims herein exemplify certain predatory and deceptive and debt collection practices which have garnered headlines and damaged the economy for the past several years in which certain so-called professionals (such as Rushmore, BCAT 2014-4TT and RMAC TRUST 2016-CTT) flout the law.  The Defendants' unsafe and unsound debt collection and mortgage servicing practices to collect consumer debts they acquired in default have embroiled Dr. Sharma, Ms. Brown, and Ms. Geiselman and the putative Classes and Subclass they seek to represent, who continue to suffer damage and losses directly and proximately caused by the Defendants.

2.      Specifically, Rushmore has knowingly collected or attempted to collect sums from Mr. & Mrs. Riffe, Dr. Sharma, Ms. Brown, and Ms. Geiselman and the putative Classes they seek to represent on behalf of BCAT 2014-4TT and RMAC TRUST 2016-CTT, which have acted as unlicensed mortgage lenders.  Since they are unlicensed they may not collect or attempt to collect consumer mortgage loans and certainly may not profit off their illegal activities.

3.      Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT know the law and since 2011 the law has been clear that in order for a mortgage lender or servicer to collect or attempt to collect in the State of Maryland they also must be licensed at each business location.  FIN. INST. § 11-504; FIN. INST. § 11-505.

4.     The Defendants also know that longstanding Maryland law holds that unlicensed professionals may not profit from their illegal activities and in the case of mortgages, may only collect the principal portion claimed due from borrowers.  Fin. Inst. § 11-523(b).  *Compare Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293 (1970); *McDaniel v. Baranowski*, 419 Md. 560, 587 (2011); *Thorpe v. Carte*, 252 Md. 523, 526 (1969); *Snodgrass v. Immler*, 232 Md. 416, 424 (1963); *Goldsmith v. Manufacturers' Liab. Ins. Co. of New Jersey*, 132 Md. 283 (1918).

5.     Further, a person who is required to be licensed as a mortgage lender may not shield its collection activities through persons like Rushmore who are required to have a separate license.

6.     Recently, the Court of Appeals issued an opinion in *Blackstone v. Sharma*, No. 40, SEPT. TERM, 2017, 2018 WL 3691347 (Md. Aug. 2, 2018) holding that trust entities like BCAT 2014-4TT and RMAC TRUST 2016-CTT are now considered mortgage lenders under Maryland law and therefore are not collection agencies under the Maryland Collection Agency Licensing Act ("MCALA), BUS. REG. 7-101, *et seq.*[3]  In support of this holding the Court of Appeals specifically cited with approval to 2009 Maryland Laws Ch. 4 (S.B. 269) which was one of several pieces of legislation recently passed by the General Assembly "that amended the recordation requirements of mortgages, added requirements to the foreclosure process, created a comprehensive mortgage fraud statute to protect homeowners in foreclosure, **altered the mortgage lender and mortgage loan originator licensing requirements**, and extended legal protections for homeowners in foreclosure and mortgage default." *Blackstone*, 2018 WL 3691347, at *24 (emphasis added).

7.     In S.B. 269 (2009 Sess.) the General Assembly altered the definition of a mortgage lender and significantly broadened the scope of Maryland's mortgage lending laws.   The new law

---

[3]     Mandate related to this decision was issued on October 4, 2018 making it a final decision as of that date.  MD. RULE 8-606(a).

expanded the term "mortgage lender" in the Maryland Mortgage Lender Law ("MMLL"), FIN. INST. § 11-501, *et seq.* to include "mortgage servicers." *Id. See also* FIN. INST. § 11-501(j)(1)(iii). The term mortgage servicer was defined to "mean[] a person who: (1) **Engages in whole or in part in the business of servicing mortgage loans for others**; or (2) Collects or otherwise receives payments on mortgage loans directly from borrowers for distribution to any other person." 2009 Maryland Laws Ch. 4; FIN. INST. § 11-501(n)(emphasis added).

8.  In *Blackstone*, the Court of Appeals concluded that the hedge fund entities before it, just like BCAT 2014-4TT, and RMAC TRUST 2016-CTT in this case, "constitutes a pool of loans that will eventually be sold off to investors." *Blackstone*, 2018 WL 3691347, at *24. Therefore, under the Court of Appeals' analysis, a Hedge Fund entity acquiring mortgage loans for the benefit of its investors is required to be licensed as a mortgage lender since it is acting as a mortgage servicer by "[e]ngag[ing] in whole or in part in the business of servicing loans for others." FIN. INST. § 11-501(n)(1). In this way a mortgage servicer, under Maryland law, is much broader than the entity that simply "[c]ollects or otherwise receives payments on mortgage loans directly from borrowers for distribution to any other person." FIN. INST. § 11-501(n)(2). To suggest otherwise would render FIN. INST. § 11-501(n)(1) meaningless.

9.  In further support of Named Plaintiffs' contention that BCAT 2014-4TT, and RMAC TRUST 2016-CTT constitute mortgage lenders under the MMLL the Named Plaintiffs also rely upon the legislative history related to S.B. 269 (2009 Sess.) in which all members of the financial services community testified in support of the legislation. In light of their favorable participation, it is well reasoned that the changes made to the MMLL's definition of a mortgage lender were known and accepted by those lobbyists representing the Defendants' interests in Annapolis.

10.     It should be noted that counsel for the hedge fund entities before the Court of Appeals in *Blackstone*, admitted to the court that the reason those entities did not wish to become licensed was that acquiring such a license may create certain tax consequences for them.  Argument of Petitioners' counsel in Blackstone, Ms. Lias-Booker, in Case 45 at 12:50 to 14:50 of webcast (available in the webcast on the Court of Appeals' website).  Upon information and belief based upon Ms. Lias-Booker's representation to the Court of Appeals in *Blackstone*, BCAT 2014-4TT also does not wish to be licensed in Maryland because it too may incur Maryland taxes as a result.

11.     Named Plaintiffs also believe long-standing Maryland law also recognizes certain entities, like BCAT 2014-4TT and RMAC TRUST 2016-CTT in this case, are mortgage lenders because mortgage assignees step into the shoes of the original mortgage lender and do not obtain any greater rights than their assignors had to give them.  *Thompkins v. Mountaineer Investments, LLC*, 94 A.3d 61, 74 (2014)("Maryland courts have long employed shoe imagery in describing the status of an assignor. *See, e.g., Textor v. Orr,* 86 Md. 392, 38 A. 939 (1897); *Annan v. Houck,* 4 Gill 325, 328, 45 Am. Dec. 133 (1846); *Kemp's Ex'x v. M'Pherson,* 7 H. & J. 320, 336 (1826)").  *See also* REAL PROP. § 2-103.

12.     In light of the *Blackstone* ruling described in the preceding paragraphs Rushmore was not permitted collect on behalf of BCAT 2014-4TT or RMAC TRUST 2016-CTT because these entities were unlicensed as mortgage lenders pursuant to the MMLL but were required to be licensed as such under Maryland law.  BCAT 2014-4TT is not permitted to profit from their illegal activities since acting as an unlicensed mortgage lender is a crime under Maryland law.  FIN. INST. § 11-523 .

13.     By unfairly and deceptively aiding and assisting an unlicensed mortgage lender in the State of Maryland, as described herein, Rushmore has further violated its duty of good faith and fair

dealing pursuant to its own license by the State of Maryland (which it may not lend to any other person or entity) in connection with the servicing of mortgage loans. MD. CODE REGS. 09.03.06.20.

14.     As a direct and proximate result of Rushmore's, BCAT 2014-4TT's, and RMAC TRUST 2016-CTT's attempts to collect consumer debts from them, Mr. & Mrs. Riffe, Dr. Sharma, Ms. Brown and Ms. Geiselman and the putative classes and subclass of persons they represent have been damaged and harmed by: (i) the Defendants' knowingly claiming sums due from Dr. Sharma, Ms. Brown, and Ms. Geiselman, and the putative Classes of members that may not be legally collected, (ii) BCAT 2014-4TT's and RMAC TRUST 2016-CTT's utilizing the courts to give the false appearance that a court has authorized their illegal practices; (iii) incurring fees and costs in order to dispute Rushmore's and BCAT 2014-4TT's, and RMAC TRUST 2016-CTT's false and misleading attempts to collect from them; and (v) recording documents in land records and court records demanding payments on behalf of unlicensed mortgage lenders. In addition, Mr. & Mrs. Riffe, Dr. Sharma, Ms. Brown, and Ms. Geiselman, and the putative Classes and Subclass of members are entitled to statutory damages for Defendants' violations of certain of the claims before the Court in this action.


## II.  PARTIES

15.     Plaintiffs Vaughn and Diane Riffe are residents of the State of Maryland and Prince George's County, Maryland, where the events which are related to their claims in this lawsuit occurred, and are the record owners of the real property commonly known as 4249 Powder Mill Road, Beltsville, MD  20705 ("Riffe Property").

16.     Plaintiff Om Sharma ("Dr. Sharma") is a resident of the State of Maryland and Prince George's County, Maryland, where the events which are related to his claims in this lawsuit occurred, and is the record owner of the real property commonly known as 5807 Marietta Station Drive in Glenn Dale, Maryland 20769 ("Sharma Property").

17.     Plaintiff Virginia Brown ("Ms. Brown") is a resident of the State of Maryland and Baltimore County, Maryland, where the events which are related to her claims in this lawsuit occurred, and is the record owner of the real property commonly known as 4204 Colonial Road, Pikesville, MD 21208 ("the Brown Property"). Ms. Brown is also the assignee of all legal claims for damages or losses sustained by her brother, Leroy Culp, Sr. (who is a co-owner of the Brown Property), as a result of the acts and omissions of the Defendants related to the Brown Property and Brown Loan subject to these proceedings.

18.     Plaintiff Susan Geiselman is a resident of the State of Maryland and both Montgomery and Worcester Counties, Maryland, where the events which are related to her claims in this lawsuit occurred, and is also the record owner of the real property commonly known as 10900 Coastal Highway, Suite 1907, Ocean City, MD 21842 ("the Geiselman Property").

19.     Defendant Rushmore Loan Management Services LLC ("Rushmore") a mortgage servicer for its co-defendants BCAT 2014-4TT and RMAC TRUST 2016-CTT which are the entities created by various Hedge Funds to acquire in whole or in part in the business of servicing loans for others and serves as the nominal owners (now or in the past) of Named Plaintiffs' and the putative class members' personal consumer loans subject to this action on behalf of various Hedge Funds. Rushmore served this capacity on behalf of BCAT 2014-4TT and RMAC TRUST 2016-CTT and was delegated and assigned all duties related to the Named Plaintiffs' loans (and the putative class members' loans) as their authorized agent on their behalf. These duties include the

retention of attorneys/substitute trustees to act and to initiate foreclosure proceedings against Maryland residents as a servicer provider and/or subservicer as those terms are defined in 12 C.F.R. § 1024.31. Upon information and belief, Rushmore acts in the same capacity for other residential mortgage owners in the State of Maryland as well. This belief is based upon public records with the Office of the Commissioner of Financial Regulation and filings in this and other courts around the State of Maryland.

20. Based upon the admission of its counsel in various Maryland state court proceedings, BCAT 2014-4TT is a New York common-law trust. BCAT 2014-4TT was established for the primary purpose acquiring "a pool of loans that will eventually be sold off to investors." *Blackstone*, 2018 WL 3691347, at \*24. The specific pool of loans it has acquired are defaulted mortgage debts owed by consumers in Maryland for pennies on the dollar of what was claimed as due and owing. Because BCAT 2014-4TT only intends to acquire defaulted, consumer debts for the primary purpose of commencing property acquisition by foreclosure, deeds in lieu, and short sales from various assigners on behalf of its investors as a FIN. INST. § 11-501(n)(1) mortgage servicer, it qualifies as a debt collector under the FDCPA and mortgage lender under the MMLL. BCAT 2014-4TT is nothing more than a paper entity that holds and owns mortgage accounts and loans on behalf of its investors. BCAT 2014-4TT does not have any employees and does not operate like a bank, credit union, or trust company; in written correspondence to the Maryland Commissioner of Financial Regulation dated March 12, 2015, BCAT 2014-4TT's named trustee in this action, i.e. Wilmington Savings Fund Society, FSB ("WSFS"), admitted that it played only as a "limited role" in governing the affairs of BCAT 2014-4TT and that it was not able to address any questions whatsoever about BCAT 2014-4TT's collection or mortgage servicing activities and failure to become licensed under Maryland law. BCAT 2014-4TT is also not exempt from the

licensure requirements for mortgage lenders in the State of Maryland since neither hedge funds nor common-law trusts are not included in the named categories of excluded persons from the MMLL and WSFS has admitted it has no responsibility whatsoever. At all times relevant to these proceedings Rushmore was aware of these facts but elected to knowingly and recklessly disregard them and knowingly continued to collect and attempt to collect on behalf of BCAT 2014-4TT and others even though it knew each had no legal right to do so either directly or indirectly in the State of Maryland without a mandatory mortgage lender license.

21.     Upon information and belief RMAC TRUST 2016-CTT is a New York common-law trust; this belief is based upon the business practices of the Roosevelt Management Company LLC which is its agent. RMAC TRUST 2016-CTT was established for the primary purpose of acquiring "a pool of loans that will eventually be sold off to investors." *Blackstone*, 2018 WL 3691347, at *24. The specific pool of loans it has acquired are defaulted mortgage debts owed by consumers in Maryland for pennies on the dollar of what was claimed as due and owing. Because RMAC TRUST 2016-CTT only intends to acquire defaulted, consumer debts for the primary purpose of commencing property acquisition by foreclosure, deeds in lieu, and short sales from various assigners on behalf of its investors as a FIN. INST. § 11-501(n)(1) mortgage servicer, it qualifies as a debt collector under the FDCPA and mortgage lender under Maryland law. RMAC TRUST 2016-CTT is nothing more than paper entity that holds mortgage accounts and loans. RMAC TRUST 2016-CTT does not have any employees and does not operate like a bank, credit union, or trust company; it is an investment entity established to acquire defaulted mortgages and to thereafter collect upon the intangible and tangible assets associated thereto on behalf of its investors. RMAC TRUST 2016-CTT is also not exempt from the licensure requirements for mortgage lenders in the State of Maryland since common-law trusts are not included in the named

categories of excluded persons from MMLL and since U.S. Bank, NA has no responsibility for it and other hedge fund entities, like Roosevelt Management Company LLC which actually runs its affairs. At all times relevant to these proceedings Rushmore was aware of these facts but elected to knowingly and recklessly disregard them and knowingly continued to collect and attempt to collect on behalf of RMAC TRUST 2016-CTT and others even though it knew each had no legal right to do so either directly or indirectly in the State of Maryland without a mandatory mortgage lender license. RMAC TRUST 2016-CTT did become licensed as a collection agency in November 2017 after Ms. Geiselman was forced to incur damages and losses from its unlicensed activities; collection agencies are not exempt from the MMLL. RMAC TRUST 2016-CTT has never been licensed as a mortgage lender but is required to be so licensed in accordance with the holding in *Blackstone* discussed *supra* since it engages in whole or in part in the business of servicing loans for others including its investors.

22.     Not named as a party to this action Roosevelt Management Company ("RMC") is a New York-based investment management firm focused on investments in, management of, and servicing of, seasoned residential mortgage loans. RMC was founded in 2008 by a team of veteran mortgage professionals with extensive experience in pricing, due diligence, servicing, and restructuring of distressed, defaulted mortgage assets. RMC's corporate headquarters is located at 1540 Broadway, Suite 1500, New York, New York, 10036. RMC's primary focus is the investment and management for clients of non-performing mortgage loans (including bankruptcy and foreclosure), sub-performing loans, seasoned performing loans, Real Estate Owned properties, Excess Mortgage Servicing Rights, and HELOCs. RMC owns more than a 10% interest in Defendant Rushmore.

23.     Defendant Rushmore is the debt collector for BCAT 2014-4TT and RMAC TRUST 2016-CTT which own the Named Plaintiffs' loans, and the loans of the putative class members, as described *infra*.  Rushmore acquired the mortgage FIN. INST. § 11-501(n)(2) servicing rights of the Named Plaintiffs and putative class and subclass member loans when it believed those loans to be in default.

24.     Not named as Defendants in this action, the law firms of the BWW Law Group LLC, Atlantic Law Group, and the Law Offices of Jeffrey Nadel and their attorneys/substitute trustees, who were retained by Rushmore and BCAT 2014-4TT and RMAC TRUST 2016-CTT to collect from Mr. & Mrs. Riffe, Ms. Brown, and Ms. Geiselman in litigation in the Circuit Courts for Prince George's County, Baltimore County and Worcester County, Maryland.

### III.  JURISDICTION, VENUE & TOLLING

25.     This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 since certain of the claims asserted herein arise under the laws of the United States.  Further, the Court may elect to retain supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.A. § 1367 since those claims are so related to the federal claims asserted herein that they form part of the same case and controversy.

26.     This Court also has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) since (1) the aggregate amount placed in controversy by the claims of the Named Plaintiffs and the proposed class members exceeds the or value of $5,000,000, exclusive of legal interest and costs; (2) the putative class action consists of at least 100 proposed class members; and (3) the citizenship of at least one class member is different from that of at least one of the Defendants—i.e. in which there is minimal diversity.  28 U.S.C. § 1332(d).  Here, the Named Plaintiffs are seeking disgorgement of the purported mortgage interest collected by the

Defendants and related costs and fees which BCAT 2014-4TT and RMAC TRUST 2016-CTT are not permitted to collect as unlicensed mortgage lenders. The potential value of the litigation, upon information and belief derived from Maryland land records, may exceed $5,000,000 if BCAT 2014-4TT and RMAC TRUST 2016-CTT continue to operate as unlicensed mortgage lenders under Maryland law. Named Plaintiffs recognize that if BCAT 2014-4TT and RMAC TRUST 2016-CTT actually become licensed as mortgage lenders the damages may reduce at that time. However, Named Plaintiffs have no control over whether BCAT 2014-4TT and RMAC TRUST 2016-CTT will make the business decision to become licensed as mortgage lenders as required by *Blackstone*.

27. This Court has jurisdiction because the Defendants transact business, perform work, have interests in real property, and provides services in Maryland. They also knew that they were acquiring debts in default and would have to engage in debt collection activities against Maryland residents.

28. Venue is appropriate in this Court pursuant to 28 U.S.C.A. § 1391 because a substantial portion part of the events or omissions giving rise to the claims before the Court, related to the Named Plaintiffs and Defendants, occurred in this District.

29. Certain of the claims asserted herein were tolled, pursuant to *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974) and *Philip Morris USA, Inc. v. Christensen*, 394 Md. 227 (2006), by Ms. Brown's prior pleadings in the state court on her behalf and on behalf certain putative class members, including Dr. Sharma, Ms. Brown, and Ms. Geiselman. Specifically, Ms. Brown originally[4] presented class action claims in the Circuit Court for Baltimore County on November

---

[4] Ms. Brown amended her factual allegations but not her substantive claims or the class definitions while her claims were pending in the state court on June 6, 2016 and again on April 6, 2017.

17, 2015 in the matter of *Nadel v. Brown* (Case No. 03-C-15012242) on behalf of the following putative classes of similarly situated persons:

    a.   **RESPA DUAL-Tracking Class:** The RESPA Class includes all borrowers who: (i) submitted, on January 10, 2014 or thereafter, an application for loss mitigation to Rushmore Loan Management Services, LLC as a mortgage servicer; (ii) concerning a "federally related mortgage," as that term is defined by 12 C.F.R. 1024.2; and (iii) after receipt of which Rushmore Loan Services, LLC, directly or indirectly through its agents, proceeded to initiate a foreclosure sale for the property subject to the loss mitigation application before the borrower's appeal rights under RESPA and its implementing regulations had expired. (Counter Complaint at ¶ 77).

    b.   **RESPA QWR Class:** The RESPA QWR Class includes all borrowers who: (i) submitted, on January 10, 2014 or thereafter, a qualified written request; (ii) concerning a "federally related mortgage," as that term is defined by 12 C.F.R. 1024.2; and (iii) Rushmore did not acknowledge or respond to the QWR in writing in the time periods required by 12 U.S.C.A. § 2605(e), 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35. (Counter Complaint at ¶ 85).

    c.   **FDCPA Class:** Those persons in the State of Maryland from whom Rushmore has communicated with directly or indirectly for the purpose of collecting a consumer debt on behalf of an unlicensed collection agency/mortgage lender. (Counter Complaint at ¶ 93).

    d.   **FDCPA Sub-class:** Those members of the FDCPA Class from whom BCAT 2014-4TT has communicated with indirectly, through its authorized agents and subagents, for the purpose of collecting a consumer debt it acquired. (Counter Complaint at ¶ 93).

30.     Because the state court refused to make any legal rulings on the claims presented to it by Ms. Brown for over two years— effectively denying her and the putative class members with any due process— she elected, as was her right, to dismiss those claims on February 26, 2018 without prejudice and join them herein with the claims asserted by Mr. & Mrs. Riffe, Dr. Sharma, and Ms. Geiselman. The denial of Ms. Brown's and the putative class members' due process rights to have no substantive action taken on their claims whatsoever while pending in the state court is supported by that court's violation of the Maryland Constitution. *See e.g.* MD. CONST. ART. IV, § 23 ("The Judges of the respective Circuit Courts of this State shall render their decisions, in all cases argued

before them, or submitted for their judgment, within two months after the same shall have been so argued or submitted").

## IV. FACTS

### A.   ADDITIONAL BACKGROUND ON THE DEFENDANTS

31.    Rushmore is a wholly owned subsidiary of RMC, an investment management firm. Rushmore was established from a predecessor organization in 2010 and is headquartered in Irvine, CA, with additional servicing sites in Dallas, TX and San Juan, Puerto Rico.

32.    As of Dec. 31, 2014, Rushmore serviced more than 42,400 loans nationwide totaling $7.8 billion. Included in these are hundreds of Maryland mortgage loans.

33.    The Consumer Financial Protection Bureau ("CFPB") has received more than a hundred complaints from consumers regarding Rushmore's mortgage servicing and loss mitigation practices related to this action and the claims before the Court.  These complaints are publically available on the CFPB's website at: http://www.consumerfinance.gov/complaintdatabase/.

34.    A primary portion of Rushmore's FIN. INST. § 11-501(n)(2) mortgage servicing portfolio according to published reports includes servicing for non-performing, sub-performing, and distressed assets like those acquired by BCAT 2014-4TT.    *See* http://www.businesswire.com/news/home/ 20150310006528/ en/Fitch-Assigns-Initial-RMBS-Servicer-Ratings-Rushmore.  The value of Rushmore's book of business exceeds $50,000,000.00. This estimate is based on the fact that Rushmore retains a portion of sums its collects for its clients including BCAT 2014-4TT and RMAC TRUST 2016-CTT as part of its collections work.

35.    BCAT 2014-4TT is not now and never has been licensed as a mortgage lender and is not exempt from the licensing statutes.  It has however, acted as an mortgage lender by demanding and attempting to collecting through its authorized agents, including Rushmore, but it is not legally

entitled to collect from Ms. Brown, Dr. Sharma and the BCAT 2014-4TT Class members since it is acting without a mandatory mortgage lender license. BCAT 2014-4TT intends and expects that nearly all loans it acquires for pennies on the dollar will be in default at the time of acquisition and it will liquidate a substantial majority of the properties related to each loan, for purposes of collecting upon the loan, by pursing foreclosures, deeds in lieu of foreclosure, and other non-retention property options related to the loans. For the remaining loans it acquires, BCAT 2014-4TT intends to extract large sums of money (sums it is not entitled to collect since it is an unlicensed, illegal mortgage lender).

36. Rushmore relied upon the records of BCAT 2014-4TT for its belief that Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe's loans and the BCAT 2014-4TT Class and Subclass members' loans were in default at the time it acquired the FIN. INST. § 11-501(n)(2) servicing rights of their loans and the loans of the putative class and subclass members related to BCAT 2014-4TT and performed no investigation of the facts available to it whatsoever, thus willfully blinded itself to the knowingly false information conveyed to it.

37. Rushmore relied upon the records of RMAC TRUST 2016-CTT for its belief that Ms. Geiselman, and the RMAC TRUST 2016-CTT Subclass members' loans were in default at the time it acquired the FIN. INST. § 11-501(n)(2) servicing rights of her loan and the loans of the Subclass members and performed no investigation of the facts available to it whatsoever, thus willfully blinded itself to the knowingly false information conveyed to it.

38. Rushmore, as the authorized FIN. INST. § 11-501(n)(2) mortgage servicer, has communicated directly or indirectly concerning consumer debts owned by BCAT 2014-4TT and RMAC TRUST 2016-CTT with demands and threats for payments and threats of judicial action, including foreclosure, even though neither BCAT 2014-4TT and RMAC TRUST 2016-CTT had

the legal right to collect indirectly through Rushmore or other collectors since they were unlicensed mortgage lenders.

39.    BCAT 2014-4TT and RMAC TRUST 2016-CTT were specifically formed to indirectly acquire defaulted, distressed mortgage loans including former FHA, Freddie Mac, Fannie Mae, and other distressed and defaulted loans through intermediaries and their affiliates but never directly from any governmental program. However, many of these loans, including Ms. Brown's and Dr. Sharma's loans and the FDCPA Class member's loans, were acquired by their intermediaries and their affiliates from HUD's DASP program where BCAT 2014-4TT's partners and its affiliates acquired the loans at a significant discount—i.e. pennies on the dollar of what was claimed to be due and owing—and thereafter transferred the loans to BCAT 2014-4TT at a further discount from what was claimed due and owing on the loans. BCAT 2014-4TT never acquired any loans directly from any government program only acquires them through intermediaries.

40.    According to published reports, over 98,000 loans have been funneled through the DASP system auctions since it began in 2010, with mortgages amounting to more than $16.7 billion in total debt. Buyers, including BCAT 2014-4TT's affiliates and predecessors who transferred Mr. & Mrs. Riffe's, Ms. Brown's, Dr. Sharma's, and the FDCPA Class members' claims to it have paid HUD $11.2 billion over the course of these auctions.

41.    Less than 7 percent of all DASP loans, according to HUD have been successfully modified and are performing again. The vast majority of DASP loans are foreclosed upon or are otherwise resolved in non-retention loss mitigation activities. Based upon these uncontroverted facts, the loans therefore are not acquired for the purpose of making the loans performing again but to acquire the properties to which they are secured and turn a quick profit. This is BCAT 2014-4TT's primary purpose as well.

42.     In 1934, Congress enacted the National Housing Act ("NHA"), which created the Federal Housing Administration ("FHA"). The goal of the FHA is to increase homeownership in the United States. In 1965, FHA became a part of HUD's Office of Housing.

43.     In 1949, Congress specifically tasked HUD with administering its programs in such a way that would fulfill the national housing goal of providing "a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation." 42 U.S.C. § 1441; 12 U.S.C. § 1701t.

44.     Thus, HUD has described the mission of the FHA as:

> provid[ing] financing to homebuyers who, compared to those served by the conventional market, have lower wealth and pose moderately higher risks but are still credit worthy. For this reason, FHA-insured mortgages have been the product of choice, and sometimes necessity, for low income Americans, offering a pathway to the middle class and a chance to build wealth that can be passed down through generations.

U.S. Dep't of Housing and Urban Dev. Fed. Housing Admin., *Annual Report to Congress: The Financial Status of the FHA Mutual Mortgage Insurance Fund*, Fiscal Year 2015, p. 14 (Nov. 16, 2015).

45.     FHA does not make mortgages, but rather insures lenders against losses on the mortgages. In other words, to increase homeownership among low-income Americans, HUD insures loans made to borrowers by FHA-approved mortgage companies. These borrowers often have lower credit scores, are permitted to tender a down payment as low as 3.5%, and are allowed to borrow money from family members to use for the down payment.

46.     As part of the FHA insurance contract between HUD and these mortgage lenders, if a homeowner defaults on his or her mortgage and the loan owner must foreclose on the property,

HUD will pay to the loan owner the full amount of the unpaid principal balance of the mortgage loan, plus some amount of delinquent interest.

47.     In order to make these insurance payments in the event of a homeowner's default, Congress created the Mutual Mortgage Insurance Fund ("the Insurance Fund"), administered by FHA, and funded through the collection of insurance premiums and fees.

48.     The vast majority of FHA homebuyers contribute less than 10% of the purchase price as a down payment. As a result, as of 2013, the vast majority of FHA homeowners pay the annual MIP for the life of the mortgage.[5]

49.     Similar to the UFMIP, HUD periodically changes the annual MIP. Between July 14, 2008 and October 3, 2010, the annual MIP was between 0.50% and 0.55%, depending on the current loan-to-value ("LTV") ratio. If the loan amount was less than or equal to 95% of the value of the property, then the annual MIP was only 0.50%. Today, the current annual MIP is 0.80% where LTV is less than or equal to 95% or 0.85% where LTV is greater than 95%.

50.     In its annual report to Congress, HUD touts the fact that its mortgage product—the FHA-insured mortgage—is an important source of home financing for African-American families. HUD, through FHA, does not make mortgages but rather insures them. In other words, to increase homeownership among low- and moderate-income Americans, FHA insures the loans made by private, FHA-approved, mortgage companies to borrowers with lower credit scores and who have less than twenty percent for a down payment. As part of these insurance contracts with the private mortgage lenders, FHA will pay the full amount of the unpaid principal balance of the mortgage if the lender must foreclose.

---

[5] For FHA mortgages issued prior to 2013, homeowners paid the annual MIP until the loan-to-value ratio reached 78%.

51.     The mortgage contract between the homeowner and the FHA-approved lender  specifically references the annual MIP. HUD issues a standard FHA form mortgage contract that all FHA mortgage lenders use. Paragraph 3 of FHA's form mortgage contract requires the loan  owner to apply payment to MIP first from the homeowner's monthly payment on the account.

52.     Although these costs are significant, the homeowner benefits by participating in  the FHA Mortgage Program. These benefits can be broken down into five categories: (1) pre-purchase benefits; (2) pre-foreclosure assistance benefits; (3) loss mitigation options; (4)  streamline refinance benefit; and (5) assumability of the FHA mortgage loan.

53.     These benefits enable HUD to further the national housing goal of "a decent home  and a suitable living environment for every American family," which Congress specifically  mandated HUD to fulfill. *See* 42 U.S.C. § 1441; 12 U.S.C. § 1701t.

54.     The FHA Mortgage Program enables borrowers with credit scores as low as 580  to obtain an affordable loan: a 30-year, fully amortizing mortgage with an interest rate at market rate,   fixed for the life of the loan. This type of mortgage is considered a responsible lending product.

55.     Congress recognized that FHA homeowners—who typically have lower incomes,  less savings and are subject to more frequent bouts of unemployment—were more likely to  experience financial hardships that could cause them to fall behind on their mortgage payments  than other homeowners. As a result, the National Housing Act requires HUD to establish a  program that requires mortgage servicers to provide alternatives to foreclosure. *See* 12 U.S.C. §  1715u ("[up]on default or imminent default . . . of any mortgage insured under this subchapter,  mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to  foreclosure. . .").

56.     To fulfill the requirement to avoid foreclosure, HUD has designed and  implemented a pre-foreclosure assistance system for FHA homeowners. Central to the  pre-foreclosure assistance

system is early outreach by the mortgage servicer to FHA homeowners soon after they fall behind on payments in order to minimize the number of FHA foreclosures.

57. HUD has issued regulations, handbooks, and other guidance that encapsulate its pre-foreclosure assistance system. Sections 600 to 604 of the Code of Federal Regulations and Chapter III.A.2.h of the FHA Single Family Housing Policy Handbook 4000.1 ("the FHA Handbook") describe the precise pre-foreclosure steps that every FHA mortgage servicer, the HUD-approved entity that accepts and processes the homeowner's payments on behalf of the lender, must follow before resorting to foreclosure. *See* 24 C.F.R. § 203.606.

58. Recognizing the importance of these pre-foreclosure assistance benefits to the homeowner, HUD has enshrined these benefits in its form FHA note and mortgage contract that all FHA mortgage lenders must use. Paragraph 6(b) of the FHA form note and Paragraph 9(d) of the FHA form mortgage require mortgage servicers to comply with these pre-foreclosure assistance benefits before accelerating the mortgage debt and beginning foreclosure proceedings. For each of the named the Plaintiffs, these provisions are a part of their loan.

59. The pre-foreclosure assistance benefits of the FHA Mortgage Program are in stark contrast to the private mortgage market. For mortgages not insured by FHA, contact with the delinquent homeowner is minimal and must occur within 36 days of default. For non-FHA mortgages, there is no requirement to make face-to-face contact with the homeowner, and there is no requirement that pertinent information be communicated in the language designated by each borrower.

60. Before and during the foreclosure process, HUD requires its mortgage servicers to consider homeowners for various loss mitigation options, including a special forbearance, a repayment plan, a standard modification, and a modification known as "FHA-HAMP," which is HUD's version of the federal Home Affordable Modification Program ("HAMP"). These requirements

are found in the HUD Handbook. *See e.g.,* FHA Single Family Housing Policy Handbook ("HUD Handbook"), v. 4000.1 (Issued March 14, 2016), *available at* http://www.allregs.com/tpl/public/fha_freesite.aspx.

61. Although HUD has long offered loss mitigation to its FHA homeowners, in 2009, with the onset of the foreclosure crisis, it expanded its program, most notably by creating FHA-HAMP. In 2012, after a critical report by the Government Accountability Office regarding HUD's modification options, HUD overhauled its modification program to make it more effective. With these changes, there was a significant increase in the number of homeowners able to save their homes with an FHA-HAMP modification.

62. Further, Paragraph 6(b) of the FHA form note and Paragraph 9(d) of the FHA form mortgage contract also require that the mortgage servicer consider each FHA homeowner for loss mitigation prior to the mortgage servicer initiating foreclosure.

63. As HUD has recognized in discussing the importance of its FHA-insured mortgage, homeownership is the pathway to a stable middle-class life. In fact, Congress has specifically mandated that HUD achieve the goal of ". . . a decent home and a suitable living environment for every American family. . .". Congress further requires that HUD achieve this objective in a manner that affirmatively furthers fair housing.

64. To achieve these congressionally mandated goals, HUD, through its FHA mortgage program, offers a panoply of benefits to ensure that these low- and moderate-income homeowners are able to maintain homeownership and reap the benefits of owning property. Homeowners with an FHA mortgage are entitled to benefits that do not exist in loans accessible on the private mortgage market. In addition to providing FHA mortgages to homeowners with lower credit scores and lower down payment requirements, HUD has designed its FHA mortgage program to also

provide early and ongoing intervention when struggling homeowners fall behind on payments, a generous mortgage modification program, the ability to easily refinance into a lower interest rate mortgage, and the right to sell the property along with the FHA mortgage to another FHA-eligible homeowner (together "the FHA Mortgage Program").

65.     While generous, these benefits come at a cost. Homeowners pay to be a part of HUD's FHA Mortgage Program, first through an upfront mortgage insurance premium financed at the closing of the FHA mortgage and then every month, as a monthly mortgage insurance payment. Though expensive, access to the FHA Mortgage Program benefits is a lifeline to long- term homeownership and financial stability for many African-American homeowners in Maryland.

66.     As a result of the 2008 financial crisis, FHA homeowners began to fall behind on their mortgages. Some of these homes were auctioned in foreclosure and, as a result, HUD was required to pay out full insurance claims from the Insurance Fund. Approximately 303,492 homeowners saved their homes through an FHA-HAMP modification. However, many of these FHA-HAMP modifications could only be offered with a "partial claim" of the unpaid principal balance, further depleting the Insurance Fund.

67.     Between 2007 and 2009, the Insurance Fund declined from $21 billion to just $4 billion. By 2012, its capital reserves ratio reached negative 1.44%, far below its congressionally mandated floor of 2%.

68.     Because of the drain the foreclosure crisis had on the Insurance Fund, in 2010, HUD launched the Delinquent Note Sale Program ("Note Sale Program," "Note Sale," or "Note Sales") to sell off delinquent mortgages it perceived as un-savable and to help shore up the Insurance Fund.

69.     Between 2010 and the end of 2011, HUD referred to its Note Sale Program as the Single Family Loan Sale ("SFLS"). SFLS was merely a pilot project to determine if the Note Sale

Program could succeed. Between 2010 and the end of 2011, HUD sold off 1,377 delinquent mortgages as part of the SFLS segment of its Note Sale Program.

70.    In 2012, HUD substantially expanded the Note Sale Program and called this expanded version the Distressed Asset Stabilization Program ("DASP").

71.    Unlike the SFLS Note Sales, the DASP-version of the Note Sale Program included two types of sales, a national sale and a Neighborhood Stabilization Outcome ("NSO-DASP") sale, which required purchasers to achieve certain outcomes for a portion of the mortgages they purchased.

72.    In July 2017, HUD's Office of the Inspector General issued a scathing report with HUD's implementation of the DASP Program and identifying multiple errors which have infected the rights of borrowers like Mr. & Mrs. Riffe, Dr. Sharma, Ms. Brown , and Ms. Geiselman (*see* HUD OIG Audit Report Number 2017-KC-0006 available at https://www.hudoig.gov/sites/default/files/documents/2017-KC-0006.pdf). Some of these significant and material errors include:

  a.  HUD did not conduct rulemaking or develop formal procedures required under the Administrative Procedures Act related to its DASP Program.

  b.  HUD Officials did not have a plan to transition its Single-Family Note Sales Program from a demonstration program to an official agency program.

  c.  As a result of HUD's not conducting rulemaking, public officials, citizens, and industry participants were not given the opportunity to provide comments for a more than $18 billion program. Additionally, with no formal procedures or guidebooks, HUD lacked a consistent standard for administering its program. When

HUD expanded DASP to a nationwide level, it did so without a formal plan to transition from a demonstration to an official program.

73. As a result of HUDs failure to comply with the Administrative Procedures Act in its creation of the DASP program before stripping the FHA rights from the Named Plaintiffs' loans without their consent or even any notice, BCAT 2014-4TT and RMAC TRUST 2016-CTT have acquired greater, purported interests in the loans of the Named Plaintiffs and putative class members then HUD had the right to give to anyone—including BCAT 2014-4TT's and RMAC TRUST 2016-CTT's predecessors in interest. BCAT 2014-4TT and RMAC TRUST 2016-CTT may not claim any greater rights than their predecessors had in the loans.

74. This case involves a new industry which has entered the field of consumer debt collection since the financial crisis which began. Specifically, this industry of Wall Street related hedge funds have acquired hundreds and thousands of defaulted, consumer loans, which are non-performing and otherwise in default, for pennies on the dollar of what is claimed due and owing from consumers. Multiple public interest and media organizations have reported irregularities related to this industry including the following:

    a. RMC's Part 2A of its Form ADV (dated March 29, 2017) filed with the Securities and Exchange Commission explains, "RMC typically identifies Real Estate Related Assets available for sale from select relationships with banks, broker-dealers, governmental and quasi-governmental agencies and other financial institutions, including Clients, as well as in certain circumstances referral agents, and analyzes and values such Real Estate Related Assets using various quantitative econometric variables and qualitative data internally generated and obtained from third parties.... As of December 31, 2016, RMC managed

approximately $2,548,465,274 (fair market value) of Real Estate Related Assets for its Clients on a non-discretionary basis." Available at https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=436789.

b.  RMC's Part 2A of its Form ADV (dated March 29, 2017) filed with the Securities and Exchange Commission filed with the Securities and Exchange Commission admits that "The ability of a servicer to enforce ownership rights in Real Estate Related Assets may be limited, delayed or prevented by a number of different circumstances. These include missing or defective documents evidencing the debt and mortgage or ownership thereof, litigation challenging the validity or legality of the initial loan transaction and litigation challenging the foreclosure or eviction process and borrower bankruptcy." *Id.*

c.  The New York Times has reported, "Private equity and hedge fund firms have bought more than 100,000 troubled mortgages at a discount from banks and federal housing agencies, emerging as aggressive liquidators for the remains of the mortgage crisis that erupted nearly a decade ago.  As the housing market nationwide recovers, this is a dark corner from which banks, stung by hefty penalties for bungling mortgage modifications and foreclosures, have retreated. Federal housing officials, for the most part, have welcomed the new financial players as being more nimble and creative than banks with terms for delinquent borrowers.  But the firms are now drawing fire. Housing advocates and lawyers for borrowers contend that the private equity firms and hedge funds are too quick to push homes into foreclosure and are even less helpful than the banks had been

in negotiating loan modifications with borrowers. Federal and state lawmakers are taking up the issue, questioning why federal agencies are selling loans at a discount of as much as 30 percent to such firms." *As Banks Retreat, Private Equity Rushes to Buy Troubled Home Mortgages* (2/27/2018)(available at http://www.nytimes.com/2015/09/29/business/dealbook/as-banks-retreat-private-equity-rushes-to-buy-troubled-home-mortgages.html)(last visited October 2, 2016).

d.   The National Consumer Law Center reports "In New York, DASP has also impeded mediations that could have improved the performance of FHA loans. For example, Brooklyn homeowner Paulette Morrison was participating in the New York foreclosure conference program during 2014. She repeatedly submitted documents to Bank of America for years without getting a decision on her eligibility for an FHA modification. Without notice to her, Bank of America sold her mortgage loan through DASP. Rushmore, as a FIN. INST. § 11-501(n)(2) servicer for the DASP buyer, then appeared for settlement conferences and would not consider a loan modification unless Ms. Morrison first made an up-front payment equal to 25% of the overdue payments and fees. This outlandishly high payment was well beyond anything she could afford. Had her loan remained FHA insured, Ms. Morrison would never have been faced such an unreasonable barrier to a modification. Servicers of FHA loans may not demand upfront payments to begin a modification." *OPPORTUNITY DENIED How HUD's Note Sale Program Deprives Homeowners of the Basic Benefits of Their Government-Insured Loans,* National Consumer Law Center (May 2016) at Page 17 (available online at

https://www.nclc.org/images/pdf/pr-reports/opportunity-denied-report.pdf)(last visited 2/27/2018).

e.  The Center for Popular Democracy reports that "Nearly eight years after the start of the global financial crisis, hedge funds and private equity firms have found yet another way to make big profits: distressed housing assets. Often, the very same corporate actors that precipitated the housing crash in the first place are buying and selling off delinquent mortgages and vacant houses that are a product of the crash. Together, these Wall Street entities have raised over $20 billion to buy the notes for as many as 200,000 homes in the United States. The newly consolidated single-family rental market is a lucrative business. A 2014 study estimated that the four largest holders of these assets have seen as much as a 23 percent rate of return on the properties they purchased in the last three years." (footnote omitted). *Do Hedge Funds Make Good Neighbors? How Fannie Mae, Freddie Mac & HUD are Selling Off Our Neighborhoods to Wall Street,* Center for Popular Democracy (June 2015)(available at https://populardemocracy.org/sites/default/files/Housing-report_web-final.pdf)(last visited 2/27/2017).

**B.  FACTS ABOUT NAMED PLAINTIFFS**

**i.  VIRGINIA BROWN**

75.  Brown purchased the Property on or about June 26, 2001 for her and her family. To acquire the Property she utilized a consumer, mortgage loan funded by U.S. Mortgage Finance Corporation and thereafter lived for a time in the Property with her family. Brown's loan was at the time insured by the FHA loan program in the United States Department of Housing and Urban Development ("HUD") along with no less than 100 other loans arranged by U.S. Mortgage Financial Corporation in 2001.

76.    Like many others, Brown sustained in the recent recession an unexpected reduction of income and fell behind on her mortgage loan subject to these proceedings. However, she applied for appropriate loss mitigation from Bank of America and started making payments to it again in good faith even during that process, payments that Bank of America accepted and retained. BANA acknowledged and accepted payments though it alleged Brown was in default from June 2013 through July 2014. Rushmore and BCAT 2014-4TT have represented to the state court, based upon their own records, that they believe, notwithstanding that Brown made some payments described herein, that "[t]he default for which the instant foreclosure action has been initiated occurred on June 1, 2010." *See* Plaintiffs' Affidavit of Default Pursuant to Md. Ann. Code, Real Prop., § 7-105.1. *See also* Plaintiffs' Affidavit of Notice of Intent to Foreclose ["NOITF"] Pursuant to Md. Ann. Code Real Prop., § 7-105.1 (testifying that the NOITF presented by the Court by the appointed substitute trustees from The Law Offices of Jeffrey Nadel to initiate this action "[was] accurate" at the time it was sent to Ms. Brown on "February 11, 2015"and the NOITF indicated the date of default to be "June 1, 2010").

77.    Sometime between November 10, 2014 and December 8, 2014, Bank of America, N.A. sold, transferred, and otherwise conveyed all interest in Brown's loan to HUD as part of HUD's Distress Asset Stabilization Program ("DASP"). As part of this transfer HUD paid a claim to Bank of America, NA on its false representation and warranty that the loan was not under consideration or otherwise eligible for FHA for loss mitigation. These representations and warranties by Bank of America were knowingly untrue because Bank of America had been in constant communication with Ms. Brown and her authorized representatives and she had applied for appropriate loss mitigation but Bank of America had not responded to her requests and all reasonable loss

mitigation options under the FHA program had not been exhausted. Further, Bank of America was also receiving and retaining regular payments from Brown in the months prior to the transfer.

78.     Certain of the FIN. INST. § 11-501(n)(2) mortgage servicing rights of Brown's mortgage loan also transferred to Rushmore from Bank of America on December 1, 2014.

79.     Thereafter, HUD sold the Brown loan, along with hundreds of similar federally regulated mortgage loans as defined by 12 C.F. R. § 1024.2, for a steep discount at a DASP sale to a captive affiliate of Angelo, Gordon & Co. ("Angelo, Gordon")—a Wall Street Hedge Fund which specializes in the acquisition of distressed and defaulted debts including DASP loans.  As part of Angelo, Gordon's strategy and business practice, a pool of distressed, defaulted consumer debts was then transferred from Angelo, Gordon's affiliate, GCAT Depositor 2014-4, LLC ("GCAT"), to BCAT 2014-4TT.  Brown's loan and members of the FDCPA Class and Subclass members were sold for pennies on the dollar of the alleged values owed and it was never disclosed by HUD to Brown that her rights under the FHA program would be taken away from her as described *supra* in the HUD Inspector General Report.  In further support of these allegations Brown identifies the following:

    a.  Through its investment portfolio and affiliates, Angelo, Gordon controls the day to day management of BCAT 2014-4TT.  BCAT 2014-4TT's named trustee action, WSFS, has <u>no</u> day-to-day management of any of the activities subject to this action.  Upon information and belief this conclusion will be further supported by BCAT 2014-4TT's governing instrument (which is not publicly available but will be discoverable).

    b.  According to published reports Angelo, Gordon, through GCAT, has acquired 7,478 loans from HUD's Distress Asset Stabilization Program ("DASP") as of June 2015.  *See Do Hedge Funds Make Good Neighbors?  How Fannie Mae, Freddie Mac & HUD are*

Selling Off our Neighborhoods to Wall Street, The Center for Popular Democracy (June 2015) (available at http://populardemocracy.org/sites/default/files/Housing-report_web-final.pdf). These loans were acquired for pennies on the dollar of the sums claimed due and owing by HUD.

c. According to published reports Angelo, Gordon, through another affiliated GCAT entity, has acquired 5,398 defaulted loans from Freddie Mac as of June 2015. *See* Do Hedge Funds Make Good Neighbors? (June 2015). These loans were also acquired for pennies on the dollar of the sums claimed due and owing by Freddie Mac.

80.     BCAT 2014-4TT retained Rushmore to act as one of its authorized. Fɪɴ. Iɴꜱᴛ. § 11-501(n)(2) mortgage servicer for Brown's loan. BCAT 2014-4TT also acted as an additional mortgage lender/servicer of Ms. Brown's loan on behalf of its investors. Fɪɴ. Iɴꜱᴛ. § 11-501(n)(1). BCAT 2014-4TT also stands in the shoes of its predecessor(s) in interest from whom it claims an assigned interest.

81.     On behalf of BCAT 2014-4TT, Rushmore has communicated with Brown for the purpose of attempting to collect upon Brown's consumer, mortgage loan subject to these proceedings. These communications including mailing monthly statements demanding sums which BCAT 2014-4TT is not legally entitled to collect as an unlicensed mortgage lender. These monthly mortgage statements sent by Rushmore to Brown (on various dates including June 1, 2015, July 1, 2015, August 1, 2015, September 1, 2015, October 1, 2015, November 1, 2015, December 1, 2015, and January 1, 2016) and commenced her prior claims in the Circuit Court for Baltimore County, provided Ms. Brown the address to which she could send it Qualified Written Requests, Requests for Information, and Notices of Error.

82.     BCAT 2014-4TT and Rushmore through their appointed agents from the Law Offices of Jeffrey Nadel, have knowingly and voluntarily maintained a foreclosure action against Ms. Brown without the without the legal right to do so since BCAT 2014-4TT is not licensed as either a mortgage lender as required under Maryland law.

83.     At the time BCAT 2014-4TT acquired the Brown loan on November 10, 2014 on behalf of its investors, both BCAT 2014-4TT and Rushmore believed Brown's consumer debt to be in default.  This belief was based upon Bank of America's and HUD's records related to the loan that were acquired by BCAT 2014-4TT and Rushmore at the time the loan was acquired which included the loan status and payment history.

84.     At the time Rushmore became the FIN. INST. § 11-501(n)(2) servicer for the Brown loan through the present, it has known that BCAT 2014-4TT is not licensed as a Maryland mortgage lender.  Despite this knowledge, Rushmore has continued to claim that it may lend its license to another even though the law does not permit it to do so.

85.     Despite its knowledge described *supra*, Rushmore falsely reported to various credit reporting agencies, in January 2015 and thereafter (including after November 10, 2014) that Brown owed it money on the loan and was past due on the loan (as described herein, however, neither Rushmore nor BCAT 2014-4TT may legally collect or attempt to collect directly or indirectly from Brown).  Further compounding its false reporting, Rushmore has reported the loan as in foreclosure status which was false and misleading since BCAT 2014-4TT has no legal right to pursue any judicial action in a Maryland court as an mortgage lender and by so acting it is committing crimes.

86.     Despite its knowledge described herein, sometime on or shortly before February 11, 2015, Rushmore, acting on behalf of BCAT 2014-4TT, retained the foreclosure law firm of the Law Offices of Jeffrey Nadel for the purpose collecting the mortgage debt from Brown.

87.	On June 4, 2015 Brown sent, by certified, prepaid U.S. Mail, to Rushmore a Request for Mortgage Assistance ("RMA") with all the documents Rushmore commonly requested for a complete loss mitigation application—included in this submission was (i) Leroy Culp's 2013-2015 Award Letter from the Social Security Administration ("SSA") and bank statements showing his SSA deposits and (ii) Brown's 2013-2014 SSA Award letters and bank statements showing Brown's SSA deposits.  Rushmore received the entire application on June 9, 2015.

88.	In response to Brown's June 4, 2015 Request for Mortgage Assistance, Rushmore sent Brown a letter dated June 12, 2015 asking for additional information from Brown by June 27, 2015.  Rushmore intended for Brown to rely upon this letter and all the representations made therein made the following specific requests:

```
   X Signed Federal tax return for the most recent calendar year
      including all schedules and W2s, 1099s, K-1s, 1120s, and/or 1065s.

 X Proof of funds for the down payment.

   Proof of Insurance.

 X RECENT 2MO. PAYSTUBS FROM CORNELL;PROOF OF 2MO. SSI DEPOSITS FROM VIRGINIA

 X RECENT SSI AWARD LETTER WITH 2MO. PROOF OF DEPOSITS FROM LEROY

 X RECENT 2MO. COMPLETE PAGES OF BANK STATEMENT(3102;7648;7206;3228)

 X PROOF OF PENSION DEPOSTS FOR APRIL'15 FROM VIRGINIA
```

89.	In reliance to Rushmore's letter dated June 12, 2015, Brown sent on June 26, 2015 to Rushmore, by fax transmission, all the relevant documents requested by Rushmore's letter dated June 12, 2015—included in this submission was Leroy Culp's 2015 Award Letter from the Social Security Administration and bank statements showing his SSA deposits as well as non-borrower, contributor Cornell Brown's 2015 SSA award letter.  Rushmore received the entire transmission. However, Rushmore never sent to Brown any written acknowledgement of this supplemental submission it had requested which it was required to do under federal law.

90.     On July 7, 2015, Rushmore sent Brown a letter which was backdated to July 2, 2015 and falsely claimed it "did not receive all the required information." Brown received this letter on July 10, 2015. Rushmore intended for Brown to rely upon this letter and all the representations made therein.

91.     On July 10, 2015 in reliance to Rushmore's backdated July 7, 2015 letter, Brown sent to Rushmore at the address it designated for such inquiries, a Qualified Written Request ("QWR")(also known as Notice of Error and a Request for Information). In this written communication Brown informed Rushmore:

   a. That she believed Rushmore had made an error in serving her loan as demonstrated by its backdated, false letter of July 2, 2015. Included in this correspondence, Brown included copies of her initial June 4, 2015 RMA (described *supra*) and the June 26, 2015 supplement (described *supra*), and the fax transmission page which demonstrated that Rushmore received the requested document it falsely claimed it did not receive.

   b. That it had failed to properly acknowledge her application within five days receipt as required under RESPA.

   c. That it had improperly not permitted her any right of appeal of its bogus decision based upon false and misleading statements.

   d. She requested if Rushmore has a normal pattern and practice, as part of its loan servicing, to backdate correspondence to borrowers like her.

   e. She further requested that Rushmore stop all negative credit reporting on her loan for a period of 60 days after it received the QWR.

92.     Rushmore received Brown's July 10, 2015 QWR on July 15, 2015.

93.     On July 30, 2015, Brown received, by two-day Fed-Ex delivery from Rushmore, a letter (backdated to July 16, 2015 but not actually sent until July 28, 2015) signed by J.L. DuVall (Rushmore's Compliance representative) acknowledging receipt of Brown's July 10, 2015 QWR. In this letter Rushmore promised Brown that it would respond to her July 10, 2015 QWR within "30 business days." Rushmore intended for Brown to rely upon this letter and all the representations made therein.

94.     Despite Rushmore's promise made in its backdated July 28, 2015 letter described in the previous paragraph, Rushmore never provided Brown a response to the QWR; now, more than 800 days since Ms. Brown initiated her prior claims in the state court, Rushmore has still knowingly failed to respond to this QWR despite its legal and duty to do so.

95.     Without even acknowledging Brown's complete application and supplement described *supra*, Rushmore sent Brown a standard, form letter dated August 19, 2015 which solicited Brown to submit another RMA to it. Rushmore had sent the same or similar letter to Brown in the past. In this correspondence, Rushmore represented to Brown the following:

```
HOW LONG WILL THE REVIEW PROCESS TAKE?
 * We will confirm receipt of your Borrower Assistance Application in
   writing within five (5) business days after receipt.

 * We will let you know if any information or documents are missing and
   how much time you have to provide the missing information to us.
 * We will evaluate you for all loss mitigation options available for
   your loan and circumstances once your Borrower Assistance Application
   is complete.
 * We will let you know in writing within 30 calendar days from the
   date your Borrower Assistance Application is complete, if any,
   options are available to you.
```

96.     Since Rushmore had not responded to her July 10, 2015 QWR and prior complete loss mitigation application despite its promise to do so—which Brown relied upon—Brown sent to Rushmore a second QWR at the address it designated for such inquiries on September 9, 2015.

Rushmore received this QWR on September 15, 2015. Brown included a complete copy of her July 10, 2015 QWR (described *supra*) in this second QWR. In this written communication Brown informed Rushmore:

  a. That it had not timely acknowledged her July 10, 2015 QWR (and she included another complete copy that QWR with this QWR as well).

  b. That it had not provided her with a response to July 10, 2015 QWR.

  c. She requested Rushmore to conduct a reasonable investigation and response to her July 10, 2015 QWR.

  d. She requested a statement of reasons from Rushmore if it believed it had not committed an error.

97. Rushmore never acknowledged or ever responded to Brown's September 9, 2015 QWR; now, more than 800 days later, Rushmore has still knowingly failed to respond to this QWR despite its had a mandatory duty to do so.

98. Rushmore sent Brown a form letter, it uses on a regular basis, dated September 14, 2015 in which it knowingly made a false representation to her that it had not received "the requested documentation from you" related to Brown's application for loss mitigation. The letter was unfair and deceptive because Brown had sent all documents that Rushmore had ever required and requested that were relevant to her situation. Further, Rushmore's letter was unfair and deceptive because it did not even identify what purported documents/information it sought it did not receive. Rushmore intended for Brown to rely upon this false letter.

99. Even though Brown had sent Rushmore a completed RMA and application for loss mitigation and two prior QWRs with complete copies of the same application and papers, including the Brown's September 9, 2015 QWR, Rushmore proceeded on September 29, 2015 to appoint,

on behalf of BCAT 2014-4TT, Jeffrey Nadel, Scott Nadel, Daniel Menchel, and John-Paul Douglasto proceed with foreclosure against Brown and Property.

100. On October 22, 2015, Rushmore solicited Brown to apply again for loss mitigation. Rushmore intended for Brown to rely upon its invitation.

101. Still trying in good faith and in reliance to Rushmore's promises and invitations, Brown submitted a second, complete RMA to Rushmore by fax transmission on October 23, 2015. Rushmore received the request—included in this submission was (i) Leroy Culp's 2015 Award Letter from the Social Security Administration ('SSA") and bank statements showing his SSA deposits and (ii) Brown's 2015 SSA Award letter and bank statements showing Brown's SSA deposits.

102. In an undated letter (which also did not include a 1st page, or Brown's loan number identification) sent by Rushmore to Brown with the intent that she rely upon it sometime before October 30, 2015, Rushmore requested that Brown send it additional documents.

103. In reliance to Rushmore's undated request sent sometime before October 30, 2015, Brown sent to Rushmore by fax transmission all of the additional documents it requested that were available and relevant to her application and circumstances on November 9, 2015—included in this submission was Leroy Culp's bank statements showing his SSA deposits. She also made an inquiry in her response to which Rushmore has not responded; now, nearly three years days since the foreclosure action in the state court commenced, Rushmore has still knowingly failed to respond to this application to which it had a mandatory duty to do so.

104. Even though it knew Brown had submitted a complete RMA to it and resubmitted the same RMA in two different QWRs to which she received no response and had also recently submitted a second complete RMA to which it had requested additional information, Rushmore's appointed

agents/substitute trustees commenced a foreclosure action in the Circuit Court for Baltimore County on November 6, 2015, on behalf of Rushmore and BCAT 2014-4TT. Rushmore and BCAT 2014-4TT specifically authorized this filing even though (i) Rushmore had never responded to Brown's RMAs which were otherwise still pending; and (ii) BCAT 2014-4TT is not permitted to collect indirectly in the State of Maryland as an unlicensed mortgage lender and Rushmore is not permitted loan its license to another, including BCAT 2014-4TT, who is otherwise required to be licensed. Rushmore and BCAT 2014-4TT have continue to maintain the foreclosure action without the right to do so for nearly three years, while knowing (i) BCAT 2014-4TT had no legal right to do so indirectly through any other person and (ii) Rushmore had no right to do so since Ms. Brown's completed loss mitigation application has never been reviewed by it as required under federal law.

105.    In support of its foreclosure action to collect from Brown on behalf of BCAT 2014-4TT, Rushmore's authorized representative(s) executed an (i) Affidavit of Default Pursuant to MD. ANN. CODE REAL PROP., § 7-105.1; (ii) Affidavit of Debt; (iii) Affidavit in Compliance with § 521 of the Service Members Civil Relief Act 50 U.S.C. APP. § 501 et seq.; (iv) Affidavit Certifying Ownership of Debt Instrument Pursuant to MD. ANN. CODE, REAL PROP., § 7-105.1(e)(2)(iii); and (v) Preliminary Loss Mitigation Affidavit.

106.    Rushmore omitted from these affidavits and papers (described in the preceding paragraph) any disclosure to Brown or the state court that BCAT 2014-4TT was not licensed by the State of Maryland whatsoever. Further, in each of these affidavits and papers, Rushmore sought to aid BCAT 2014-4TT to collect from Brown indirectly even though it knew (i) the subject debt was a consumer debt, (ii) that BCAT 2014-4TT acquired the debt while it was in default, and (iii) BCAT

2014-4TT was unlicensed as a mortgage lender and had no right to collect in the State of Maryland without a required license and was not otherwise exempt from being licensed.

107.    Further demonstrating BCAT 2014-4TT's and Rushmore's pattern of illegal conduct is their imposition onto Ms. Brown's mortgage account of certain property inspection fees which are expressly barred as a matter of Maryland law (*see e.g. Taylor v. Friedman*, 344 Md. 572, 583 (1997) and COM. LAW § 12-121) and the knowing and willful assessment of inspection fees onto a mortgage account is a crime (COM. LAW § 12-122). Specifically, in Affidavit of Debt filed in the state court Rushmore on BCAT 2014-4TT's behalf and with BCAT 2014-4TT's consent swore under penalties to the state court that Ms. Brown owes BCAT 2014-4TT the sum of $255.00 in property preservation fees when it has no legal right to make that claim. *Taylor*, 344 Md. at 583 and COM. LAW § 12-121.

108.    The Law Offices of Jeffrey Nadel sent Brown a letter dated November 5, 2015 on behalf and with the authority of Rushmore and BCAT 2014-4TT which stated that "[a] foreclosure sale of the property may occur at any time after 45 days from the date of this notice." This is an untrue statement since no foreclosure sale of the property could legally occur until Brown's loss mitigation application is acted upon and, if denied, not until her period of appeal of Rushmore's negative decision is made. Now, almost three years later Rushmore still has not acted on Ms. Brown's complete, loss mitigation application.

109.    In reliance to Rushmore's and BCAT 2014-4TT's representations to her, Ms. Brown also made payments to Rushmore acting on behalf of BCAT 2014-4TT. Rushmore disclosed to Brown less than three years before the commencement of this action that had applied these payments to interest and fees claimed due from Ms. Brown that it is not entitled to retain because of its

unlicensed activities. Unlicensed professionals are not permitted to profit off their illegal activities under Maryland law.

110. In support of is foreclosure action, Rushmore's Senior Vice President Kevin Elliott also provided the state court a knowingly false Preliminary Loss Mitigation Affidavit. This testimony falsely stated "under penalties of perjury and upon personal knowledge" the following:

> ☒ The secured party or a representative of the secured party has not been able to obtain all documentation and information necessary to conduct the loss mitigation analysis.
>
> Required additional documentation to complete loss mitigation analysis [list documents required]: _Needs full package prior Modification was unable to be reviewed because missing 2015 Award letter because the deposits were different than 2014 letter_

111. The proceeding statement was knowingly false because in fact Brown had previously submitted her 2015 Award Letter to Rushmore. Specifically, Brown's 2015 award letter was included in (i) Brown's RMA and loss mitigation application received by Rushmore on June 9, 2015, (ii) Brown's July 10, 2015 QWR received by Rushmore on July 15, 2015, and (iii) Brown's September 9, 2015 QWR received by Rushmore on September 15, 2015.

112. Even though Ms. Brown notified Rushmore and BCAT 2014-4TT through her original counter complaint in the Circuit Court foreclosure action that Mr. Elliott's affidavit described *supra* was false nearly three years days ago, neither Rushmore nor BCAT 2014-4TT and have taken any steps to correct the false testimony and they have instead elected to maintain the foreclosure action based upon sworn testimony they know is false.

113. Brown has sustained continuing damages and losses as follows as a direct and proximate result of the illegal, unfair, and deceptive practices of Rushmore and BCAT 2014-4TT described herein:

a.     Economic damages incurred by Brown in the form of costs of time incurred to communicate with Rushmore—efforts which Rushmore has simply ignored despite its duties to the contrary, improper late fees, and foreclosure costs and interest added to Brown's account which BCAT 2014-4TT is not legally entitled to collect (as an unlicensed mortgage lender).   The improper foreclosure and other costs added to Brown's loan by Rushmore arise from both (i) unlicensed status of BCAT 2014-4TT and (ii) Rushmore's improper commencement of this action while Brown's completed applications for loss mitigation were pending and before her right to appeal any denial of those loss mitigation applications had expired.

b.     Economic damages incurred by Brown in the form of costs to transmit information to Rushmore, acting on behalf of BCAT 2014-4TT, related to her QWRs and loss mitigation applications which Rushmore has largely disregarded as described herein. These sums equal a sum of approximately $50.00.

c.     Non-Economic damages related to emotional damages sustained by Brown related to Rushmore's (FIN. INST. § 11-501(n)(2)) and BCAT 2014-4TT's (FIN. INST. § 11-501(n)(1)) botched servicing and collection of her loan manifested by fear, anxiety, anger, embarrassment, stress, worry, and sleeping issues.   More specifically, Brown's physical manifestations described herein arise from the illegal activities of the Rushmore and BCAT 2014-4TT alleged herein who have disregarded their duties and responsibilities to Brown under federal and state law and now proceeded against her and her Property without the right to do so.   She fears the appointed agents including Jeffrey Nadel, at the request of Rushmore and BCAT 2014-4TT, will wrongfully take her home and continue to ignore her valid QWRs and valid requests for loss mitigation.   The worry, embarrassment, and anxiety

also exasperates and negatively impacts Brown's sleeping and angers her that Rushmore and BCAT 2014-4TT would act against her and others in violation of the laws governing their activities. She does not wish for anyone else to have to suffer from the illegal activities of Rushmore and BCAT 2014-4TT as well. Ms. Brown's friends and family, including her son Cornell Brown who lives with her, are available to testify on her behalf and provide the Court and Jury with objective facts in support of Ms. Brown's non-economic damages and losses claimed herein.

114.    Ms. Brown is also entitled to statutory damages under the FDCPA and RESPA.

115.    Ms. Brown's damages and losses asserted herein accrued within three years of the commencement of her original pleading in the Circuit Court and continued thereafter during the last three years before the commencement of this action. Had Rushmore and BCAT 2014-4TT taken any action to respond to Ms. Brown's requests and reviewed her facially complete loss mitigation applications and otherwise even dismissed the illegal, unfair and deceptive foreclosure action, Rushmore and BCAT 2014-4TT could have mitigated certain of the damages. Instead Rushmore and BCAT 2014-4TT elected to maintain the threat of foreclosure without the right to do so, to demand sums they are not entitled to collect, and simply ignored Ms. Brown's loss mitigation applications which have been pending for nearly three years.

116.    Ms. Brown is also entitled to restitution damages and losses from BCAT 2014-4TT since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit BCAT 2014-4TT to retain profits from its illegal activity.

### ii.    OM SHARMA

117.    On June 29 2007, Dr. Sharma acquired his home and property commonly known as 5807 Marietta Station Drive in Glenn Dale, Maryland 20769 ("Sharma Property').

118.    Thereafter, he was able to refinance the original loan he had obtained into an FHA insured mortgage ("Sharma Loan") on or about January 5, 2010. At that time Dr. Sharma resided in the Sharma Property with his family and the Sharma Loan was utilized for personal, consumer purposes.

119.    Due to the downturn of the economy and a reduction of household income, Dr. Sharma, like thousands of other Maryland residents, fell behind on the Sharma Loan and it became in default. At that time Bank of America, NA ("BANA"), as the successor by merger to BAC Home Loans Servicing, LP, had acquired ownership of the loan.

120.    Even though Dr. Sharma had not exhausted his FHA loss mitigation options under the FHA Program, BANA sold the Sharma Loan to HUD through its DASP Program and made a claim to be paid by the HUD under the FHA insurance. As a result of BANA's claims to HUD, the Sharma Loan was assigned to HUD by BANA on or about January 29, 2015 together with "all beneficial interest" under the related Deed of Trust. That assignment is recorded in the land records for Prince George's County (Book 37360, Page 440). At this time both BANA and HUD believed the Sharma Loan to be in default.

121.    HUD pooled the Sharma Loan together with other DASP loans and sold them to an affiliate of RMC who thereafter transferred the Sharma Loan to BCAT 2014-4TT on or about July 21, 2015 as evidenced by the land records for Prince George's County (Book 37360, Page 443). As part of the transfer, HUD improperly stripped the Sharma Loan of any FHA benefits without notice to Dr. Sharma in violation of the Administrative Procedures Act as determined by HUD's Inspector General (and discussed *supra*). At this time both Rushmore and BCAT 2014-4TT believed the Sharma Loan to be in default.

122.     BCAT 2014-4TT, through its affiliates and predecessors, acquired the Sharma Loan for pennies on the dollar of what Rushmore claimed was due and owing on the loan.  Typically, such transactions were sold for less than half of the sums claimed due and HUD discounted the sales to BCAT 2014-4TT's predecessors with the expectation that they would reduce borrower's loan balances—something BCAT 2014-4TT has not done.

123.     After its acquisition of the Sharma Loan, Rushmore threatened Dr. Sharma, on a monthly and sometimes weekly basis, with foreclosure and other debt collection activities on behalf of BCAT 2014-4TT even through Rushmore knew BCAT 2014-4TT was acting illegally in the State of Maryland as an unlicensed mortgage lender.  In each of these regular and monthly threats, Rushmore concealed from Dr. Sharma that it had no right to collect from Dr. Sharma or even to threaten to collect from him on behalf of BCAT 2014-4TT.

124.     On January 27, 2015 Rushmore represented to Dr. Sharma in written correspondence asserting that Dr. Sharma owed the following sums on the Sharma Loan:

**Summary of Total Debt Composition:**

Loan Balance, Interest, Escrow and Other Debt:

| | |
|---|---|
| Current Principal Balance: | $667,522.15 |
| Current Unpaid Accrued Interest | $129,770.57 |
| Escrow Balance: | $0.00 |
| Late Charges: | $1,107.06 |
| NSF Charges: | $0.00 |
| Other Charges: | $48,305.16 |
| Partial Payments Not Yet Applied: | $0.00 |
| **Total Amount of Your Debt:** | **$846,704.94** |

125.     On May 5, 2016, Rushmore, as the Sharma Loan's FIN. INST. § 11-501(n)(2) servicer, offered Dr. Sharma a trial modification on behalf of BCAT 2014-4TT which was conditioned on its demand for a substantial down-payment of $50,000.  In this offer, Rushmore still concealed from Dr. Sharma that it knew BCAT 2014-4TT's collection practices on behalf of its investors in

Maryland were still illegal because it was unlicensed as a mortgage lender. In the proposed trial plan Rushmore falsely represented the following:

Whereas, Servicer is authorized on behalf of the owner and holder of said Promissory Note to enforce the terms of the Loan Documents and agree to this Agreement;

Whereas, Borrower(s) are in default in the payment of monthly installments of principal, interest, escrow and/or other payments called for under the Loan Documents and when payments due under this agreement resume on June 1, 2015, the loan will be due for payments and additional expenses authorized under the Loan Documents totaling $253,356.56 below as set forth below:

| | | |
|---|---|---|
| 1. | Unpaid monthly payments from April 1, 2011 through May 1, 2015 | $252,249.50 |
| 2. | Late Charges: | $1,107.06 |
| 3. | NSF Charges: | $0.00 |
| 4. | Negative Escrow Balance after payments applied: | $0.00 |
| 5. | Foreclosure Legal Fees: | $0.00 |
| 6. | Other Legal Fees: | $0.00 |
| 7. | Corporate Advances: | $0.00 |
| 8. | Costs and Advances (inspections, etc.): | $0.00 |
| 9. | Credit (suspense/partial payment) Balance: | $0.00 |
| | **TOTAL PLAN ARREARS** | **$253,356.56** |

Borrower's non-default regular monthly payments of principal and interest plus escrow for taxes and insurance for the period of the Trial Modification Agreement will become due. Regular payments from June 1, 2015 through November 1, 2015 totaling $30,269.94 will become due during the term of this Agreement and are not accounted for in the schedule of arrearage items outlined above.

And

Whereas, Servicer has the right to commence or continue foreclosure proceedings to foreclose on the Property which serves as security for the Loan Documents; and

126. Rushmore's representations that it was entitled to enforce the Sharma Loan on behalf of BCAT 2014-4TT, collect interest, late fees, illegal property inspection fees, and costs in excess of the principal portion on the Sharma Loan (which all constitute profits), and had the right to commence foreclosure proceedings were all false since, as a matter of Maryland law, BCAT 2014-4TT had none of these rights directly or indirectly and it certainly was not entitled to profit off its illegal activities. At best it was only permitted to collect the principal portion of the Sharma payments that were due on the Sharma Loan and no other sums (*see* ¶ 4 *supra*).

127. In reliance on Rushmore's demands described in the prior paragraph and without any knowledge of BCAT 2014-4TT's illegal activities, Dr. Sharma timely paid Rushmore the sum of $50,000 in the form of two cashier's checks in the sum of $25,000 each (check numbers 6708600632 and 9101349441) which it received for its benefit and the benefit of BCAT 2014-4TT.

128. Dr. Sharma successfully completed the proposed Trial Modification Agreement by paying additional sums to Rushmore on behalf of BCAT 2014-4TT through November 2015. During this entire time Rushmore continued to conceal from Dr. Sharma that BCAT 2014-4TT was (i) acting illegally as an unlicensed mortgage lender and was not able to collect from him directly or indirectly through Rushmore and (ii) certainly was not permitted to profit off its illegal activities.

129. All of Dr. Sharma's payments to Rushmore on behalf of BCAT 2014-4TT should have had the payments applied to the principal portion of his loan actually due. Instead, Rushmore applied the payments to the profits it claimed due for BCAT 2014-4TT but BCAT 2014-4TT is not permitted to profit off its illegal activities.

130. On December 4, 2015 and January 14, 2016, Rushmore sent Dr. Sharma with the proposed final modification of the Sharma Loan but in presenting the papers Rushmore made several, knowingly false representations that it intended for Dr. Sharma to rely upon including:

   a. Rushmore claimed that Dr. Sharma's loss mitigation representative had discussions with Dr. Sharma about the terms and conditions of the final, proposed modification and had come agreement about those but in fact no such discussions and never came to such agreement.

   b. The Trial Modification Offer did not identify that the modification Rushmore intended to offer would convert the loan to an adjustable rate mortgage but in fact

that is what the final proposed modification did after Rushmore and BCAT 2014-4TT had extracted large sums from Dr. Sharma.

131.    On March 26, 2016, Rushmore wrote to Dr. Sharma and represented the following:

> The purpose of this correspondence is to discuss your mortgage loan for the property listed above. It is our understanding that your financial situation has changed. As your Mortgage Servicer, Rushmore Loan Management Services is focused on customizing alternatives to foreclosure for each customer's individual circumstances.
>
> IMPORTANT: AS OF THE DATE OF THIS NOTICE, OUR RECORDS SHOW THAT THE ABOVE REFERENCED MORTGAGE LOAN IS DELINQUENT. IF THIS MORTGAGE LOAN HAS BEEN PAID AND BROUGHT CURRENT SINCE THE DATE OF THIS NOTICE, PLEASE DISREGARD THIS LETTER.
>
> Pursuant to the terms of the referenced Security Instrument along with all riders thereto, you are hereby served notice of the following:
>
> (a)  Your Note and Security Instrument are presently in DEFAULT due to non-payment of the installment, which was due on 07-01-12 and any other installments, costs, or fees due.
>
> (b)  The total amount currently due is:$ 216,305.96
>        Total Net Amount Due: $ 228,131.61
>        Less Unapplied Balance: ($ 11,825.65 )
>
> (c)  You must now pay all past due payments, including any other installments, fees, charges, or other expenses that are due or become due at the time you cure this default. To cure this default, you must remit the TOTAL AMOUNT necessary to cure the default.

132.    In the sums claimed due by Rushmore on behalf of BCAT 2014-4TT in the preceding paragraph, a majority of the sums claimed due were for interest, fees, and costs which amount to profits claimed by BCAT 2014-4TT on the loan but it is not entitled to collect as an unlicensed mortgage lender (*see* ¶ 4 *supra*).

133.    In light of the inconsistent statements and misrepresentations identified by Dr. Sharma about the Trial Payment Plan and the proposed Final Modification from Rushmore, he sustained significant frustration, anxiety and other distress including cardiac irregularities, and increased depression and problems managing his diabetes.

134.    Dr. Sharma also sought the assistance of a non-profit housing counseling agency, (i.e. the Kairos Development Corporation and Harold Davis) engaged by the State of Maryland to help homeowners like Dr. Sharma, who also communicated with Rushmore about the proposed modification and also found the terms and conditions of Rushmore's take it or leave it options to be unconscionable.

135.    Finally, fearing he had no other options in light of Rushmore's escalating threats of foreclosure and because Rushmore knowingly concealed from him the true facts that it had no right to threaten him on behalf of BCAT 2014-4TT, Dr. Sharma agreed to the misleading modification terms offered by Rushmore and returned the modification to it on or about April 28, 2016.

136.    The take it or leave and unconscionable mortgage modification terms, offered by Rushmore on behalf of BCAT 2014-4TT to Dr. Sharma, were inconsistent with the loss mitigation offered through the FHA program.  As the downstream assignee of HUD, BCAT 2014-4TT had no right to not honor the FHA loss mitigation programs available to borrowers like Dr. Sharma when neither he, nor any other borrower were ever given notice that their rights would be terminated through HUD's DASP program and as the HUD IG found the DASP program failed to materially comply with the Administrative Procedures Act.

137.    On June 13, 2016, Rushmore wrote to Dr. Sharma and informed him that the FIN. INST. § 11-501(n)(2) servicing the Sharma Loan would transfer from it to Shellpoint Mortgage Servicing effective July 1, 2016.  BCAT 2014-4TT remained the owner and the FIN. INST. § 11-501(n)(1) servicer of his loan on behalf of its investors.

138.    All sums paid by Dr. Sharma to Rushmore on behalf BCAT 2014-4TT were not applied by Rushmore correctly since BCAT 2014-4TT is not entitled to profit from its illegal activities in

the State of Maryland. The entirety of the payments should have been applied to principal portion of Dr. Sharma's loan balance and any taxes or insurance actually paid by BCAT 2014-4TT on Dr. Sharma's behalf. This misapplication of Dr. Sharma's payments by Rushmore to categories of alleged costs and interest amounts to illegal profits to BCAT 2014-4TT which it should be ordered to disgorge—to suggest otherwise would be to permit an unlicensed professional to profit from its illegal activities.

139.    Dr. Sharma's misdirected payments are a liquidated sum that can be identified from Rushmore's electronic business records.

140.    On August 21, 2017 Rushmore wrote to Dr. Sharma and confirmed to him that BCAT 2014-4TT remained the owner of his loan. Rushmore's correspondence continued to conceal from Dr. Sharma that Rushmore knew BCAT 2014-4TT was acting as an unlicensed mortgage lender without the right to do so.

141.    Dr. Sharma has sustained continuing damages and losses as follows as a direct and proximate result of the illegal, unfair, and deceptive practices of Rushmore and BCAT 2014-4TT described herein:

    a.    Economic damages incurred by Dr. Sharma in the form of costs of time incurred to communicate with Rushmore which Rushmore has simply ignored despite its duties to the contrary, improper late fees, property preservations fees, and foreclosure costs and interest added to Dr. Sharma's account which BCAT 2014-4TT is not legally entitled to collect (as an unlicensed mortgage lender). The other improper costs added to Dr. Sharma's loan by Rushmore arise from the unlicensed status of BCAT 2014-4TT and its illegal profits acquired in misapplication of his payments to BCAT 2014-4TT's profits to interest, costs, and fees it is not entitled to collect as an unlicensed mortgage lender.

b. Non-Economic damages related to emotional damages sustained by Dr. Sharma related to Rushmore's and BCAT 2014-4TT's botched servicing and collection of his loan manifested by fear, anxiety, anger, stress, worry, increased depression, and increased complications to his cardiac system. More specifically, Dr. Sharma's physical manifestations described herein arise from the illegal activities of the Rushmore and BCAT 2014-4TT alleged herein who have disregarded their duties and responsibilities to Dr. Sharma under federal and state law.

142. Dr. Sharma is also entitled to statutory damages under the FDCPA.

143. Dr. Sharma's damages and losses asserted herein accrued within three years of the commencement of this action and were otherwise tolled by Ms. Brown's prior action in the Circuit Court for Baltimore County which was never acted upon by that Court and dismissed without prejudice so that this action could proceed.

144. Dr. Sharma is also entitled to restitution damages and losses from BCAT 2014-4TT since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit BCAT 2014-4TT to retain profits from its illegal activity.

### iii. VAUGHN & DIANE RIFFE

145. On January 5, 2010 Mr. & Mrs. Riffe refinanced their prior mortgage loan on the Riffe Property into a FHA insured mortgage ("Riffe Loan"). At that time Mr. & Mrs. Riffe resided in the Riffe Property with their family and the Riffe Loan was utilized for personal, consumer purposes.

146. Due to the downturn of the economy and a reduction of household income, Mr. & Mrs. Riffe, like thousands of other Maryland residents, fell behind on the Riffe Loan and it became in default. At that time Bank of America, NA ("BANA") as the successor by merger to BAC Home Loans Servicing, LP had acquired ownership of the loan.

147.   Even though Mr. & Mrs. Riffe had not exhausted their FHA loss mitigation options under the FHA Program, BANA sold the Riffe Loan to HUD through its DASP Program and made a claim to be paid by the HUD under the FHA insurance.  As a result of BANA's claims to HUD, the Riffe Loan was assigned to HUD by BANA on or about January 29, 2015 together with "all beneficial interest" under the related Deed of Trust.  That assignment is recorded in the land records for Prince George's County (Book 37360, Page 419).  At this time both BANA and HUD believed the Riffe Loan to be in default.

148.   HUD pooled the Riffe Loan together with other DASP loans and sold them to an affiliates of RMC who thereafter transferred the Riffe Loan to BCAT 2014-4TT on or about July 20, 2015 and evidenced in the land records for Prince George's County (Book 37360, Page 423).  At this time both Rushmore and BCAT 2014-4TT believed the Riffe Loan to be in default.

149.   BCAT 2014-4TT, through its affiliates, acquired the Riffe Loan for pennies on the dollar of what Rushmore claimed was due and owing on the loan as the Fin. Inst. § 11-501(n)(2) servicer of the Riffe Loan.  Typically, such transactions were sold for less than half of the sums claimed due and HUD discounted the sales with the expectation that BCAT 2014-4TT's predecessors would reduce borrower's loan balances.

150.   Thereafter its acquisition of the Riffe Loan on a monthly and sometimes weekly basis, Rushmore threatened Mr. & Mrs. Riffe with foreclosure and other debt collection activities on behalf of BCAT 2014-4TT even through Rushmore knew BCAT 2014-4TT was acting illegally in the State of Maryland as an unlicensed mortgage lender.  In each of these regular and monthly threats, Rushmore concealed from Mr. & Mrs. Riffe that it did not have any right to collect from them or even to threaten to collect from them on behalf of BCAT 2014-4TT.

151.    Apparently, as part of its illegal and otherwise improper practices on behalf of BCAT 2014-4TT, Rushmore engaged the BWW Law Group LLC to assist its collection practices and commence a foreclosure against Mr. & Mrs. Riffe and the Riffe Property sometime around March 2015 which resulted in costs of over $1,000 to be assessed against Mr. & Mrs. Riffe's mortgage account within three years of the commencement of this action.  These were unjustified costs since no foreclosure action ever occurred and upon information and belief no work was actually performed by the BWW Law Group since what it does as a normal practice of its collections business is to record Deeds of Appointment and commence foreclosure proceedings—neither of which ever occurred.

152.    In addition to the improper assessment of foreclosure costs not actually incurred by Rushmore on behalf of BCAT 2014-4TT, Rushmore also improperly assessed other costs to Mr. & Mrs. Riffe's mortgage account which was improper under Maryland law.  These included the assessment of property inspection fees on multiple dates (i.e, 6/23/2016, 6/14/2016, 2/24/2016, 1, 25, 2016, 12/30/2015, 11/25/2015, 10/27/2015, 10/23/2015, 9/25/2015, 8/25/2015, 7/23/2015, 6/23/2015, 5/28/2015, 5/21/2015, 4/29/2015, and 4/1/2015) which are expressly prohibited under Maryland law and Rushmore's licensing agency has instructed it that is may not assess.  COM. LAW § 12-121(b). *See also Taylor*, 344 Md. 572, 584 (1997)("For the foregoing reasons we conclude that the legislative history does not so clearly demonstrate a purpose to limit the prohibition of § 12–121 to closing costs as to override the plain language of the statute").  *See also* Office of the Commissioner of Financial Regulation Advisory Notice (January 7, 2014)(available at https://www.dllr.state.md.us/finance/advisories/advisory-nonjudicialevictions.pdf).

153.     Rushmore did not disclose to Mr. & Mrs. Riffe that it was assessing the illegal property, inspection fees against their account.  They only learned about the assessments from their current FIN. INST. § 11-501(n)(2) mortgage servicer in January 2018.

154.     Rushmore, also on behalf of BCAT 2014-4TT as the FIN. INST. § 11-501(n)(2) mortgage servicer of the Riffe Loan, charged the mortgage account of Mr. and Mrs. Riffe with monthly late fees (from April 2015 through at least January 2016) even through the Riffe Loan had been accelerated by BCAT 2014-4TT's predecessor which prohibited Rushmore from churning late fees month after month since the whole loan had been called due.

155.     On or about October 10, 2015, Rushmore offered Mr. & Mrs. Riffe a trial modification on behalf of BCAT 2014-4TT which was conditioned on its demand for a substantial down-payment of $4,040.  In this offer, Rushmore still concealed from Mr. & Mrs. Riffe that it knew BCAT 2014-4TT's collection practices in Maryland were still illegal because it was unlicensed as a mortgage lender.

156.     Rushmore's representations that it was entitled to enforce the Riffe Loan on behalf of BCAT 2014-4TT, collect interest, late fees, and costs in excess of the principal portion on the Riffe Loan (which all constitute profits), and had the right to commence foreclosure proceedings were all false since as a matter of Maryland law, BCAT 2014-4TT had none of these rights directly or indirectly and it certainly was not entitled to profit off its illegal activities.  At best he was only permitted to collect the principal portion of the Riffe payments that were due on the Riffe Loan and no other sums (*see* ¶ 4 *supra*).

157.     In reliance to Rushmore's demands described in the prior paragraph and without any knowledge of BCAT 2014-4TT's illegal activities, Mr. & Mrs. Riffe timely paid Rushmore the

sum of $4,040 which it received for its benefit and the benefit of BCAT 2014-4TT acting on behalf of its investors on or about October 23, 2015.

158.    Mr. & Mrs. Riffe successfully completed the proposed Trial Modification Agreement by paying additional sums to Rushmore on behalf of BCAT 2014-4TT through April 2016.   During this entire time Rushmore continued to conceal from Mr. & Mrs. Riffe that BCAT 2014-4TT was (i) acting illegally as an unlicensed mortgage lender and was not able to collect from them directly or indirectly through Rushmore and (ii) certainly was not permitted to profit off its illegal activities.

159.    All of Mr. & Mrs. Riffe's payments to Rushmore on behalf of BCAT 2014-4TT should have had the payments applied to the principal portion of their loan actually due (*see* ¶ 4 *supra*). Instead, Rushmore applied the payments to the profits it claimed due for BCAT 2014-4TT but BCAT 2014-4TT is not permitted to profit off its illegal activities as an unlicensed mortgage lender.

160.    On May 17, 2016 Rushmore as the Fin. Inst. § 11-501(n)(2) servicer for the Riffe Loan sent Mr. & Mrs. Riffe a proposed final modification of the Riffe Loan but in presenting the papers Rushmore made several, knowingly false representations that it intended for Mr. & Mrs. Riffe to rely upon including:

> a.  Rushmore claimed that Mr. & Mrs. Riffe's loss mitigation representative had discussions with Mr. & Mrs. Riffe about the terms and conditions of the final, proposed modification and had come agreement about those but in fact no such discussions and never came to such agreement.
>
> b.  The Trial Modification Offer did not identify that the modification Rushmore intended to offer would convert the loan to an adjustable rate mortgage but in fact

that is what the final proposed modification did after Rushmore and BCAT 2014-4TT had extracted large sums from Mr. & Mrs. Riffe.

161. In the sums claimed due by Rushmore on behalf of BCAT 2014-4TT in the proposed Loan Modification Agreement, a majority of the sums claimed due were for interest, fees, and costs which amount to profits claimed by BCAT 2014-4TT on the loan but it is not entitled to collect as an unlicensed mortgage lender (*see* ¶ 4 *supra*).

162. In addition, the loan modification terms presented by Rushmore which were not subject to negotiation based on Rushmore's practices, called for the modification to have a significantly increased interest rate and the Riffe Loan's maturity date was extended to 2047.

163. Finally, fearing they had no other options in light of Rushmore's escalating threats of foreclosure and because Rushmore knowingly concealed from them the true facts that it had no right to threaten him on behalf of BCAT 2014-4TT, Mr. & Mrs. Riffe agreed to the misleading modification terms offered by Rushmore and returned the modification to it on or about May 25, 2016.

164. The take it or leave and unconscionable mortgage modification terms offered by Rushmore on behalf of BCAT 2014-4TT to Mr. & Mrs. Riffe were inconsistent with the loss mitigation offered through the FHA program.  As the assignee of HUD, BCAT 2014-4TT had no right to not honor the FHA loss mitigation programs available to borrowers like Mr. & Mrs. Riffe when neither they, nor any other borrower were ever given notice that their rights would be terminated through HUD's DASP program and as the HUD IG found the DASP program failed to materially comply with the Administrative Procedures Act.

165. On or about June 13, 2016 Rushmore wrote to Mr. & Mrs. Riffe informed them that the FIN. INST. § 11-501(n)(2) servicing the Riffe Loan would transfer from it to Shellpoint Mortgage

Servicing effective July 1, 2016. BCAT 2014-4TT remained the owner and the Fin. Inst. § 11-501(n)(1) servicer of the Riffe Loan on behalf of its investors.

166. All sums paid by Mr. & Mrs. Riffe to Rushmore on behalf BCAT 2014-4TT were not applied by Rushmore correctly since BCAT 2014-4TT is not entitled to profit from its illegal activities in the State of Maryland. The entirety of the payments should have been applied to principal portion of Mr. & Mrs. Riffe's loan balance and any taxes or insurance actually paid by BCAT 2014-4TT on Mr. & Mrs. Riffe's behalf. This misapplication of Mr. & Mrs. Riffe's payments by Rushmore to categories of alleged costs and interest amounts to illegal profits to BCAT 2014-4TT which it should be ordered to disgorge—to suggest otherwise would be to permit an unlicensed professional to profit from its illegal activities.

167. Mr. & Mrs. Riffe's misdirected payments are a liquidated sum that can be identified from Rushmore's electronic business records.

168. On January 25, 2018 Shellpoint wrote to Mr. & Mrs. Riffe and confirmed to them that BCAT 2014-4TT remained the owner and the Fin. Inst. § 11-501(n)(1) servicer of their loan on behalf of its investors.

169. Mr. & Mrs. Riffe have sustained continuing damages and losses as follows as a direct and proximate result of the illegal, unfair, and deceptive practices of Rushmore and BCAT 2014-4TT described herein:

      c.     Economic damages incurred by Mr. & Mrs. Riffe in the form of costs of time incurred to communicate with Rushmore which Rushmore has simply ignored despite its duties to the contrary, improper late and inspection fees and foreclosure costs and interest added to Mr. & Mrs. Riffe's account which BCAT 2014-4TT is not legally entitled to collect (as an unlicensed mortgage lender). The other improper costs added to Mr. &

Mrs. Riffe's loan by Rushmore arise from the unlicensed status of BCAT 2014-4TT and its illegal profits acquired in misapplication of his payments to BCAT 2014-4TT's profits to interest, costs, and fees it is not entitled to collect as an unlicensed mortgage lender.

170.    Mr. & Mrs. Riffe are also entitled to statutory damages under the FDCPA.

171.    Mr. & Mrs. Riffe's damages and losses asserted herein accrued within three years of the commencement of this action and were otherwise tolled by Ms. Brown's prior action in the Circuit Court for Baltimore County which was never acted upon by that Court and dismissed without prejudice so that this action could proceed.

172.    Mr. & Mrs. Riffe are also entitled to restitution damages and losses from BCAT 2014-4TT since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit BCAT 2014-4TT to retain profits from its illegal activity.

### iv.    SUSAN GEISELMAN

173.    Ms. Geiselman owns the Geiselman Property.

174.    On or about March 31, 2008, Ms. Geiselman's deceased husband, Michael K. Ward, refinanced their mortgage loan for the Geiselman Property with Bank of America ("Geiselman/Ward Loan") which was secured by a Deed of Trust signed by Ms. Geiselman and Mr. Ward.

175.    The Geiselman/Ward Loan was utilized for personal, consumer purposes related to the couple's second home—i.e. the Geiselman Property.

176.    Shortly after the refinance Mr. Ward began to struggle with health and mental problems and due to the downturn of the economy. As a result of the loss of income and financial problems, the Geiselman/Ward Loan fell into default after September 2009. Ms. Geiselman was not aware

at the time that the Geiselman/Ward Loan was not being paid (since it was in Mr. Ward's name and he managed the family's financial affairs).

177.    On January 3, 2013, Mr. Ward, in utter despair at his financial situation, took his own life. Ms. Geiselman was named the personal representative of his estate and learned for the first time that the Geiselman/Ward Loan was not being paid, that Mr. Ward had allowed his life insurance policy lapse, and that her family was literally broke.

178.    On or about June 2, 2016, RMAC TRUST 2016-CTT acquired the Geiselman/Ward Loan from Nationstar Mortgage LLC for pennies on the dollar of what was claimed due and owing on the loan for the benefit of its investors.  An Assignment of the Deed of Trust "together with all interest secured thereby, all liens, and any rights due" is recorded in the land records for Worcester County evidencing this transaction (Book 6808, Page 111).   At the time of this assignment, Nationstar, Rushmore, and RMAC TRUST 2016-CTT all believed the Geiselman/Ward Loan to be in default.

179.    On March 6, 2017 at 7:50PM, Ms. Geiselman learned that Rushmore, through its appointed agents at the Atlantic Law Group had commenced a foreclosure proceeding against her and the Geiselman Property in the Circuit Court for Worcester County on behalf of RMAC Trust 2016-CTT when she was served with the foreclosure papers (Case No. C-23-CV-17-000070)("Geiselman Foreclosure").

180.    At this time Rushmore had no right to attempt to collect for RMAC Trust 2016-CTT since RMAC Trust 2016-CTT was acting as an unlicensed mortgage lender and unlicensed professionals are not permitted to use Maryland courts for their unlicensed activities.

181.    Rushmore claimed in sworn testimony to the state court in the Geiselman Foreclosure that it was entitled to collect sums on behalf of RMAC Trust 2016-CTT through the foreclosure action.

Included in these sums claimed by Rushmore were sums for interest, late charges, foreclosure fees and costs Rushmore know RMAC Trust 2016-CTT was not entitled to collect as an unlicensed mortgage lender.

182.    Because Rushmore and RMAC Trust 2016-CTT, through their appointed agents at the Atlantic Law Group, were asserting a right to collect from her by foreclosing on the Geiselman Property without the right to do so, Ms. Geiselman retained counsel to appear on her behalf in the Geiselman Foreclosure and incurred her counsel's time and expenses to challenge Rushmore's and RMAC Trust 2016-CTT's illegal collection activity.

183.    Through counsel, Ms. Geiselman appeared in the Geiselman Foreclosure action and moved that the action be dismissed.  Her counsel filed motions, attended two motions hearing on her behalf, and presented argument as to why the foreclosure action should be dismissed in light of Rushmore's and RMAC Trust 2016-CTT's illegal collection activities.

184.    On September 29, 2017, in the second hearing before the Circuit Court for Worcester County related to Ms. Geiselman's Motion to Dismiss, her counsel appeared on her behalf and presented argument to the Honorable Thomas C. Groton, III.  At the conclusion of the hearing, Judge Groton ruled as follows:

        a.  RMAC Trust 2016-CTT was an unlicensed collection agency;

        b.  RMAC Trust 2016-CTT was not permitted to collect indirectly through Rushmore or its appointed agents at the Atlantic Law Group while it was unlicensed;

        c.  RMAC Trust 2016-CTT had no legal right to pursue any foreclosure action against Ms. Geiselman or the Geiselman Property while it remained an unlicensed collection agency; and

        d.  The Geiselman Foreclosure action was dismissed.

185.    No person took any appeal from Judge Groton's September 29, 2017 ruling dismissing the Geiselman Foreclosure action.

186.    Following the dismissal of the Geiselman Foreclosure action, RMAC Trust 2016-CTT became licensed a Maryland collection agency on November 21, 2017.   In its application to become licensed, RMAC Trust 2016-CTT identified to the State of Maryland that it is controlled and managed by RMC. RMAC Trust 2016-CTT has never become licensed as a mortgage lender but is threatening to commence another attempted foreclosure against the Geiselman Property and Ms. Geiselman in the Circuit Court for Worcester County foreclosure against the even though RMAC Trust 2016-CTT is an unlicensed mortgage lender.

187.    Ms. Geiselman has sustained continuing damages and losses as follows as a direct and proximate result of the illegal, unfair, and deceptive practices of Rushmore and RMAC Trust 2016-CTT described herein including:

    a.    Economic damages incurred in the form of legal fees incurred defending Rushmore's and RMAC Trust 2016-CTT's illegal foreclosure action against her.

    b.    Economic damages incurred in the form of interest, fees, and costs added to the Geiselman/Ward Loan balance which RMAC Trust 2016-CTT had no right to claim since it may not profit from its illegal activities before it became licensed as a collection agency.

188.    Ms. Geiselman is also entitled to statutory damages under the FDCPA.

189.    Ms. Geiselman's damages and losses asserted herein accrued within three years of the commencement of this action and were otherwise tolled by Ms. Brown's prior action in the Circuit Court for Baltimore County which was never acted upon by that Court and dismissed without prejudice so that this action could proceed.

### D. THE DEFENDANTS' LEGAL DUTIES RELATED TO THE SUBJECT TRANSACTIONS SUBJECT TO THIS ACTION

190.    The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005). This duty of care applies to Rushmore, BCAT 2014-4TT and RMAC TRUST 2016-CTT as their work involves secured, consumer mortgage loans acquired while in default.

191.    Since 1970, "if a statute requiring a license for conducting a trade, business or profession is regulatory in nature for the protection of the public, rather than merely to raise revenue, an unlicensed person will not be given the assistance of the courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy." *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293, 265 A.2d 759, 761 (1970). This duty to be licensed before utilizing the state courts applies to BCAT 2014-4TT which act as a mortgage lender but is not licensed as one.

192.    Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Rushmore has duties to the Named Plaintiffs and the Class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605. Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Rushmore is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Rushmore is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the

60

borrower." It is unreasonable and a violation of its duties for Rushmore to demand inaccurate sums due to BCAT 2014-4TT and RMAC TRUST 2016-CTT while they were acting as unlicensed collection agencies and had no right to collect any sums from the Named Plaintiffs and Class members while not licensed in the form of interest, fees, and expenses.

193.    The Maryland Mortgage Fraud Protection Act, MD. CODE ANN., REAL PROP. § 7-401, *et seq.*, establishes a statutory duty upon Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT to disclose to mortgage borrowers and homeowners, like the Named Plaintiffs and the Class members in this action, to disclose material information with respect to the mortgage lending process which includes the servicing and foreclosure (and threatened foreclosure of mortgage loans). *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D. Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL 4402680 (D. Md. Sept. 20, 2011). In this case Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT have duties to disclose to the Named Plaintiffs and the Class members (and the state courts) that BCAT 2014-4TT and RMAC TRUST 2016-CTT were acting as unlicensed collection agencies and they have failed to do so. *Compare McDaniel v. Baranowski*, 419 Md. 560, 587, 19 A.3d 927, 943 (2011).

### F. MARYLAND'S RESPONSE TO THE UNLICENSED DEBT COLLECTION CRISIS AS RELATED TO THE PLAINTIFFS

194.    Rushmore is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(4)(6) since it is a business engaged in collecting on defaulted debts owned by others by using interstate wires and mail, among other acts. *See also*, *Schlosser v. Fairbanks Capital Corp.,* 323 F.3d 534, 536 (7th Cir. 2003) (the FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not. *See Bailey v. Security*

*Nat'l Servicing Corp.,* 154 F.3d 384, 387 (7th Cir.1998); *Whitaker v. Ameritech Corp.,* 129 F.3d 952, 958 (7th Cir.1997); *see also Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 403-04 (3d Cir.2000); *Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103, 106-07 (6th Cir.1996); *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1208 (5th Cir.1985)").

195.    As part of their  routine, principle purposes, and on-going collection practices, BCAT 2014-4TT and RMAC TRUST 2016-CTT regularly collects or attempts to collect monthly mortgage payments and/or forbearance payments or short-payoffs by and through the mails and interstate wires through its authorized FIN. INST. § 11-501(n)(2) servicers including Rushmore from Ms. Brown, Dr. Sharma, Mr. & Mrs. Riffe, and Ms. Geiselman and the putative class members they represent on behalf of their investors.

196.    Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT also attempt to collect from the same through civil litigation in Maryland Courts authorized by it and through its authorized agents, including actions which are filed as foreclosure actions in the state courts and also through bankruptcy proceedings in the United States Bankruptcy Court for Maryland.

197.    Under FIN. INST. § 11-504 a person may not act as a mortgage lender unless that person is licensed as a mortgage lender—including assignees of mortgage loans.  *See also* In the Matter of: National Payment Relief, LLC d/b/a Mortgage Relief - National Loan Services, NPR Capital, LLC Alberto Artasanchez and Rosalie Bucci Respondents, 2014 WL 7409911.

198.    Every collection effort in Maryland authorized by Rushmore on behalf of BCAT 2014-4TT and RMAC TRUST 2016-CTT (while they were acting without a Collection Agency license), including each and every foreclosure action filed in Maryland courts on its behalf as well as the collection and attempted collection of any mortgage payments, and each and every judgment lien filed in

Maryland, is an unfair or deceptive trade practice since these actions were committed without the right to do so as stated by the legislature.

199.    In addition the Office of the Commisioner of Financial Regulation has issued a regulation under the MMLL that explains that "a person is not exempt [from being licensed as a mortgage lender] because the person: (a) Is an out-of-State deposit-taking financial institution; (b) Does not have offices in Maryland; (c) Does not have tax situs in Maryland; or (d) Is not required to register as a foreign corporation doing business in Maryland." Md. Code Regs. 09.03.06.03(1).

200.    Rushmore has willfully and knowingly sought, directly or indirectly, to collect debts on behalf of its unlicensed principals (i.e. BCAT 2014-4TT and RMAC TRUST 2016-CTT), including threatened to utilize the foreclosure process when BCAT 2014-4TT and RMAC TRUST 2016-CTT has no legal right to pursue the foreclosure process. Rushmore has also recklessly disregarded the notice before it, failed to conduct reasonable investigations to inquiries it received, and instead proceeded in its collection attempts with knowledge that BCAT 2014-4TT and RMAC TRUST 2016-CTT were mortgage lenders. Further, Rushmore has conspired with BCAT 2014-4TT and RMAC TRUST 2016-CTT and its affiliates to collect on BCAT 2014-4TT's and RMAC TRUST 2016-CTT's behalf even though BCAT 2014-4TT and RMAC TRUST 2016-CTT had no legal right to collect without the mandatory license required by Maryland law (either directly or indirectly). These are material misrepresentations and false statements and omissions by Rushmore which would and have mislead the least sophisticated consumer by: (i) enticing voluntary payments for sums not legally collectable by BCAT 2014-4TT and RMAC TRUST 2016-CTT or (ii) led an unsophisticated consumer to forgo a valid defense as recognized in the Geiselman Foreclosure action.

## V.  NAMED PLAINTIFFS' CLASS ALLEGATIONS

A.  **FDCPA CLASS, BCAT 2014-4TT Sub-Class, and RMAC TRUST 2016-CTT Allegations**

201.  This action is also properly brought as a Class under Fed. R. Civ. P. 23. Named Plaintiffs propose, as the definition of the FDCPA Class, that it be defined as follows:

> Those persons in the State of Maryland from whom Rushmore has communicated with directly or indirectly for the purpose of collecting a consumer debt on behalf of an unlicensed mortgage lender including BCAT 2014-4TT and RMAC TRUST 2016-CTT.

202.  This action is also partially brought on behalf of a FDCPA Subclass by Dr. Sharma and Mr. & Mrs. Riffe under Fed. R. Civ. P. 23. Dr. Sharma and Mr. & Mrs. Riffe propose, as the definition of the FDCPA Subclass, that it be defined as follows:

> Those members of the FDCPA Class who paid, directly or indirectly, any amount to BCAT 2014-4TT which were applied by Rushmore to interest, fees, costs, and other charges other than the principal portion of payments due from them.

203.  The particular members of the FDCPA Class and the FDCPA Subclass are capable of being described without difficult managerial or administrative problems.  The members of the FDCPA Class and FDCPA Subclass are also readily identifiable from the information and public records available through the State of Maryland Land Records and the Office of the Commissioner of Financial Regulation.  Upon information and belief, based on a review of public records, the size of the FDCPA Class and FDCPA Subclass exceeds several hundred persons.

204.  The FDCPA Class and FDCPA Subclass members are sufficiently numerous that individual joinder of all members is impractical.  This allegation is based in part on the fact that BCAT 2014-4TT and RMAC TRUST 2016-CTT acquired many Deeds of Trust, and the loans related thereto, according to public records, throughout the State of Maryland related to the Named Plaintiffs, FDCPA Class, and FDCPA Subclass.  Further, according to public records BCAT 2014-

4TT and RMAC TRUST 2016-CTT, through Rushmore, have attempted and/or actually utilized the collection tools of the state courts to collect from FDCPA Class and FDCPA Subclass members but not disclosed to those Courts that it is not permitted to do so.

205. There are questions of law and fact common to the FDCPA Class and FDCPA Subclass which predominate over any questions affecting only individual members of the FDCPA Class and FDCPA Subclass and, in fact, the wrongs alleged against Rushmore and BCAT 2014-4TT and RMAC TRUST 2016-CTT by the FDCPA Class and FDCPA Subclass members and the remedies sought by Named Plaintiff and the FDCPA Class and FDCPA Subclass against the Defendants are identical, the only difference being the exact sum which each FDCPA Class and FDCPA Subclass member is entitled to receive.

206. The common issues related to FDCPA Class include, but are certainly not limited to:

     i.    Whether BCAT 2014-4TT, RMAC TRUST 2016-CTT or other entities Rushmore collects for were licensed as mortgage lenders and, if so, during what period;

    ii.    Whether Rushmore has the right to collect on behalf of BCAT 2014-4TT, RMAC TRUST 2016-CTT or other entities while they were unlicensed as mortgage lenders;

    iii.    Whether Rushmore's duty of good faith under its license pursuant to Md. Code Regs. 09.03.06.20, 12 U.S.C.A. § 2605, and 12 U.S.C.A. § 2605's Regulation X extends to the FDCPA Class members?

    iv.    Whether BCAT 2014-4TT and RMAC TRUST 2016-CTT are entitled to any relief by a Maryland Court when BCAT 2014-4TT and RMAC TRUST 2016-CTT were acting as unlicensed mortgage lenders?

v. Whether BCAT 2014-4TT and RMAC TRUST 2016-CTT, or anyone else acting on their behalf, ever disclosed to the Named Plaintiffs and the FDCPA Class members and the Maryland Courts, as part of their collection attempts, that BCAT 2014-4TT and RMAC TRUST 2016-CTT did not have the required mortgage lender license;

vi. Whether Ms. Brown's prior putative class claims presented in the Circuit Court for Baltimore County tolled any statute of limitations for the FDCPA Class members?

vii. Whether Rushmore's, BCAT 2014-4TT's, and RMAC TRUST 2016-CTT's concealment of the true facts concerning BCAT 2014-4TT's and RMAC TRUST 2016-CTT's illegal status should toll any limitations period(s) applied to the FDCPA Class' claims;

viii. Whether Rushmore concealed from members of the FDCPA Class that BCAT 2014-4TT and RMAC TRUST 2016-CTT were not licensed as a mortgage lender and had no right to collect in the State of Maryland without the license;

ix. Whether Rushmore is permitted to continue collecting upon the loans of the FDCPA Class;

x. Whether Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT may impose upon the FDCPA Class members accounts any interest, fees and expenses they incurred by utilizing the state court system illegally since BCAT 2014-4TT and RMAC TRUST 2016-CTT was acting as an unlicensed mortgage lender because unlicensed professionals are not permitted to profit from their illegal activities?

207. The common issues related to the FDCPA Subclass include, but are certainly not limited to:

i.   Whether BCAT 2014-4TT is entitled to retain any profits in the form of interest, costs, expenses, and other non-principal portion of payments by the FDCPA Subclass members;

ii.   Whether Rushmore has misapplied the FDCPA Subclass members' payments to it on behalf of BCAT 2014-4TT to interest, costs, expenses, and other non-principal fees claimed due from the BCAT 2014-4TT; and

iii.   Whether BCAT 2014-4TT should be ordered to disgorge money and profits that it has wrongfully collected based upon its unlicensed mortgage lender activities.

208.   Named Plaintiffs' legal and equitable claims are typical of and identical to each member of the FDCPA Class and FDCPA Subclass and will be based on the same legal and factual theories and are typical.

209.   BCAT 2014-4TT's, RMAC TRUST 2016-CTT's, and Rushmore's defenses (which defenses are denied) would be typical of and identical for each member of the FDCPA Class and FDCPA Subclass and will be based on the same legal and factual theories.

210.   The Named Plaintiffs will also fairly and adequately represent and protect the interests of the FDCPA Class and FDCPA Subclass. Named Plaintiffs have retained counsel experienced in consumer class actions including actions involving unlawful lending and debt collection practices. Named Plaintiffs do not have any interests which might cause them not to vigorously prosecute this action or that are otherwise adverse to the interests of the members of the FDCPA Class and FDCPA Subclass.

211.   The Named Plaintiffs are similarly situated with, and have suffered injuries similar to, the members of the FDCPA Class and FDCPA Subclass they seek to represent. Named Plaintiffs have been wronged, wish to obtain redress of the wrong, and want the Defendants stopped from

enriching themselves via illegal activities or otherwise perpetrating similar wrongs on others on behalf of unlicensed collection agencies.

212.    Certification of a FDCPA Class under Fed. R. Civ. P. 23(b)(3) is appropriate as to the FDCPA Class members in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.  A class action will cause an orderly and expeditious administration of FDCPA Class members' claims, and economies of time, effort and expenses will be fostered and uniformity of decisions will be ensured.

213.    Rushmore's, BCAT 2014-4TT's, and RMAC TRUST 2016-CTT's failure to disclose the true licensed status of BCAT 2014-4TT and RMAC TRUST 2016-CTT to Named Plaintiffs and the FDCPA Class and FDCPA Subclass members tolled the running of any limitations that may otherwise apply to the claims of the Named Plaintiff and the members of the FDCPA Class and FDCPA Subclass until Rushmore, BCAT 2014-4TT and RMAC TRUST 2016-CTT made the disclosures they were required to make.

214.    Rushmore has known since 2007 that BCAT 2014-4TT and RMAC TRUST 2016-CTT were required to have a license to act as a mortgage lender in the State of Maryland. Instead of requiring BCAT 2014-4TT and RMAC TRUST 2016-CTT to comply with the law before it began to act on its behalf, Rushmore chose to evade the path described above to improperly circumvent Maryland law and improperly attempt to lend its license to BCAT 2014-4TT and RMAC TRUST 2016-CTT.  At all times relevant and material to this action, with knowledge that BCAT 2014-4TT and RMAC TRUST 2016-CTT failed to obtain the required license to act as a mortgage lenders, Rushmore attempted to collect or actually collect on its behalf from the Named Plaintiffs and FDCPA Class and FDCPA Subclass Members.

215. The Named Plaintiff and members of the FDCPA Class were not required to assume that BCAT 2014-4TT and RMAC TRUST 2016-CTT were engaging in illegal activities with the aid and assistance of Rushmore. The Named Plaintiffs and members of the FDCPA Class were reasonable in not assuming that Rushmore was aiding BCAT 2014-4TT's and RMAC TRUST 2016-CTT's illegal activities.

216. Any limitations period that may otherwise apply to claims of the Named Plaintiffs and members of the FDCPA Class and FDCPA Subclass is tolled by Ms. Brown's prior putative class claims and also since BCAT 2014-4TT and RMAC TRUST 2016-CTT and Rushmore had duties to disclose material facts to the Named Plaintiffs and FDCPA Class members related to BCAT 2014-4TT's and RMAC TRUST 2016-CTT's illegal status. The omission of this fact made BCAT 2014-4TT's and RMAC TRUST 2016-CTT's and Rushmore's acts unfair or deceptive.

217. Due to their presumed and actual knowledge, as described *supra*, Rushmore, BCAT 2014-4TT, and RMAC TRUST 2016-CTT had an appreciation that they were not entitled to receive the benefits they were attempting to collect or actually collecting from the Named Plaintiffs and FDCPA Class members.

218. The FDCPA Class and FDCPA Subclass members have suffered damages, losses, and harm similar those sustained by the Named Plaintiffs as described *supra*.

### C.    RESPA Dual-Tracking Class Allegations

219. This action is also partially brought on behalf of a RESPA Dual-Tracking Class under Fed. R. Civ. P. 23. Ms. Brown and Mr. & Mrs. Riffe, as the Named Plaintiffs for this class proposes, as the definition of the RESPA Dual-Tracking Class, that it be defined as follows:

> The RESPA Class includes all borrowers who: (i) submitted, on January 10, 2014 or thereafter, an application for loss mitigation to Rushmore Loan Management Services, LLC as a mortgage servicer; (ii) concerning a

"federally related mortgage," as that term is defined by 12 C.F.R. 1024.2; and (iii) after receipt of which Rushmore Loan Services, LLC, directly or indirectly through its agents, proceeded to initiate a foreclosure action for the property subject to the loss mitigation application before the borrower's appeal rights under RESPA and its implementing regulations had expired.

220. The loans subject to the Ms. Brown's and Mrs. Riffe's RESPA claims asserted herein are typical of and identical to each member of the putative RESPA Dual-Tracking Class: Rushmore referred them and the putative class member loans to foreclosure by the appointed agents selected by Rushmore and imposed those foreclosure fees onto the subject mortgage accounts. In addition each class member loan subject to this action is a federally related mortgage loan as defined by 12 C.F.R. 1024.2 and will be based on the same legal and factual theories.

221. Certification of the RESPA Dual-Tracking Class under Rule 23(b)(2) and (b)(3) is appropriate as to the RESPA Dual-Tracking Class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. A class action will cause an orderly and expeditious administration of RESPA Dual-Tracking Class members' claims, and economies of time, effort and expenses will be fostered and uniformity of decisions will be ensured.

222. The particular members of the RESPA Dual-Tracking Class are capable of being described without difficult managerial or administrative problems. The members of the RESPA Dual-Tracking Class are also readily identifiable from Rushmore's electronic records which identify borrowers' addresses, the dates it receives correspondence and loss mitigation applications from borrowers and thereafter it responds to the applications in writing and/or denies the loss mitigation application in writing, the date(s) it initiates foreclosure proceedings, and the date(s) it receives borrower appeals from denials of loss mitigation as well as when it responds to such applications.

Upon information and belief the size of the RESPA Dual-Tracking Class exceeds more than a hundred persons.

223. Ms. Brown and Mr. & Mrs. Riffe believes the amount in controversy equals at least the maximum statutory damages permitted in this matter—i.e. $2,000 per class member for the RESPA Dual-Tracking Class. The amount in controversy also includes the foreclosure costs assessed to Ms. Brown's and Mr. and Mrs. Riffe's RESPA Dual-Tracking Class members' mortgage accounts by Rushmore. These additional losses and damages have been proximately caused by Rushmore and may be easily identified from Rushmore's electronic records.

224. The RESPA Dual-Tracking Class members have each sustained the same or similar damages as the Ms. Brown described *supra*.

225. All members of the RESPA Dual-Tracking Class have been subject to and affected by the same conduct. The claims are based on Rushmore's standard policies and practices that employ standard and uniform solicitations of loss mitigation assistance like the one sent to Mr. & Mrs. Riffe and Ms. Brown by Rushmore and systems utilized by Rushmore to initiate foreclosure.

226. There are also questions of law and fact that are common to the RESPA Dual-Tracking Class, and predominate over any questions affecting only individual members of the RESPA Dual-Tracking Class. These questions include, but are not limited to the following:

> a. the nature, scope and operation of Rushmore's obligations to homeowners under its mortgage modification programs related to RESPA since January 10, 2014;

> b. whether Rushmore's initiating foreclosure proceedings before the period of time permitted by RESPA and its own correspondence to borrowers is in violation of Rushmore's duty of good faith and fair dealing to the RESPA Dual-Tracking Class members since January 10, 2014;

71

c. whether Rushmore's conduct violates the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.A. § 2605 and its implementing regulations at 12 C.F.R. § 1024.41;

d. whether there are more than 50 borrowers who are members of the RESPA Dual-Tracking Class;

e. whether Rushmore should be enjoined from continuing to pursue foreclosure actions, directly or indirectly, concerning RESPA Dual-Tracking Class members who submitted loss mitigation requests under RESPA and its implementing regulations before an action was initiated and while they trusted that their loss mitigation applications and/or loss mitigation appeals were being reviewed in accordance with RESPA

f. whether Rushmore's violation of RESPA entitles the RESPA Dual-Tracking Class to statutory damages and actual damages in a sum equal to the amount of attorneys' fees and costs assessed by Rushmore directly and indirectly to the Ms. Brown's, Mr. & Mrs. Riffe's, and the RESPA Dual-Tracking Class members' mortgage accounts, plus statutory damages for foreclosure proceedings which could not legally occur in violation of the RESPA guidelines; and

227. The claims of Ms. Brown and Mr. and Mrs. Riffe are typical of the RESPA Dual-Tracking Class members and do not conflict with the interests of any other members of the RESPA Dual-Tracking Class because Ms. Brown, Mr. & Mrs. Riffe, and the other members of the RESPA Dual-Tracking Class were subject to the same conduct, same practices and procedures by Rushmore, and were met with the same referrals to foreclosure proceedings conducted by Rushmore's agents

under Maryland law while their requests for mortgage assistance were still being processed and before their rights under 12 C.F.R. § 1024.41 had expired.

228.    Rushmore's defenses (which defenses are denied) would be typical of and identical for each member of the RESPA Dual-Tracking Class, and will be based on the same legal and factual theories.

229.    Ms. Brown is similarly situated with and has suffered similar damages as the other members of the RESPA Dual-Tracking Class.

230.    Ms. Brown and Mr. & Mrs. Riffe will also fairly and adequately represent and protect the interests of the RESPA Dual Tracking Class. They do not have any interests antagonistic to the class.    Ms. Brown and Mrs. Riffe have retained counsel experienced in consumer class actions including actions involving unlawful lending and debt collection practices.  Ms. Brown and Mr. & Mrs. Riffe do not have any interests which might cause them not to vigorously prosecute this action.

231.    Ms. Brown and Mr. & Mrs. Riffe are similarly situated with, and have suffered injuries similar to the members of the RESPA Dual-Tracking Class and RESPA QWR Class they seek to represent. Ms. Brown and Mrs. & Mrs. Riffe has been wronged; wish to obtain redress of the wrong, and wants Rushmore stopped from enriching itself via illegal activities or otherwise ignoring its duties and responsibilities as a mortgage servicer subject to RESPA.

232.    Any limitations period that may otherwise apply to claims of Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class and RESPA QWR Class members' claims asserted herein were tolled by Ms. Brown's prior pleadings in the Circuit Court for Baltimore County which refused to take any action for more than two years and as a result denied Ms. Brown and the putative class members any due process they were entitled to receive.

## C.  RESPA QWR Class Allegations

233.    This action is also partially brought on behalf of a RESPA QWR Class under Fed. R. Civ.

P. 23. Ms. Brown, as the Named Plaintiff for this claim proposes, as the definition of the RESPA

QWR Class, that it be defined as follows:

> The RESPA QWR Class includes all borrowers who: (i) submitted, on
> January 10, 2014 or thereafter, a qualified written request; (ii) concerning a
> "federally related mortgage," as that term is defined by 12 C.F.R. 1024.2;
> and (iii) Rushmore did not acknowledge or respond to the QWR in writing
> in the time periods required by 12 U.S.C.A. § 2605(e), 12 C.F.R. § 1024.36,
> and 12 C.F.R. § 1024.35.

234.    The loans subject to the Ms. Brown's RESPA claims asserted herein are typical of and

identical to each member of the putative RESPA QWR Class.  In addition each class member loan

subject to this action is a federally related mortgage loan as defined by 12 C.F.R. 1024.2 and will

be based on the same legal and factual theories.

235.    Certification of the RESPA QWR Class under Rule 23(b)(2) and (b)(3) is appropriate as to

the RESPA QWR Class in that common questions predominate over any individual questions and

a class action is superior for the fair and efficient adjudication of this controversy.  A class action

will cause an orderly and expeditious administration of RESPA QWR Class members' claims, and

economies of time, effort and expenses will be fostered and uniformity of decisions will be

ensured.

236.    The particular members of the RESPA QWR Class are capable of being described without

difficult managerial or administrative problems.  The members of the RESPA QWR Class are also

readily identifiable from Rushmore's electronic records which identify borrowers' addresses, the

dates it receives QWRs from borrowers and thereafter it acknowledges and responds to the

applications in writing. Upon information and belief the size of the RESPA QWR Class exceeds more than a hundred persons.

237. Ms. Brown believes the amount in controversy equals at least the maximum statutory damages permitted in this matter—i.e. $2,000 per class member for the RESPA QWR Class. Pursuant to Fed. R. Civ. P. 23 Named Plaintiff also seeks a determination of Rushmore's liability for actual damages to the RESPA QWR Class leaving the class members to prove their individual damages in separate actions (if they have damages and losses and desire to pursue them).

238. The RESPA QWR Class members have each sustained the same or similar damages as the Ms. Brown described *supra*.

239. All members of the RESPA QWR Class have been subject to and affected by the same conduct. The claims are based on Rushmore's standard policies and practices related to the receipt and response to QWRs like the QWRs sent by Ma. Brown to Rushmore and systems utilized by Rushmore to acknowledge and respond to those QWRs.

240. There are also questions of law and fact that are common to the RESPA QWRs, and predominate over any questions affecting only individual members of the RESPA QWR Class. These questions include, but are not limited to the following:

 a. the nature, scope and operation of Rushmore's obligations to homeowners sending it QWRs related to RESPA since January 10, 2014;

 b. whether Rushmore's failure to acknowledge and respond to QWRs violate of Rushmore's duty of good faith and fair dealing to the RESPA QWR Class members since January 10, 2014;

 c. whether Rushmore's conduct violates RESPA, 12 U.S.C.A. § 2605 and its implementing regulations at 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35;

d.  whether there are more than 50 borrowers who are members of the RESPA QWR Class;

e.  whether Rushmore should be enjoined and ordered to take corrective action to immediately develop policies and procedures to ensure that it complies with the QWR acknowledgement and response deadlines established in 12 U.S.C.A. § 2605 and its implementing regulations at 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35;

f.  whether Rushmore's violation of RESPA entitles the RESPA QWR Class to statutory damages and a judicial determination that Rushmore is liable to the RESPA QWR Class for actual damages in a sum to be proved by the RESPA QWR Class members on an individual basis in separate actions; and

241.  The claims of the Ms. Brown are typical of the RESPA QWR Class members and do not conflict with the interests of any other members of the RESPA QWR Class because the Ms. Brown and the other members of the RESPA QWR Class were subject to the same conduct, same practices and procedures by Rushmore, and were met with the same failure to timely acknowledge or respond to QWRs received by it pursuant to 12 U.S.C.A. § 2605 and its implementing regulations at 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35.

242.  Ms. Brown is similarly situated with and has suffered similar damages as the other members of the RESPA QWR Class.

243.  Ms. Brown will also fairly and adequately represent and protect the interests of the RESPA QWR Class. She does not have any interests antagonistic to the class.   Ms. Brown has retained counsel experienced in consumer class actions including actions involving unlawful lending and debt collection practices.  Named Plaintiffs do not have any interests which might cause them not to vigorously prosecute this action.

244. She is similarly situated with, and has suffered injuries similar to the members of the RESPA QWR Class she seeks to represent. Ms. Brown has been wronged; wishes to obtain redress of the wrong, and wants Rushmore stopped from enriching itself via illegal activities or otherwise ignoring its duties and responsibilities as a mortgage servicer subject to RESPA.

245. Any limitations period that may otherwise apply to claims of Ms. Brown and the RESPA QWR Class members' claims asserted herein were tolled by Ms. Brown's prior pleadings in the Circuit Court for Baltimore County which refused to take any action for more than two years and denied Ms. Brown and the putative class members any due process.

## COUNT I

**VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT,**
**15 U.S.C. § 1692,** *et seq.*
**(FDCPA Class and FDCPA Subclass, and Individual Claims**
**Against All Defendants)**

246. Named Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

247. As stated *supra*, the FDCPA claims asserted herein were tolled by Ms. Brown's prior putative claims before the Circuit Court for Baltimore County which it did not act upon for more than two years before Ms. Brown dismissed them without prejudice.

248. Rushmore acquired its FIN. INST. § 11-501(n)(2) mortgage servicing rights and interest in the Named Plaintiffs' and FDCPA Class Members' consumer mortgage loans during a period in which each alleges (directly and indirectly) the loan was in default and therefore it is a Debt Collector within the meaning of 15 U.S.C. § 1692a(6). In its relationship with the Named Plaintiffs and all the FDCPA Class members, Rushmore was collecting on behalf of another.

249.    BCAT 2014-4TT and RMAC TRUST 2016-CTT were both formed for the principal purpose of acquiring defaulted consumer debts for pennies on the dollar and therefore qualifies as a debt collector pursuant to 15 U.S.C. §1692a(6) which explains that a debt collector includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts..."  In their relationship with the Named Plaintiffs and all the FDCPA Class members, BCAT 2014-4TT and RMAC TRUST 2016-CTT also are debt collectors since their collect on the consumer debts they have acquired in default on loans that will eventually be sold off to investors as part of their principal purposes.

250.    By communicating with the Named Plaintiffs and FDCPA Class and FDCPA Subclass members directly and indirectly and threatening and/or actually pursuing litigation and demanding sums not legally due from the Named Plaintiffs and FDCPA Class and Subclass members on behalf of BCAT 2014-4TT and RMAC TRUST 2016-CTT (who are not exempt from licensure as as mortgage lenders under the MMLL pursuant to *Blackstone*), Rushmore, RMAC TRUST 2016-CTT and BCAT 2014-4TT used false, deceptive, or misleading representations or means in connection with the collection of the consumer debts of the Named Plaintiff and FDCPA Class and FDCPA Subclass members in violation of 15 U.S.C. § 1692e.

251.    Rushmore's, RMAC TRUST 2016-CTT, and BCAT 2014-4TT's actions described herein also constitute unfair or unconscionable means to collect or attempt to collect from the Named Plaintiff and FDCPA Class and FDCPA Subclass members in violation of 15 U.S.C. § 1692f.

252.    Named Plaintiffs and the FDCPA Class and FDCPA Subclass have suffered actual economic and non-economic damages, as more fully described *supra* and have incurred attorney's fees and court costs as a result of Defendants' illegal debt collection practices and direct and indirect actions described herein.

253.    The FDCPA provides for statutory damages in addition to actual damages.  The FDCPA Class is entitled to statutory damages in the sum of $500,000 from Defendant Rushmore pursuant to 15 U.S.C.A. § 1692k(a)(2)(B).  The FDCPA Subclass is entitled to statutory damages in the sum of $500,000 from Defendant BCAT 2014-4TT pursuant to 15 U.S.C.A. § 1692k(a)(2)(B).

254.    Ms. Geiselman requests the Court to determine Rushmore's and RMAC TRUST 2016-CTT's liability to her actual damages pursuant to 15 U.S.C.A. § 1692k(a)(1) for her legal fees incurred to defend against the Geiselman Foreclosure action which they had no right to commenced through their agents at the Atlantic Law Group—a sum of approximately $6,900.00.

255.    Ms. Brown requests the Court to determine Rushmore's and BCAT 2014-4TT's liability to her actual damages pursuant to 15 U.S.C.A. § 1692k(a)(1) for her legal fees incurred to defend against the Brown Foreclosure action which they had no right to commenced through their agents at the Law Offices of Jeffrey Nadel—a sum of approximately $4,600.00.

256.    Dr. Sharma and Mr. & Mrs. Riffe further requests that the Court determine Rushmore and BCAT 2014-4TT's liability to them and the FDCPA Subclass members under this claim as to actual damages pursuant to 15 U.S.C.A. § 1692k(a)(1) for the all sums demanded and collected by Rushmore and BCAT 2014-4TT that were applied to interest, fees, and other costs not including principal mortgage payments due since BCAT 2014-4TT is not permitted to profit from its illegal activities and these sums paid by Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members amount to unlawful profits retained by BCAT 2014-4TT without the right to do so.  Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members therefore seek actual damages on their FDCPA subclass claims in a sum in excess of $75,000.00.

    **WHEREFORE** Named Plaintiffs pray that this Court to enter judgment in them and the FDCPA Class' and FDCPA Subclass' favor against Rushmore, RMAC TRUST 2016-CTT,

and BCAT 2014-4TT on these FDCPA claims and to:

A. Certify this case as a class action with the Named Plaintiffs as class representative and their attorneys as Class Counsel on behalf of the FDCPA Class and FDCPA Subclass described herein;

B. Award Statutory damages in the amount allowed by the FDCPA Class from Rushmore equal to $500,000.00 to the FDCPA Class members;

C. Award Statutory damages in the amount allowed by the FDCPA Subclass from BCAT 2014-4TT equal to $500,000.00 to the FDCPA Subclass members;

D. Award actual damages to Ms. Geiselman from Rushmore's and RMAC TRUST 2016-CTT, jointly and severely, in the sum of $6,900;

E. Award actual damages to Ms. Brown from Rushmore and BCAT 2014-4TT, jointly and severely, in the sum of $4,600;

F. Award Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members actual damages for the all sums demanded and collected by Rushmore and BCAT 2014-4TT that were applied to interest, fees, and other costs not including principal mortgage payments due since BCAT 2014-4TT is not permitted to profit from its illegal activities and these sums paid by Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members in a sum in excess of $75,000.00 to be proven at trial; and

G. Award reasonable attorney's fees, litigation expenses and costs; and

H. Provide such other or further relief as the Court deems appropriate.

**COUNT II**

**Violation Maryland's the Maryland Consumer Debt Collection Act,**
**COM. LAW, §14-201 *et seq.* ("MCDCA") and the**
**Maryland's Consumer Protection Act ("MCPA"),**
**MD. CODE ANN., COM. LAW § 13-101 *et seq.***
**(FDCPA Class and FDCPA Subclass, and Individual Claims**
**Against All Defendants)**

257. Named Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

258. Defendants are collectors by attempting to collecting upon debts of the Named Plaintiff and FDCPA Class and FDCPA Subclass members arising out of consumer transactions—their mortgage loans used for personal purposes to acquire or refinance their homes and Property. MD CODE ANN., COM. LAW §14-201(b).

259. Through their communications to the Named Plaintiffs and FDCPA Class and FDCPA Subclass members and those instruments recorded in the land records of various counties and filed in land records in the Circuit Courts throughout the State of Maryland, Defendants have attempted to assert rights, directly or indirectly, to collect money from the Named Plaintiff and FDCPA Class and FDCPA Subclass members to which neither have any legal right to attempt to collect because BCAT 2014-4TT, RMAC TRUST 2016-CTT, and similar entities are not licensed as mortgage lenders but are required to be licensed to collect directly or indirectly (through Rushmore) in the State of Maryland. These communications were made in violation of MD CODE ANN., COM. LAW § 14-202(8).

260. Further, Rushmore has maintained it may cause foreclosure actions on behalf of BCAT 2014-4TT, RMAC TRUST 2016-CTT, and similar entities to be threatened, docketed, and maintained even though BCAT 2014-4TT, RMAC TRUST 2016-CTT, and similar entities have no legal right to pursue the actions while acting without the proper mortgage lender license in violation of MD CODE ANN., COM. LAW §14-202(8).

261.    Finally, by recording documents in the government's records throughout the State of Maryland and filing papers in the land records of circuit courts indicating that it has a right to collect payments from the Named Plaintiff and FDCPA Class and FDCPA Subclass members on behalf of BCAT 2014-4TT and RMAC TRUST 2016-CTT (and similar unlicensed mortgage lenders), Rushmore has used a communication in collecting or attempting to collect a debt which improperly implies that the government or a government agency has authorized the collection effort when the government has not done so in violation of MD CODE ANN., COM. LAW §14-202(9).

262.    The Defendants' violations of the MCDCA, described herein are also *per se* violations of the MCPA pursuant to § 13-301(14)(iii) of the Commercial Law Article.

263.    Named Plaintiffs and the FDCPA Class and FDCPA Subclass members are therefore entitled to their damages and losses described *supra* which have proximately resulted from Defendants' direct and indirect actions in violation of the MCDCA.  COM. LAW, § 14-203.

**WHEREFORE** Named Plaintiffs pray that this Court enter judgment in favor of Named Plaintiffs and the FDCPA Class and the FDCPA Subclass against the Defendants on their MCDCA and MCPA claims and to:

    a.    Certify this case as a class action with the Named Plaintiffs as class representative and their attorneys as Class Counsel on behalf of the FDCPA Class and FDCPA Subclass described herein;

    b.    Award actual damages to Ms. Geiselman from Rushmore's and RMAC TRUST 2016-CTT, jointly and severely, in the sum of $6,900;

    c.    Award actual damages to Ms. Brown from Rushmore and BCAT 2014-4TT, jointly and severely, in the sum of $4,600;

    d.    Award Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members

actual damages for the all sums demanded and collected by Rushmore and BCAT 2014-4TT that were applied to interest, fees, and other costs not including principal mortgage payments due since BCAT 2014-4TT is not permitted to profit from its illegal activities and these sums paid by Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members in a sum in excess of $75,000.00 to be proven at trial; and

e. Award reasonable attorney's fees, litigation expenses and costs; and

f. Provide such other or further relief as the Court deems appropriate.

## COUNT III
**Common Law Claim on behalf of the FDCPA Subclass for Unjust Enrichment**
**(FDCPA Subclass, and Individual Claims of Dr. Sharma and Mr. & Mrs. Riffe**
**Against Rushmore and BCAT 2014-4TT)**

264.    Dr. Sharma and Mr. & Mrs. Riffe incorporate all preceding paragraphs as if set forth fully herein on behalf of the FDCPA Subclass.

265.    Defendant BCAT 2014-4TT was not entitled to receive, directly or indirectly, any benefit (including profits) or payments directly traceable to its profits realized from the Named Plaintiffs and FDCPA Subclass Members' payments which were applied by Rushmore to interest, fees, and costs unrelated to the principal portion of the payments.  An unlicensed mortgage lender is not permitted to profit from its illegal activities.

266.    Maryland law recognizes that a claim for unjust enrichment is permitted in instances like this one where, even though a claim may be covered by a contract between the parties, (i) one party breaches the contract (by charging sums now lawfully charged), (ii)  the contract does not fully address a subject matter such as one party's illegal, criminal activity and (ii) there is evidence of fraud or bad faith when a party acts contrary to the law.  *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000).

267.    As demonstrated herein, Rushmore and BCAT 2014-4TT have known their practices are illegal but have knowingly assumed the risk of continuing to collect without the right to so while concealing from Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members the true facts that BCAT 2014-4TT is acting illegally through Rushmore.

268.    Rushmore and BCAT 2014-4TT has known or should have known since 2011 that BCAT 2014-4TT was required to have a license to act as a mortgage lender in the State of Maryland and BCAT 2014-4TT failed to obtain a license to act as a mortgage lender before attempting and actually collecting from Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members. Rushmore and BCAT 2014-4TT have known since the commencement of Ms. Brown's prior counter complaints in the Circuit Court for Baltimore County that Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members had claims against it for its unlawful collection activities, but it knowingly continued to collect and attempt to collect from them under the color of law without the right to do so.

269.    Due to its knowledge, as described above, Rushmore and BCAT 2014-4TT  had an appreciation that neither was entitled to receive the benefits it was collecting from Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members that flow from the payments collected and misdirected by Rushmore to permit BCAT 2014-4TT to profit from its illegal activities in the form of interest, costs, and fees realized from Dr. Sharma's, Mr. & Mrs. Riffe's, and the FDCPA Subclass members' payments (other than what was applied to the principal portion of their monthly payments).

270.    The acceptance and retention by Rushmore and BCAT 2014-4TT of any sums received as claimed interest, fees, and costs unrelated to the principal portion of their payments by a result of the Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members under such circumstances

is inequitable since Rushmore and BCAT 2014-4TT did not have the legal right to even collect such payments in the first instance in the manner it sought to collect them—this conclusion is just and proper even though Rushmore and BCAT 2014-4TT might have otherwise collected the alleged debts legally by obtaining a license as a mortgage lender. The amounts accepted and retained by Rushmore and BCAT 2014-4TT for interest, fees, and costs unrelated to the principal portion due from Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass on their mortgage loans are liquidated amounts.

**WHEREFORE**, Named Plaintiffs Dr. Sharma and Mr. & Mrs. Riffe and the FDCPA Subclass Class Members pray that this Court:

a.      Certify this case as a class action with Dr. Sharma and Mr. & Mrs. Riffe  as the class representatives for the FDCPA Subclass and their attorneys as counsel on behalf of the FDCPA Subclass members described herein;

b.      Grant a money judgment and order the Rushmore and BCAT 2014-4TT   to disgorge and pay to the FDCPA Subclass members a sum equal to all interest, fees, and costs unrelated to the principal portion due from Dr. Sharma, Mr. & Mrs. Riffe, and the FDCPA Subclass members they have collected, and the benefits and profits they realized as a result in a sum in excess of $75,000.00.

c.      Award reasonable attorney's fees, litigation expenses and costs; and

d.      Provide such other or further relief as the Court deems appropriate.


**<u>COUNT IV</u>**
**VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**
**("RESPA"), 12 U.S.C.A. § 2605,**
**12 C.F.R. § 1024.41, 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35**
**(On behalf of the Ms. Brown and Mr. & Mrs. Riffe Individually and**

**on behalf of the RESPA Dual-Tracking Class and on behalf of Ms. Brown individually on behalf of the RESPA QWR Class against Defendant Rushmore Only)**

271.    Ms. Brown and Mr. & Mrs. Riffe incorporate all preceding paragraphs as if set forth fully herein.

272.    Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class and the RESPA QWR Class members are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41, 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35.  Each of the loans subject to this action are federally related mortgages as defined in 12 C.F.R.1024.2 and involve consumer transactions at the time the loans were taken out by Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class and the RESPA QWR Class members.

273.    Rushmore is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.

274.    Rushmore had duty of care under 12 C.F.R. § 1024.41(c) of Regulation X to acknowledge receipt of and evaluate the complete loss mitigation applications submitted by the Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class borrowers for all available options and provide them with written notice stating the determination of which loss mitigation options, if any, were available.

275.    Among other practices, RESPA and its implementing regulations prohibit a mortgage servicer from simultaneously initiating foreclosure proceedings against a homeowner's property and reviewing a homeowner's application for loss mitigation, a process known as "dual-tracking." Rushmore initiates foreclosure proceedings by referring mortgage accounts, including those of Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class borrowers to foreclosure counsel and charging foreclosure sums against the mortgage accounts.

276. Specifically,

> If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall:
> (A) Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and
> (B) Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options.

12 C.F.R. §1024.41(b)(2)(i).

277. Once a servicer receives a complete application:

> Within 30 days of receiving a borrower's complete loss mitigation application, a servicer shall:
> (i) Evaluate the borrower for all loss mitigation options available to the borrower; and
> (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

12 C.F.R. §1024.41(c).

278. In addition, once Ms. Brown and the RESPA Dual-Tracking Class Members submitted their loss mitigation applications, Rushmore was prohibited from initiating a foreclosure activities until it had completed its review of the application and if that application was denied, until Named Plaintiff and each of the RESPA Del-Tracking Class Members had exhausted their loss mitigation

appeal rights:

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:
> (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
> (2) The borrower rejects all loss mitigation options offered by the servicer; or
> (3) The borrower fails to perform under an agreement on a loss mitigation option.

12 C.F.R. §1024.41(g).

279.    If a servicer fails to comply with 12 C.F.R. §1024.41(b)(2)(i), "a borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA." 12 C.F.R. §1024.41(a). Section 6(f) of RESPA is codified at 12 U.S.C. 2605(f).

280.    Rushmore proceeded, directly and indirectly through its agents, to proceed with foreclosure activity against Ms. Brown's and RESPA Dual-Tracking Class members' homes at a time not permitted by 12 C.F.R. § 1024.41 since they had submitted loss mitigation applications to Rushmore and it had no right to initiate foreclosure activity against Ms. Brown, Mr. & Mrs. Riffe and the RESPA Dual-Tracking Class members before their RESPA appeal rights had exhausted.

281.    By referring Ms. Brown's and Mr. & Mrs. Riffe's property to foreclosure before it was permitted to do so, Rushmore violated the provisions of 12 C.F.R. 1024.41 and the prohibition on dual-tracking by mortgage servicers.  As a direct and proximate result of these violations Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-tracking Class members are entitled to RESPA's statutory damages in the maximum sum of $1,000,000 pursuant to 12 U.S.C.A. § 2605(f)(2)(B)(i). The RESPA Dual-tracking Class members are also entitled to actual damages pursuant to 12 U.S.C.A. § 2605(f)(2)(A) in a sum of all costs and fees assessed by Rushmore to the RESPA Dual-

tracking Class Member's mortgage accounts.

282.    Rushmore also had duty of care under 12 U.S.C.A. § 2605(e), 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35 to acknowledge in writing QWRs (including notices of error and requests for information) sent to it by Ms. Brown and RESPA QWR Class members within five days) and to respond to the QWR in writing within 30 days (unless it seeks an extension of not more than 15 days).

283.    By (i) untimely acknowledging Ms. Brown's and the RESPA QWR Class member's QWRs and/or (ii) not responding to Ms. Brown's and the RESPA QWR Class member's QWRs, Rushmore has violated 12 U.S.C.A. § 2605(e), 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35.  As a direct and proximate result of these violations Ms. Brown and the RESPA QWR Class members are entitled to RESPA's statutory damages in the maximum sum of $1,000,000 pursuant to 12 U.S.C.A. § 2605(f)(2)(B)(i).  The RESPA QWR Class members are also entitled to actual damages pursuant to 12 U.S.C.A. § 2605(f)(2)(A); however, pursuant to Rule 23 Ms. Brown is only seeking the Court to determine as a matter of law that Rushmore is liable to the RESPA QWR members for their actual damages pursuant to 12 U.S.C.A. § 2605(f)(2)(A) to be proved on an individual basis in separate actions.  For herself individually, she is seeking a sum of $20,000 individually for Rushmore's violation of RESPA's QWR violations.

284.    Upon information and belief, based upon the experiences of the Ms. Brown, described *supra*, and those described by consumers to the CFPB as described *supra* and the following public facts and allegations, Rushmore has a pattern and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 for borrowers like the Named Plaintiff and RESPA QWR Class and the RESPA Dual-tracking Class members:

a. The well pled claims against Rushmore related to impermissible dual-tracking in violation of RESPA and Regulation X that pending in the United States District Court for the District of Maryland. *Lindsay v. Rushmore Loan Mgmt.*, No. PWG-15-1031, 2016 WL 1169957, at *2 (D. Md. Mar. 25, 2016).

b. The legal finding of contempt that Rushmore knowingly conflicting statements to a borrower and the bankruptcy court related to a debtor's application for loss mitigation was a valid legal conclusion. <u>*In re: Hosking*</u>, No. 15 CV 3999 (VB), 2016 WL 128209, at *5 (S.D.N.Y. Jan. 11, 2016).

c. The well pled allegations relied upon by the court in *Bennett v. Bank of Am., N.A.*, No. CV 15-30-ART, --- F.Supp.3d ----, 2015 WL 5063271 (E.D. Ky. Aug. 26, 2015), which concluded that the plaintiff had identified sufficient facts to demonstrate violations of 12 U.S.C. § 2605 by Rushmore.

d. The allegations identified in the complaint filed in *Lindsey v. Rushmore Loan Management Services, LLC.*, No. CIV.A. 8:15-cv-1031 pending in the U.S. Dist. Ct. for the Dist. Of Md. related to 12 U.S.C. § 2605 violations by Rushmore.

e. The allegations identified in the complaint filed in *Altmann v. Rushmore Loan Management Services, LLC.*, No. CIV.A.1:15-cv-880 pending in the U.S. Dist. Ct. for the Eastern Dist. of California related to 12 U.S.C. § 2605 violations by Rushmore.

**WHEREFORE**, pursuant to 12 U.S.C.A. § 2605(f)(2), Ms. Brown, Mr. & Mrs. Riffe and RESPA QWR Class and RESPA Dual-tracking Class members respectfully request the Court to:

A. Certify this action as a Class Action pursuant to Rule 23;

B. Enter judgment in favor of Ms. Brown, Mr. & Mrs. Riffe, and the RESPA Dual-Tracking Class members and against Rushmore for its violations of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41 by proceeding or attempting to proceed with foreclosure activity while the loss mitigation applications of the Named Plaintiff and RESPA Dual-tracking Class members were submitted;

C. Enter judgment in favor of Ms. Brown and the RESPA QWR Class members and against Rushmore for its violations of 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35 by not timely acknowledging and/or responding to the QWRs of Ms. Brown and the RESPA QWR members;

D. Award statutory damages the sum of $1,000,000 in statutory damages to the Ms. Brown, Mr. & Mrs. Riffe, and RESPA Dual-tracking Class members and further award them their actual damages in a sum each to the foreclosure fees and charges assessed to their mortgage accounts by Rushmore;

E. Award statutory damages in the sum of $1,000,000 in statutory damages to the Named Plaintiff and RESPA QWR Class members and pursuant to Rule 23 determine Rushmore is liable as a matter of law to the RESPA QWR Class members actual damages pursuant to 12 U.S.C.A. § 2605(f)(2)(A) and as to Ms. Brown award her individual, actual damages as determined by the trier of fact;

F. Award attorney's fees incurred by Named Plaintiffs Ms. Brown and Mr. & Mrs. Riffe and RESPA Dual-tracking and RESPA QWR Class members; and

G. Grant Named Plaintiff Ms. Brown and RESPA Dual-tracking and RESPA QWR Class members such other and further relief as this Court finds necessary and proper.

## COUNT V

**DELCARATORY JUDGMENT**
**(On behalf of the Named Plaintiffs Dr. Sharma, Ms. Brown and Mr. & Mrs. Riffe Individually)**

285. Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe incorporate all preceding paragraphs as if set forth fully herein.

286. Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe are entitled to declaratory relief pursuant 28 U.S.C.A. §§ 2201-2202 and CTS. & JUD. PROC. § 3-401, *et seq.*

287. Under the FHA Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe were entitled to certain rights and protections that BCAT 2014-4TT disregards as part of its routine and customary practices: (i) including loss mitigation programs available under the FHA program and its terms and conditions including loan modifications with principal reductions; and (ii) the right to a face-to-face meeting with a representative of their FIN. INST. § 11-501(n)(2) mortgage servicer(s);

288. Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe seek a declaration that:

(a) BCAT 2014-4TT entitled to no greater rights than what its predecessors in interest had to give it;

(b) HUD as BCAT 2014-4TT'S predecessor in interest had no right to strip the FHA protections from Ms. Brown's, Dr. Sharma's, and Mr. & Mrs. Riffe's loans without (i) notice to Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe and (ii) complying with the Administrative Procedures Act; and

(c) BCAT 2014-4TT's Fɪɴ. Iɴsᴛ. § 11-501(n)(2) mortgage servicer(s) of Ms. Brown's, Dr. Sharma's, and Mr. & Mrs. Riffe's mortgage loans must service the loans consistent with the FHA servicing guidelines.

WHEREFORE, Named Plaintiffs pray that this Court to enter declaratory judgments in their favor and make the following Orders to:

a. Order and declare that as a matter of law, that BCAT 2014-4TT is entitled to no greater rights than what its predecessors in interest had to give it;

b. Order and declare that HUD as BCAT 2014-4TT's predecessor in interest had no right to strip the FHA protections from Ms. Brown's, Dr. Sharma's, and Mr. & Mrs. Riffe's loans without (i) notice to Ms. Brown, Dr. Sharma, and Mr. & Mrs. Riffe and (ii) complying with the Administrative Procedures Act;

c. BCAT 2014-4TT's Fɪɴ. Iɴsᴛ. § 11-501(n)(2) mortgage servicer(s) of Ms. Brown's, Dr. Sharma's, and Mr. & Mrs. Riffe's mortgage loans must service the loans consistent with the FHA servicing guidelines;

d. Award reasonable attorneys' fees, litigation expenses and costs;

e. Order other appropriate declaratory relief; and

Respectfully Submitted,

_//s//Phillip R. Robinson_
Phillip R. Robinson
Bar No. 27824
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD 20910
Phone (301) 448-1304

_//s//Scott C. Borison (with permission)_
Scott C. Borison
Bar No. 22576
Legg Law Firm LLP.
1900 S. Norfolk Rd. Suite 350
San Mateo CA 94403
Phone (301) 620-1016
Fax (301) 620-1018
borison@legglaw.com

MD Office:
38 S. Paca St. #116 B
Baltimore MD 21202
_Counsel for the Plaintiff and Putative_
_Class Members_
_Attorney for Named Plaintiffs_

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing and attached exhibits was transmitted to all parties through the Court's CM/ECF System when filed.

Respectfully Submitted,

_//s//Phillip R. Robinson_
Phillip R. Robinson