# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

OM SHARMA, *et al.*,                    *

      **Plaintiffs,**          *

**v.**                                                                    Case No.: GJH-18-656

                          *

**RUSHMORE LOAN MANAGEMENT**
**SERVICES, LLC, *et al.*,**          *

      **Defendants.**          *

                          *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Om Sharma, Vaughn and Diane Riffe, Virginia Brown, and Susan Geiselman filed this putative class action on March 5, 2018 against mortgage servicer Rushmore Loan Management Services, LLC ("Rushmore") and the trustees of two New York common law trusts that own Plaintiffs' mortgages: Wilmington Savings Fund Society, FSB ("Wilmington"), doing business as Christiana Trust, sued solely in its capacity as trustee for the trust BCAT 2014-4TT ("BCAT"); and U.S. Bank, National Association ("U.S. Bank"), sued solely in its capacity as trustee for the trust RMAC 2016-CTT ("RMAC"). ECF No. 1. Plaintiffs assert a variety of federal and Maryland statutory claims premised on alleged violations of mortgage lending and servicing laws by Rushmore, Wilmington, and U.S. Bank ("Defendants"). Plaintiffs filed an Amended Complaint on October 9, 2018, ECF No. 25, which Defendants have each individually moved to dismiss, ECF Nos. 38, 39, 41. No hearing is necessary. *See* Loc. Rule 105.6. (D. Md.). For the following reasons, the Court will grant the motions to dismiss by Wilmington and U.S. Bank and grant in part and deny in part Rushmore's motion to dismiss.

## I.    BACKGROUND[1]

Each of the Plaintiffs alleges that they initiated a residential mortgage with a non-party lender, that they fell behind on their payments, and that the mortgages were eventually purchased by BCAT or RMAC and serviced by Rushmore, which took steps toward foreclosure in each case. The Court recounts Plaintiffs' allegations about the structure and history of the entities at issue, and the federal housing programs in which they participated, before turning to the specifics of Plaintiffs' mortgages and how they came to be owned by one of the trusts.

### A.  Defendants and General Allegations

The Amended Complaint includes an extensive history of public and private responses to the late 2000s housing and financial crisis. Among other topics, Plaintiffs describe the Federal Housing Administration ("FHA"), the office within the U.S. Department of Housing and Urban Development ("HUD") that provides mortgage insurance on loans made by approved lenders, allowing lenders to recover the unpaid principal balance of such mortgage loans if and when they foreclose on them. ECF No. 25 ¶¶ 42, 45–46. Funds for those payments are drawn from the Mutual Mortgage Insurance Fund ("MMI Fund"), which is funded through FHA's collection of insurance premiums and fees. *Id.* ¶ 47. Borrowers with FHA mortgages are also entitled to certain protections and rights to help avoid foreclosure, including access to favorable loan modification procedures. *Id.* ¶¶ 52–56, 60–61, 64.

In 2010, because the MMI Fund had been depleted by the foreclosure crisis, HUD began acquiring delinquent FHA mortgages and then selling them through its Single Family Loan Sale program. *Id.* ¶¶ 68–69. HUD expanded the program in 2012 and renamed it the Distressed Asset Stabilization Program ("DASP"). *Id.* ¶¶ 70–71. As a result of the sales of their mortgages

---

[1] Unless otherwise stated, these facts are taken from Plaintiffs' Amended Complaint, ECF No. 25, and are presumed to be true.

through DASP, FHA borrowers lost access to the borrower protections and other rights that they had enjoyed when the mortgages were FHA-insured. *Id.* ¶ 73. Since 2010, over 98,000 loans have been sold through the program. *Id.* ¶ 73. Plaintiffs note that a July 2017 report by HUD's Office of Inspector General found that the agency lacked formal procedures or guidelines for administering DASP and concluded that it should have been implemented through a notice-and-comment rulemaking procedure compliant with the Administrative Procedure Act. *Id.* ¶ 72.

Plaintiffs also describe the emergence of the industry to which Defendants belong, in which "Wall Street related hedge funds have acquired hundreds and thousands of defaulted, consumer loans, which are non-performing and otherwise in default, for pennies on the dollar of what is claimed due and owing from consumers." *Id.* ¶ 74. These entities purchase distressed and defaulted loans through DASP and other sources in order to "acquire the properties to which they are secured and to turn a quick profit." *Id.* ¶ 41. Plaintiffs identify one such entity, Angelo, Gordon & Co. ("AGC"), which Plaintiffs allege is a New York hedge fund "which specializes in the acquisition of distressed and defaulted loans including DASP loans." *Id.* ¶ 79.

AGC, Plaintiffs allege, "controls the day to day management" of BCAT, which is a New York common law trust established to acquire defaulted mortgage debts owed by Maryland consumers. *Id.* ¶¶ 20, 79a. Plaintiffs allege that BCAT "is nothing more than a paper entity that holds and owns mortgage accounts and loans on behalf of its investors" and "does not have any employees and does not operate like a bank, credit union, or trust company." *Id.* ¶ 20. BCAT "only intends to acquire defaulted, consumer debts for the primary purpose of commencing property acquisition by foreclosures, deeds in lieu, and short sales." *Id.* The trust's named trustee is Defendant Wilmington, which unlike AGC "has <u>no</u> day-to-day management of any of the activities subject to this action." *Id.* ¶ 79a.

Plaintiffs also identify non-party Roosevelt Management Company LLC ("Roosevelt"), "a New York-based investment management firm focused on investments in, management of, and servicing of, seasoned residential mortgage loans." *Id.* ¶ 22. Roosevelt is the "agent" of RMAC and "runs its affairs," in contrast to Defendant U.S. Bank, which is its trustee but "has no responsibility for it." *Id.* ¶ 21. Like BCAT, RMAC is a New York common law trust established to acquire defaulted mortgage debts owed by Maryland consumers, has no employees, and is "nothing more than a paper entity that holds mortgage accounts." *Id.* Plaintiffs also allege that RMAC "is an investment entity established to acquire defaulted mortgages and to thereafter collect upon the intangible and tangible assets associated thereto on behalf of its investors." *Id.*

Defendant Rushmore, Plaintiffs allege, is a mortgage servicer and a wholly owned subsidiary of Roosevelt that was established in 2010 and is headquartered in Irvine, California. *Id.* ¶¶ 19, 31. Rushmore services "hundreds of Maryland mortgage loans," *id.* ¶ 32, and was retained by BCAT and RMAC to act as the mortgage servicer for the loans at issue in this action, *id.* ¶¶ 19, 80, 178–81. In its role as mortgage servicer for the trusts, Rushmore "was delegated and assigned all duties related to [Plaintiffs'] loans . . . as their authorized agent on their behalf." *Id.* ¶ 19. These duties included "retention of attorneys/substitute trustees to act and to initiate foreclosure proceedings against Maryland residents." *Id.*

### B. Plaintiffs and Specific Allegations

The Court now turns to the specific allegations asserted about each Plaintiff's mortgage, a discussion that necessarily includes some of the procedural history of the litigation, which the Court addresses in full in the next section. Each Plaintiff's allegations include as an element that BCAT or RMAC improperly profited from the Plaintiffs' loans because the trusts were acting as mortgage servicers without the relevant required state licenses.

### 1. Virginia Brown

Plaintiff Virginia Brown ("Brown") and her brother, non-party Leroy Culp, Sr., are the owners of a parcel of real property in Pikesville, Maryland, which Brown purchased for herself and her family in June 2001. *Id.* ¶¶ 17, 75.[2] To finance the purchase, Brown initiated an FHA-insured loan. *Id.* ¶ 75. At some point, Brown fell behind on her payments and applied for loss mitigation with the owner of the mortgage, Bank of America, N.A. ("BANA"), which did not respond to Brown's requests. *Id.* ¶¶ 76–77.

At some time in November or December 2014, BANA conveyed all interest in Brown's loan to HUD as part of DASP. *Id.* ¶ 77. On December 1, 2014, Rushmore acquired the servicing rights to the loan. *Id.* ¶ 78. HUD then sold Brown's loan, along with hundreds of others of similar federally regulated loans, to an affiliate of AGC, which in turn transferred it to BCAT. *Id.* ¶ 79.[3] Based on loan records prepared by BANA and HUD, Rushmore and BCAT believed the loan was in default. *Id.* ¶ 83. On behalf of BCAT, Rushmore began communicating with Brown to attempt to collect on her loan, including by sending monthly mortgage statements. *Id.* ¶¶ 80–81. Beginning in January 2015, Rushmore reported to credit reporting agencies that Brown was past due in loan payments owed to Rushmore and that her loan was in foreclosure status. *Id.* ¶ 85. In February 2015, Rushmore, acting on BCAT's behalf, retained the Law Offices of Jeffrey Nadel for the purpose of collecting Brown's mortgage debt. *Id.* ¶¶ 82, 86.

---

[2] On January 16, 2020, the personal representative of the Estate of Virginia Brown, Cornell Brown, filed a Motion for Substitution of Party alerting the Court that Brown is deceased. ECF No. 52. Brown accordingly moved to substitute himself in her place pursuant to Federal Rule of Civil Procedure 25(a)(1). *Id.* While the movant did not file a statement noting Plaintiff Brown's death, as Rule 25(a)(1) requires, he did submit a Letters of Administration certificate signed by the Register of Wills for Baltimore County, Maryland that grants him administration of Plaintiff Brown's Estate. ECF No. 52-1. Defendants have not filed an opposition to the Motion for Substitution within the 14-day period provided by Local Rule 105.2. *See* Loc. R. 105.2 (D. Md.). Accordingly, the Court will grant the Motion for Substitution, but for simplicity will continue to refer to Plaintiff Brown rather than to her Estate.
[3] The Amended Complaint is somewhat unclear as to the specific timing of these events, but the ordering is immaterial.

On June 4, 2015, Brown mailed Rushmore a "Request for Mortgage Assistance" that included "all the documents Rushmore commonly requested for a complete loss mitigation application." *Id.* ¶ 87. Rushmore received the application on June 9, 2015 and sent Brown a letter on June 12, 2015 asking for certain additional information by June 27, 2015. *Id.* ¶¶ 87–88. On June 26, 2015, Brown faxed Rushmore all of the documents it had requested in its June 12 letter. *Id.* ¶ 89. Rushmore received the entire transmission but never sent Brown a written acknowledgment. *Id.* Instead, on July 7, 2015, Rushmore sent Brown a letter dated July 2, 2015 that claimed that it "did not receive all the required information." *Id.* ¶ 90.

Brown received the letter on July 10, 2015 and responded the same day with a correspondence that the Amended Complaint describes as a Qualified Written Request ("QWR"), a term defined by the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq. Id.* ¶ 91; *see* 12 U.S.C. § 2605(e)(1). In the alleged QWR, Brown informed Rushmore that she believed it had made an error in servicing her loan in its July 2 letter, had failed to properly acknowledge receipt of her June 4 request for assistance, and had erroneously failed to inform her of the appeal process for her application. ECF No. 25 ¶¶ 91a, 91b, 91c. Brown also requested information about whether Rushmore had a practice of backdating correspondence to borrowers and further requested that Rushmore stop all negative credit reporting on her loan for 60 days after receiving the QWR. *Id.* ¶¶ 91d, 91e. Rushmore received the alleged QWR on July 15, 2015. *Id.* ¶ 92.

On July 30, 2015, Brown received a letter from Rushmore compliance representative J.L. DuVall, backdated to July 16, 2015 but not sent until July 28, acknowledging receipt of Brown's July 10, 2015 correspondence and promising to respond within 30 days. *Id.* ¶ 93. Rushmore did not respond, however, and instead on August 19, 2015 sent Brown a standard form letter

requesting that she submit an additional request for mortgage assistance. *Id.* ¶¶ 94–95. Brown

responded by sending Rushmore a second alleged QWR on September 9, 2015, which Rushmore

received on September 15. *Id.* ¶ 96. Brown's mailing included a complete copy of her July 10,

2015 correspondence and a letter requesting an investigation and a response to that request,

including a statement of reasons if Rushmore believed it had not committed an error. *Id.* ¶¶ 96,

96a–d. Rushmore did not respond. *Id.* ¶ 97.

Instead, Rushmore sent Brown an additional form letter dated September 14, 2015 stating

that it had not received "the requested documentation from you" relating to Brown's application

for loss mitigation. *Id.* ¶ 98. On September 29, 2015, Rushmore, on behalf of BCAT, appointed

attorneys to proceed with foreclosure on Brown's property. *Id.* ¶ 99. On October 22, 2015,

however, Rushmore solicited Brown again to submit an application for loss mitigation. *Id.* ¶ 100.

In response, Brown faxed Rushmore a second packet requesting mortgage assistance on October

23, 2015. *Id.* ¶ 101. In an undated letter sent sometime before October 30, 2015, Rushmore

requested that Brown again send it additional documents. *Id.* ¶ 102. On November 9, 2015,

Brown sent to Rushmore by fax all of the additional requested documents that were available to

her, accompanied by an inquiry to which Rushmore did not respond. *Id.* ¶ 103.

Despite Brown's responses, Rushmore's attorneys commenced a foreclosure action

against Brown on behalf of Rushmore and BCAT on November 6, 2015 in the Circuit Court for

Baltimore County. *Id.* ¶ 104.[4] Pursuant to Maryland law, Rushmore filed several affidavits in the

action, including a Preliminary Loss Mitigation Affidavit by Rushmore's Senior Vice President,

Kevin Elliott. *Id.* ¶ 110. Elliot represented that Rushmore had not been able to obtain all

documentation and information necessary to conduct loss mitigation analysis and that certain

---

[4] The previous day, the attorneys also sent Brown a letter alerting her that a foreclosure sale of her property may
occur after 45 days from the date of the notice. ECF No. 25 ¶ 108.

documents were needed, including a "2015 Award Letter" that was needed "because the deposits were different than 2014 letter [sic]." *Id.* ¶ 110. Elliott apparently referred to a letter from the Social Security Administration awarding benefits for the years 2013 to 2015 to Brown's brother, as well as an earlier letter for the years 2013 to 2014. *Id.* ¶ 87. Brown had included the 2015 Award Letter in the packet she sent to Rushmore on June 9, 2015 and in the alleged QWRs that she submitted on July 10, 2015 and September 9, 2015. *Id.* ¶ 111.

As this Court explained in a previous Memorandum Opinion addressing Defendants' request for costs and attorneys' fees for litigating the Brown foreclosure action, Brown filed a class action counterclaim complaint against Wilmington and Rushmore on November 17, 2015 alleging violations of RESPA, the Fair Debt Collection Practices Act ("FDCPA"), the Maryland Collection Agency Licensing Act ("MCALA"), and the Maryland Mortgage Lender Law ("MMLL"). ECF No. 31 at 2 (citing ECF No. 14-7 at 5).[5] After filing two amended complaints, Brown voluntarily dismissed the counterclaims on February 26, 2018. *Id.* at 2–3. Brown and the remaining Plaintiffs in this case filed this action on March 5, 2018. The original Complaint explained, and the Amended Complaint reiterates, that Brown brought this action "[b]ecause the state court refused to make any legal rulings on the claims presented to it by Ms. Brown for over two years." ECF No. 2 ¶ 23; ECF No. 25 ¶ 30.

In this action, Brown seeks a variety of forms of damages, including economic damages for her costs incurred to communicate with Rushmore, improper foreclosure fees and other costs, and costs of approximately $50.00 to transmit information to Rushmore related to Brown's alleged QWRs and loss mitigation applications. ECF No. 25 ¶¶ 113–113b. Brown also seeks noneconomic damages for emotional harm arising from Rushmore's "botched servicing and

---

[5] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to page numbers generated by that system.

collection of [Brown's] loan," statutory damages under the FDCPA and RESPA, and restitution damages and losses from BCAT for allegedly unlawfully profiting by acting as an unlicensed mortgage servicer. *Id.* ¶¶ 113c, 114, 116.

### 2. Om Sharma

Plaintiff Om Sharma ("Sharma") acquired a home in Glenn Dale, Maryland on June 29, 2007. *Id.* ¶ 117. He refinanced his original loan into an FHA insured mortgage on or about January 5, 2010. *Id.* ¶ 118. Sharma's loan was eventually acquired by BANA, which transferred it to HUD through DASP in January 2015. *Id.* ¶¶ 119–20. HUD then transferred the loan to Roosevelt, which in turn transferred it to BCAT on or about July 21, 2015. *Id.* ¶ 121. Rushmore acquired the rights to service the loan and on January 27, 2015 sent Sharma written correspondence asserting that he owed certain amounts. *Id.* ¶ 124–25.[6] On May 5, 2016, Rushmore offered Sharma a trial modification of his loan conditioned on a down payment of $50,000. *Id.* ¶ 125. The correspondence informed Sharma that Rushmore had the right to commence or continue foreclosure proceedings. *Id.*

Sharma timely paid the down payment and completed the proposed trial modification by making additional payments to Rushmore through November 2015. *Id.* ¶¶ 127–28. On December 4, 2015 and January 14, 2016, Rushmore sent Sharma a proposed final modification of his loan. *Id.* ¶ 130. The Amended Complaint alleges that the documents falsely indicated that Sharma had discussed the terms of the final modification with Rushmore, and failed to inform Sharma that the modification would convert the loan to an adjustable rate mortgage. *Id.* ¶¶ 130, 130a, 130b. On March 26, 2016, Rushmore wrote to Sharma informing him that he was in default, owed $216,305.96 to Rushmore, and was required to pay the entire amount at that time. *Id.* ¶ 131.

---

[6] The Amended Complaint dates this correspondence as January 27, 2015, an apparent typographical error given the overall chronology alleged. *See* ECF No. 25 ¶¶ 121, 125.

After seeking assistance from a nonprofit housing counseling agency, Sharma eventually agreed to the terms of Rushmore's proposed final modification on or about April 28, 2016. *Id.* ¶ 134–35. On June 13, 2016, Rushmore wrote to Sharma to inform him that a new servicer, Shellpoint Mortgage Servicing, would become his loan servicer effective July 1, 2016. *Id.* ¶ 137. Rushmore wrote to Sharma again on August 21, 2017, however, informing him that BCAT remained the owner of his loan. *Id.* ¶ 140. The Amended Complaint asserts that BCAT improperly profited from Rushmore's servicing of Sharma's loan because a majority of the amounts that Rushmore claimed and that Sharma paid were for interest, fees, and costs rather than the principal portion of the loan. *Id.* ¶¶ 129, 132, 138.

The Amended Complaint also alleges that Sharma suffered significant emotional and mental health issues as a result of his interactions with Rushmore. *Id.* ¶ 133. Sharma claims non-economic damages resulting from this emotional harm, as well as economic damages for the costs of time incurred to communicate with Rushmore and for improper late fees, property preservation fees, and foreclosure costs and interest. Sharma further claims statutory damages under the FDCPA and restitution damages and losses from BCAT. *Id.* ¶¶ 141–142, 144.

### 3. Vaughn and Diane Riffe

Plaintiffs Vaughn and Diane Riffe ("the Riffes") refinanced an existing mortgage loan on a property in Beltsville, Maryland on January 5, 2010. *Id.* ¶¶ 15, 145. At some point prior to January 29, 2015, they fell behind on their payments and defaulted on the mortgage, which at that time was owned by BANA. *Id.* ¶ 146. On or about January 29, 2015, BANA transferred the loan to HUD through DASP. *Id.* ¶ 147. HUD then transferred the loan to Roosevelt, which in turn transferred it to BCAT on or about July 20, 2015. *Id.* ¶¶ 147–48. After Rushmore obtained the servicing rights to the loan, it engaged the BWW Law Group LLC to assist it with collection

and to commence a foreclosure against the Riffes "sometime around March 2015." *Id.* ¶ 151. Though no foreclosure action ever occurred, the Riffes' mortgage account was charged $1,000. *Id.* The Amended Complaint also asserts that Rushmore improperly charged the Riffes' account with monthly late fees from April 2015 through at least January 2016 and improperly assessed property inspection fees on several occasions, which the Riffes only learned of from their current mortgage servicer in January 2018. *Id.* ¶¶ 152, 154.

On or about October 10, 2015, Rushmore offered the Riffes a trial modification of their loan that was conditioned on a down payment of $4,040. *Id.* ¶ 155. The Riffes timely made the down payment on or about October 23, 2015 and completed the trial modification by paying additional sums to Rushmore through April 2016. *Id.* ¶¶ 157–58. On May 17, 2016, Rushmore sent the Riffes a proposed final modification, which the Amended Complaint alleges falsely stated that the Riffes had discussions with Rushmore about the terms of the final modification and failed to inform them that the offer would convert their loan to an adjustable rate mortgage. *Id.* ¶¶ 160, 160a, 160b. The proposed modification terms also increased the Riffes' interest rate and extended the maturity rate of the loan to 2047. *Id.* ¶ 162. The Riffes agreed to the terms and returned the modification on or about May 25, 2016. *Id.* ¶ 163. On or about June 13, 2016, Rushmore wrote to the Riffes to inform them that Shellpoint Mortgage Servicing would become their servicer effective July 1, 2016. *Id.* ¶ 165.

Similar to Plaintiff Sharma, the Amended Complaint alleges that the Riffes' payments were improperly misapplied to profits for BCAT rather than toward the principal portion of their loan and any taxes or insurance BCAT actually paid on the Riffes' behalf. *Id.* ¶¶ 156, 159, 166. The Riffes claim economic damages for costs and time incurred to communicate with Rushmore,

improper late fees, inspection fees, foreclosure costs, and interest, statutory damages under the FDCPA, and restitution damages and losses from BCAT. *Id.* ¶¶ 169, 169c, 170–72.

### 4. Susan Geiselman

Plaintiff Susan Geiselman owns a residential property in Ocean City, Maryland. *Id.* ¶ 18. On or about March 31, 2008, Geiselman's late husband, Michael K. Ward, refinanced a mortgage loan for the property with Bank of America on or about March 31, 2008. *Id.* ¶ 174. Shortly after the refinancing, Ward begin to struggle with mental health issues and, unbeknownst to Geiselman, fell into default on the loan after September 2009. *Id.* ¶ 176. On January 3, 2013, Ward took his own life and Geiselman was named the personal representative of his estate, at which point she learned that the mortgage loan was in default, that Ward had allowed his life insurance to lapse, and "that her family was literally broke." *Id.* ¶ 177.

On or about June 2, 2016, Geiselman's loan was acquired by RMAC from its previous owner Nationstar Mortgage LLC. *Id.* ¶ 178. Rushmore acquired the servicing rights for the loan and initiated a foreclosure proceeding against Geiselman through attorneys at the Atlantic Law Group in March 2017. *Id.* ¶ 179. Geiselman's counsel appeared at the foreclosure action and moved that it be dismissed. *Id.* ¶ 182–83. In a hearing on September 29, 2017, Judge Thomas C. Groton, III of the Circuit Court for Worcester County, Maryland, ruled that RMAC was an unlicensed collection agency and was not permitted to pursue a foreclosure action against Geiselman or to collect through Rushmore or its attorneys. *Id.* ¶¶ 179, 184, 184a–c. Judge Groton accordingly dismissed the foreclosure action. *Id.* ¶ 184d. Rather than appeal, RMAC acquired a Maryland collection agency license on November 21, 2017. *Id.* ¶ 186. The Amended Complaint asserts that RMAC "is threatening to commence another attempted foreclosure" against Geiselman in the same court. *Id.* ¶ 186.

In this action, Geiselman claims economic damages for the legal fees incurred defending the foreclosure action against her and for interest, fees, and costs added to her loan balance before RMAC became licensed as a collection agency. *Id.* ¶¶ 187–187b. Geiselman also claims statutory damages under the FDCPA. *Id.* ¶ 189.

### 5. Class Allegations

Finally, the Amended Complaint proposes three classes and a subclass: an "FDCPA Class" of Maryland persons with whom Rushmore has communicated to collect a consumer debt on behalf of BCAT or RMAC, *id.* ¶ 201; an "FDCPA Subclass" of members of the FDCPA Class who paid any amount to BCAT that Rushmore applied to charges other than the principal portion of their loan, *id.* ¶ 202; a "RESPA Dual-Tracking Class" of borrowers who submitted to Rushmore on or after January 10, 2014 an application for loss mitigation of a federally related mortgage, after receipt of which Rushmore or its agents initiated a foreclosure before the borrower's appeal rights under RESPA and applicable regulations had expired, *id.* ¶ 219; and a "RESPA QWR Class" of borrowers who submitted to Rushmore on or after January 10, 2014 a QWR concerning a "federally related" mortgage that Rushmore did not acknowledge or respond to in writing in the time period required by RESPA and applicable regulations, *id.* ¶ 233.

### C. Claims

The Amended Complaint alleges five counts against some or all of the Defendants. Count I alleges that all Defendants violated provisions of the FDCPA, 15 U.S.C. §§ 1692e, 1692f when Rushmore, on behalf of BCAT and RMAC, communicated with Plaintiffs and the FDCPA Class and FDCPA Subclass members to threaten or pursue litigation and to demand sums that Plaintiffs and class members did not owe to the Defendant trusts because they were not licensed mortgage lenders. *Id.* ¶¶ 250–51.

Count II alleges that all Defendants violated provisions of the Maryland Consumer Debt

Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14-202(8), 14-202(9), in three ways:

falsely asserting, in communications with Plaintiffs and the FDCPA Class and Subclass members

and in county land records, that they have rights to collect money from those borrowers that they

in fact lack because BCAT and RMAC are not licensed mortgage lenders, ECF No. 25 ¶ 259;

threatening that Rushmore may bring foreclosure actions on behalf of BCAT and RMAC, and

bringing such actions, even though BCAT and RMAC have no right to pursue such actions

without valid mortgage lender licenses, *id.* ¶ 260; and filing land records falsely asserting a right

to collect payments from Plaintiffs and the FDCPA Class and Subclass members, improperly

implying that a government entity has authorized collection, *id.* ¶ 261. Count II also asserts that

these violations are *per se* violations of a provision of the Maryland Consumer Protection Act

("MCPA"), Md. Code Ann., Com. Law § 13-301(14)(iii). *Id.* ¶ 262.

Count III is a common law unjust enrichment claim by Sharma, the Riffes, and the

proposed FDCPA Subclass against Rushmore and BCAT, alleging that BCAT lacked the license

needed to receive profits from collecting on mortgages but that it nonetheless sought and

obtained them with Rushmore's knowing assistance. *Id.* ¶¶ 265, 268–70. Count IV alleges that

Rushmore violated provisions of RESPA and its implementing regulations by failing to

acknowledge receipt and evaluate the loss mitigation applications that Brown, the Riffes, and the

proposed RESPA Dual-Tracking Class submitted before initiating foreclosure proceedings. *Id.*

¶¶ 274–75, 279–81. Count IV also alleges that Rushmore violated other provisions of RESPA

and applicable regulations by untimely acknowledging or not responding to Brown's alleged

QWR and those of the RESPA QWR Class's members. *Id.* ¶ 283. The Amended Complaint

alleges that Rushmore has a pattern and practice of noncompliance with RESPA's requirements

for borrowers like Brown and the RESPA QWR Class members, as evidenced by Brown's experience, complaints about Rushmore to the Consumer Financial Protection Bureau, and allegations made in other cases before federal courts. *Id.* ¶¶ 284–284e.

Finally, in Count V, Brown, Sharma, and the Riffes seek a declaratory judgment under 28 U.S.C. §§ 2201–2202 that HUD "had no right to strip the FHA protections" from their loans when it sold them through DASP without providing them notice and complying with the Administrative Procedure Act, and that BCAT as purchaser of the loans is entitled to no greater rights than what HUD had as its predecessor in interest, with the result that BCAT's servicer must service the loans consistent with FHA servicing guidelines. *Id.* ¶ 286–88.

### D. Procedural History

As noted previously, Brown filed this action along with her co-plaintiffs on March 5, 2018 after dismissing the similar counterclaim action that she filed in her foreclosure case on November 17, 2015. ECF No. 2 ¶ 23; ECF No. 14-7 at 5. In April 2018, Rushmore and Wilmington moved under Federal Rule of Civil Procedure 41(d) for an Order that Brown pay their costs and fees for the counterclaim action, and further asked the Court to stay this case pending her payment and the Maryland Court of Appeals' forthcoming ruling in a case raising related issues, *Blackstone v. Sharma*, No. 040, September Term 2017. ECF No. 7, ECF No. 14-1. U.S. Bank joined in Rushmore's motion to stay. ECF No. 10. The Court of Appeals issued a decision in *Blackstone* on August 2, 2018, *Blackstone v. Sharma*, 191 A.3d 1188 (Md. 2018), and Plaintiffs filed an Amended Complaint in this action on October 9, 2018, ECF No. 25.

In a Memorandum Opinion on March 22, 2019, the Court granted in part and denied in part the motions by Rushmore and Wilmington and denied U.S. Bank's motion to stay as moot. ECF No. 31. Applying Rule 41(d), the Court denied Defendants' requests for attorneys' fees but

granted Wilmington and Rushmore's requests for costs. *Id.* at 5. In its accompanying Order, the Court directed Wilmington and Rushmore to submit Bills of Costs and stayed the case until the costs were paid. ECF No. 32. Wilmington filed a Bill of Costs on April 5, 2019, ECF No. 33, and Brown filed a Notice on April 10, 2019 stating that she had mailed Wilmington a check for the amount that it sought, ECF No. 35. Rushmore did not file a Bill of Costs on the Court's docket. On May 8, 2019, however, Brown filed a Notice that she had received from Rushmore the payment that she had made to Wilmington. ECF No. 37.

None of the Defendants responded to Brown's Notices to clarify what transpired with her costs payments or to request that the Court lift the stay of the case. Instead, on April 24, 2019, Wilmington moved for an extension of time to file an answer to the Amended Complaint, ECF No. 36, which Plaintiffs did not oppose, and on May 10, 2019, all three Defendants filed Motions to Dismiss, ECF Nos. 38, 39, 41. Based on these filings, the Court assumes that all issues with respect to costs have been addressed and that Defendants wish to lift the stay.

On May 24, 2019, Plaintiffs filed a Motion for Leave to file a combined Opposition to Defendants' Motions to Dismiss and their proposed brief. ECF Nos 42, 43. Defendants filed Replies to the Opposition on June 7. ECF Nos. 44, 45, 46.[7] On October 2, 2019, Plaintiffs submitted a letter alerting the Court that Judge Bennett of this Court issued rulings in two cases that raise some of the issues presented in this case. ECF No. 50 (citing *Suazo v. U.S. Bank Trust, NA*, No. RDB-18-1451, 2019 WL 4673450 (D. Md. Sept. 25, 2019); *Robinson v. Fay Servicing, LLC*, No. RDB-18-2710 (D. Md. Sept. 27, 2019)). The following day, Rushmore and U.S. Bank filed a Notice of Supplemental Authority that also alerted the Court to Judge Bennett's ruling in the *Suazo* case. ECF No. 51.

---

[7] Wilmington's Reply was rejected by the Clerk of the Court as improperly filed and was refiled on June 17, 2019. ECF No. 48. The Court looks to the refiled Reply and treats it as timely.

## II.     STANDARD OF REVIEW

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*, 550 U.S. at 570). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III.     DISCUSSION

The core contention of Counts I, II, and III of the Amended Complaint (together, the "Licensing Claims") is that BCAT and RMAC acted as unlicensed mortgage lenders in retaining Rushmore to enforce and foreclose on Plaintiffs' mortgages, thereby violating Maryland and federal law. *See, e.g.*, ECF No. 25 ¶¶ 35, 198. Because that assertion is simply incorrect as a matter of law, the Court will dismiss the claims that flow from it. The Court will also dismiss the

claim for a declaratory judgment in Count V because it fails to present an actual controversy between the parties. Count IV, however, will be dismissed in part and allowed to proceed in part because the Amended Complaint plausibly alleges that Rushmore violated RESPA in servicing Brown's loan.

### A. Licensing Claims

Defendants move to dismiss Counts I, II, and III on the ground that the MMLL, the Maryland mortgage lender statute, does not require BCAT and RMAC to hold mortgage lender licenses. The parties' arguments on this issue implicate three provisions of the statute, codified in the Financial Institutions Article of the Maryland Code. § 11-504 provides that "A person may not act as a mortgage lender unless the person is: (1) A licensee; or (2) A person exempted from licensing under this subtitle." Md. Code Ann., Fin. Inst. § 11-504. A "mortgage lender" is defined as "any person who: (i) Is a mortgage broker; (ii) Makes a mortgage loan to any person; or (iii) Is a mortgage servicer." *Id.* § 11-501(j). Finally, a "mortgage servicer" is "a person who: (1) Engages in whole or in part in the business of servicing mortgage loans for others; or (2) Collects or otherwise receives payments on mortgage loans directly from borrowers for distribution to any other person." *Id.* § 11-501(n). The Amended Complaint asserts, and Defendants do not contest, that Rushmore is a mortgage servicer under § 11-501(n)(2). Plaintiffs further claim, however, that BCAT and RMAC "engage[] in whole or in part in the business of servicing mortgage loans for others" and therefore qualify as mortgage servicers under § 11-501(n)(1) and as mortgage lenders under § 11-501(j)(iii), and therefore must be licensed under § 11-504. *See* ECF No. 25 ¶¶ 8, 20–21, 80, 113c, 137, 165, 168.

In responding to this claim, Defendants note a point of vagueness in the Amended Complaint: whether Plaintiffs' claims are asserted against Wilmington and U.S. Bank, as the

18

trustees of BCAT and RMAC, or rather against the trusts themselves. Rushmore observes that the introduction of the Amended Complaint identifies the Defendants in the action as Wilmington and U.S. Bank, solely in their roles as trustees, but also establishes for them the defined terms "BCAT 2014-4TT" and "RMAC TRUST 2016-CTT," which are used throughout the pleading in allegations that appear to be made against the trusts themselves. ECF No. 38-1 at 18 n.6 (citing ECF No. 25 at 2). Plaintiffs only briefly address this issue in their Opposition, asserting at one point that Wilmington and U.S. Bank "are simply nominal parties and have no control whatsoever to [sic] the day to day management of either trust." ECF No. 43 at 19 n.3.

The Court need not delve further into this question, however, because neither the trustee banks nor the trusts themselves qualify as mortgage servicers under the MMLL. The Court reaches these conclusions of Maryland law by "predict[ing] how [the Maryland Court of Appeals] would rule if presented with the issue[s]," which it has not addressed. *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). The Court's analysis is guided by Maryland statutory interpretation principles, *see Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234–38 (4th Cir. 2014), "[t]he cardinal rule" of which is that the Court must "ascertain and effectuate the intent of the General Assembly," *Hollingsworth v. Severstal Sparrows Point, LLC*, 141 A.3d 90, 94 (Md. 2016) (citing *McClanahan v. Wash. Cty. Dep't of Soc. Servs.*, 129 A.3d 293 (Md. 2015)). For this purpose, Maryland courts apply the "plain meaning rule," under which courts "give the 'ordinary and natural meaning' to statutory language because this language is 'the primary source of legislative intent.'" *McClanahan*, 129 A.3d at 298 (quoting *Motor Vehicle Admin. v. Shrader*, 597 A.2d 939, 943 (Md. 1991)). Courts generally "interpret statutes to give every word effect, avoiding constructions that render any

portion of the language superfluous or redundant." *State v. Holton*, 24 A.3d 678, 684 (Md. 2011) (quoting *Gillespie v. State*, 804 A.2d 426, 427 (Md. 2002)).

Determining whether Wilmington and U.S. Bank are exempt from the MMLL requires little more than basic application of these interpretive principles. § 11-502(b) of the Financial Institutions Article states that "[t]he provisions of this subtitle do not apply to: (1) Any bank, trust company, savings bank, savings and loan association, or credit union incorporated or chartered under the laws of this State or the United States or any other-state bank having a branch in this State." As each of the Defendants notes, both U.S. Bank and Wilmington are federally chartered banks listed on the website of the federal Office of the Comptroller of the Currency ("OCC"). *Financial Institution Lists*, Office of the Comptroller of the Currency, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/index-financial-institution-lists.html.[8] Accordingly, Wilmington and U.S. Bank are exempt from the MMLL's mortgage lender licensing requirement.

Plaintiffs' main argument on this question is the same as their response to the question whether the banks or the trusts themselves are the Defendants: that the trustee banks are "simply nominal parties and have no control whatsoever to [sic] the day to day management of either trust." ECF No. 43 at 19 n.3. Plaintiffs do not cite to the Amended Complaint for this assertion of fact, however, nor to any authority indicating why it would impact the application of the plain language of § 11-502(b)(1). Instead, Plaintiffs cite an OCC interpretive letter, an out-of-circuit district court decision, and an unrelated statute to claim that a federal charter does not preempt state law requirements for assets held by banks. *Id.* As Wilmington notes in its Reply, however,

---

[8] The Court takes judicial notice of these public records pursuant to Federal Rule of Evidence 201(b)(2). *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

Defendants' argument does not primarily rely on federal preemption but rather on the text of § 11-502(b)(1), which explicitly exempts banks from the licensing provisions of the MMLL. ECF No. 48 at 9. Therefore, to the extent Counts I, II, and III are asserted against the trustee banks for failing to obtain mortgage lender licenses under the MMLL, they must be dismissed because the banks are exempt from that requirement.

The Court thus turns to whether the trusts themselves are mortgage servicers and are therefore required by the MMLL to hold lender licenses. Plaintiffs make a number of overlapping arguments in claiming that the trusts "[e]ngage[] in whole or in part in the business of servicing mortgage loans for others" and therefore qualify as servicers under § 11-501(n)(1). But none of their arguments undermine the conclusion that the plain text of the statute does not reach the trusts. As Judge Bennett explained in his thorough and well-reasoned opinion in the *Suazo* case, which addressed the same question with respect to a statutory trust, "[t]he MMLL defines the term 'mortgage servicer' in a somewhat circular manner, setting forth that the term encompasses those who engage in the business of 'servicing mortgage loans for others,'" and provides no further definition of "servicing." 2019 WL 4673450, at *7. Ordinarily, however, as Judge Bennett also noted, the phrase refers to "[t]he administration of a mortgage loan, including the collection of payments, release of liens, and payment of property insurance and taxes." *Mortgage Servicing*, Black's Law Dictionary (11th ed. 2019).

Nowhere in the Amended Complaint do Plaintiffs allege that the trusts perform any of these activities. Instead, they assert that each trust is "nothing more than a paper entity that holds mortgage accounts and loans." ECF No. 25 ¶ 21; *see also id.* ¶ 20 (describing BCAT as "nothing more than a paper entity that holds and owns mortgage accounts and loans on behalf of its investors"). Plaintiffs further allege that the trusts have no employees, do not operate like

financial institutions, and were established simply to acquire a pool of loans to eventually be sold to investors. *Id.* ¶¶ 20–21. It is Rushmore, the Amended Complaint states, that performs the ordinary duties of a mortgage servicer for Plaintiffs' loans. *See, e.g.*, *id.* ¶¶ 81–104, 123–37, 150–68, 179–83. And Plaintiffs do not dispute Defendants' assertion that Rushmore holds a mortgage lender license.[9] Based on their own allegations, therefore, Plaintiffs are left with the claim that merely holding title to mortgage loans qualifies an entity as a mortgage servicer under § 11-501(n)(1). The Court agrees with Judge Bennett's finding in *Suazo* that the definition in that provision is not so broad. *See Suazo*, 2019 WL 4673450, at *7.

In arguing that the Court should look beyond the plain text of the statute, Plaintiffs rely heavily on the Maryland Court of Appeals' decision in *Blackstone*, which Plaintiffs claim supports their interpretation. It does not, as Judge Bennett cogently explained in *Suazo*:

> In *Blackstone*, the Maryland Court of Appeals considered only the "limited legal issue" of whether "the General Assembly intended a foreign statutory trust, as owner of a delinquent mortgage loan, to obtain a license as a collection agency under [the Maryland Collection Agency Licensing Act] before substitute trustees instituted a foreclosure action against a homeowner who defaulted on his or her mortgage." 461 Md. at 96, 191 A.3d 1188. The Court concluded that they did not. Over the course of its Opinion, the Court of Appeals did not once address the scope of the Maryland Mortgage Lender Law and certainly did not conclude that the statute required [a foreign statutory trust] to obtain a license.

2019 WL 4673450, at *6 (first alteration in original). Plaintiffs point to a specific statement in *Blackstone* – that mortgage industry trusts "constitute[] a pool of loans that will eventually be sold off to investors" – and insist that it means that such trusts are engaged in the business of

---

[9] Rushmore cites an entry in the online Nationwide Multistate Licensing System ("NMLS") database as evidence of its license. ECF No. 38-1 at 21 n.7. While the database itself does not appear on its face to be judicially noticeable, the Maryland Office of the Commissioner of Financial Regulation provides the database as its public resource for verifying lender licenses. *See* Licensee Search - Financial Regulation, Md. Office of the Comm'r of Fin. Regulation, https://www.dllr.state.md.us/finance/industry/licsearch.shtml. For this reason, and because Plaintiffs have not objected, the Court will take judicial notice of Rushmore's license entry.

servicing loans under the MMLL. ECF No. 43 at 15 (quoting *Blackstone*, 191 A.3d at 1218). This "ambitious logical leap," as Judge Bennett described it, is simply a non sequitur and has no support in *Blackstone*'s analysis.[10] *Suazo*, 2019 WL 4673450, at *7.

Plaintiffs also argue that interpreting § 11-501(n)(1) not to reach the trusts renders it duplicative of § 11-501(n)(2) and therefore superfluous. Judge Bennett also specifically rejected this claim in *Suazo*, explaining that "[t]he definition in § 11-501(n)(1) encompasses a broad array of mortgage servicing activities such as releasing liens and paying property insurance," while "the second definition in § 11-501(n)(2) is constrained to the narrower task of 'collect[ing] or otherwise receiv[ing] payments on mortgage loans directly from borrowers for distribution to any other person.'" 2019 WL 4673450, at *7 (quoting Md. Code Ann., Fin. Inst. § 11-501(n)(2)). Therefore, reading § 11-501(n)(1) as broader than § 11-501(n)(2), but not so broad that it reaches the Defendant trusts here, "both comports with the plain meaning of the term 'mortgage servicing' and does not render § 11-501(n)(2) superfluous." *Id.*

Plaintiffs finally argue that as assignees of mortgages, each trust "steps into the shoes of the maker of the loan and qualifies as a mortgage lender." ECF No. 43 at 17. Judge Bennett once again cogently dispatched with this argument in *Suazo*, finding that it was "simply without merit":

> It is certainly true that assignees acquire "every right which the assignor possessed under the mortgage at the time of the assignment." Md. Code Ann., Real Prop. § 2-103. Additionally, Maryland courts frequently describe assignees as "standing in the shoes" of the assignor or use like imagery. *Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 139, 94 A.3d 61 (2014). Such metaphors do not suggest that one who assumes a contract thereupon assumes the same entity status as the assignor, thereby subjecting it to the same rules and regulations. Quite simply, one

---

[10] Notably, in the same paragraph, the Court of Appeals differentiated such trusts from servicers, noting that mortgage trusts are called "'special purpose vehicles' because they simply hold the loans managed by the trustees and collected by the mortgage servicers." 191 A.3d at 1218. It is "[t]he mortgage servicer, as opposed to the statutory trust, [that] acts as the debt collector and interacts with the borrowers." *Id.*

23

does not become a "mortgage lender" merely by obtaining title to a
mortgage loan.

2019 WL 4673450, at *8. As Judge Bennett further noted, "mortgage lender" is defined by § 11-501(j) as "any person who: (i) Is a mortgage broker; (ii) Makes a mortgage loan to any person; or (iii) Is a mortgage servicer." Md. Code Ann., Fin. Inst. § 11-501(j). Assignees of mortgages are conspicuously absent, and the Court "may not supply words which the General Assembly was capable of inserting but did not." *Suazo*, 2019 WL 4673450, at *8 (citing *Chi. Title Ins. Co. v. Mary B.*, 988 A.3d 1044, 1051 (Md. App. 2010)).[11]

Because none of Plaintiffs' arguments for departing from the plain text of § 11-501(n) are persuasive, the Court agrees with Judge Bennett's determination in *Suazo* and concludes that BCAT and RMAC are not mortgage servicers required to obtain licenses by the MMLL. Accordingly, Counts I, II, and III, which each rely on the faulty premise that the trusts have unlawfully operated without licenses, will be dismissed.

### B. RESPA Claims

Rushmore next moves to dismiss Brown's claim against it under RESPA for failing to respond to her alleged QWRs, as well as Brown's and the Riffes' claims challenging Rushmore's alleged dual tracking of their loans. The Court considers these separate sets of allegations in turn.

Rushmore first argues that Brown's letters to Rushmore were not QWRs and that it therefore had no obligation to respond to them. The primary provision of RESPA at issue, 12 U.S.C. § 2605(e), "imposes a duty on loan servicers to respond to borrower inquiries and take

---

[11] Judge Bennett further found that a Court of Appeals decision Plaintiffs also cite here, *Taylor v. Friedman*, 689 A.2d 59 (Md. 1997), had no bearing on whether a statute prohibiting property inspection fees applied to the defendant assignee trust in that case. *Suazo*, 2019 WL 4673450, at *10. In short, while the court in *Taylor* described various entities that had held a note secured by a deed of trust on a residence as "Lender," the court did not hold that each "Lender" could be liable under the inspection fee statute. *See id.* The Court agrees with Judge Bennett's reading of *Taylor* and concludes that it has even less relevance here than in *Suazo*.

certain actions with respect to such inquiries." *Cole v. Fed. Nat'l Mortg. Ass'n*, No. GJH-15-3960, 2017 WL 623465, at *6 (citing 12 U.S.C. § 2605(e)). "Borrower inquiries triggering these duties are known as 'qualified written requests' or QWRs." *Id.* The statute defines a QWR as

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

"If any servicer of a federally related mortgage loan receives a [QWR] from the borrower . . . for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." *Id.* § 2605(e)(1)(A). The statute defines "servicing" as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *Id.* § 2605(i)(3). "A mere request for information on loan modifications does not constitute a QWR." *Davenport v. Wells Fargo Home Mortg.*, No. PJM 14-2369, 2015 WL 4475467, at *2 (D. Md. July 17, 2015).

The Amended Complaint alleges that Brown submitted QWRs to Rushmore on July 10, 2015 and on September 9, 2015. ECF No. 25 ¶¶ 91–91c, 96–96d. According to the Amended Complaint, the July 10 QWR stated that Brown believed Rushmore had made an error in servicing her loan when it sent her a letter, which it allegedly backdated to July 2, 2015, claiming that Brown's earlier requests for mortgage assistance did not include all required information. *Id.*

¶ 91a. The September 9 QWR included a copy of the July 10 correspondence, alerted Rushmore

that it had not timely responded, and requested a statement of reasons from Rushmore if it

believed it had not committed an error. *Id.* ¶¶ 96a–d. Rushmore now argues that neither of these

mailings constituted QWRs because they merely requested information on a loan modification

and did not relate to the servicing of Brown's loan. ECF No. 38-1 at 24–26.

Even making all inferences in favor of Plaintiffs, Rushmore is correct. While the

Amended Complaint attempts to fit Brown's July 10 letter into the QWR rubric by alleging that

Brown believed Rushmore "had made an error in [servicing] her loan," the purported error was

in backdating a letter responding to a request for information on a potential loan modification.

ECF No. 25 ¶ 91. In essence, Brown was simply seeking information about that prior

correspondence. And "[c]ourts have repeatedly held that requests for information related to loan

modifications do not concern 'servicing' and therefore are not QWRs." *Nash v. PNC Bank, N.A.*,

No. TDC-16-2910, 2017 WL 1424317, at *5 (D. Md. Apr. 20, 2017) (collecting cases). Here,

none of Brown's correspondence concerned Rushmore's receipt of scheduled periodic payments

on Brown's loan or the making of such payments, which are the subjects that a communication

must concern to qualify as a QWR under the applicable statutes. *See* 12 U.S.C. § 2605(i)(3); *see*

*also Minson v. CitiMortgage, Inc.*, No. DKC 12-2233, 2013 WL 2383658, at *5 (D. Md. May

19, 2013) (holding that a correspondence did not relate to servicing because it said nothing about

the defendant's receipt of scheduled payments or the amount of the payments).

Plaintiffs' arguments with respect to these provisions simply ignore the definition of

"servicing" at § 2605(i)(3), which plainly limits the scope of the QWR definition at

§ 2605(e)(1)(A). Plaintiffs alternatively point to RESPA's implementing regulations to argue that

Brown's correspondence was sufficient.[12] Plaintiffs primarily cite 12 C.F.R. § 1024.36, which states that a QWR "that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section." 12 C.F.R § 1024.36(a). It also directs that "[a] servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan." *Id.*

"This argument fails," however, "because the language in a regulation cannot be read to broaden the scope of the statutory definition of 'servicing' or to expand the types of requests for information constituting a QWR beyond those established by the statute." *Nash*, 2017 WL 1424317, at *6. Therefore, "reference to 12 C.F.R. § 1024.36 cannot transform a request for information about a loan modification into a QWR." *Id.* (collecting cases). Plaintiffs additionally point to a different regulation, 12 C.F.R. § 1024.35(b), which lists several "covered errors" that a borrower may raise with a servicer and thereby render their correspondence a QWR. Plaintiffs point specifically to § 1024.35(b)(7), "Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39," and § 1024.35(b)(11), "[a]ny other error relating to the servicing of a borrower's mortgage loan."

§ 1024.39, however, establishes affirmative obligations of servicers to contact borrowers when they become delinquent, which was not the scenario that Brown alleges here. 12 C.F.R. § 1024.39. And § 1024.35(b)(11) echoes the QWR statutes in limiting its reach to errors that relate to "servicing" of the loan, which as previously explained Brown's correspondence did not. These regulations therefore do not reach Brown's correspondence with Rushmore. Therefore,

---

[12] "RESPA's implementing regulations are codified at 12 C.F.R. §§ 1024.1 to 1024.41 and known as 'Regulation X.'" *Brown v. Select Portfolio Servicing, Inc.*, No. GJH-18-1664, 2019 WL 1958547, at *3 (D. Md. May 2, 2019).

Plaintiffs' RESPA claim asserting that Rushmore unlawfully failed to respond to Brown's alleged QWRs will be dismissed.

The remaining component of Plaintiffs' RESPA claim is the contention that Rushmore unlawfully subjected Brown's and the Riffes' loans to "dual tracking." "Dual tracking occurs where a servicer moves towards foreclosure while the loss mitigation process is ongoing in violation of RESPA." *Brown*, 2019 WL 1958547, at *5. Under 12 C.F.R. § 1024.41(g), if a servicer makes the first notice or filing required by applicable law for a foreclosure, but the borrower then submits a complete loss mitigation application more than 37 days before a foreclosure sale, the servicer may not conduct the sale or move for a foreclosure judgment or order of sale unless:

> (1) The servicer has sent the borrower a notice . . . that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
> (2) The borrower rejects all loss mitigation options offered by the servicer; or
> (3) The borrower fails to perform under an agreement on a loss mitigation option.

12 C.F.R. § 1024.41(g).[13] § 1024.41(b)(1) defines a "complete loss mitigation application" as "an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1).

Rushmore argues that it was not restrained by these provisions from foreclosing on Brown's loan because Brown never submitted a complete loss mitigation application. The

---

[13] Plaintiffs also note § 1024.41(f), which bars servicers from proceeding with a foreclosure if the borrower submits a completed loss mitigation application before the servicer makes the first notice or filing for a foreclosure. ECF No. 43 at 30. Because Plaintiffs only mention this provision and do not appear to claim that Rushmore violated it, the Court does not consider it further.

Amended Complaint alleges, however, that Brown repeatedly submitted loss mitigation application packets to Rushmore and promptly responded when it asked for more information. To recount the allegations, on June 4, 2015, Brown mailed Rushmore a packet containing "all the documents Rushmore commonly requested for a complete loss mitigation application." ECF No. 25 ¶ 87. Rushmore requested specific additional information on June 12, 2015, *id.* ¶¶ 87–88, and Brown faxed it that information on June 26, *id.* ¶ 89. Rushmore then wrote Brown on July 2 stating that it had not received the required information, *id.* ¶ 90, leading Brown to submit her first alleged QWR on July 10, *id.* ¶ 91.

Rushmore acknowledged receipt of the July 10 letter on July 28 and pledged to respond within 30 days. *Id.* ¶¶ 93. Instead, on August 19, it sent Brown a form letter asking her to submit another request for mortgage assistance. *Id.* ¶¶ 94–95. Brown then sent her second alleged QWR on September 9, *id.* ¶ 96, to which Rushmore did not respond directly, instead sending her on September 14 yet another form letter stating that it had not received requested documentation relating to her application for loss mitigation, *id.* ¶¶ 97–98. Two weeks later, on September 29, Rushmore appointed attorneys to proceed with a foreclosure against Brown. *Id.* ¶ 99.

Three weeks after that, however, Rushmore solicited Brown to submit an application for loss mitigation, *id.* ¶ 100, to which she responded the next day by submitting "a second, complete [request for mortgage assistance]," *id.* ¶ 101. Rushmore once again requested additional documents, *id.* ¶ 102, and on November 9 Brown responded by sending "all of the additional documents [Rushmore] requested that were available and relevant to her application and circumstances," *id.* ¶ 103. Rushmore had commenced a foreclosure action against Brown three days earlier, however. *Id.* ¶ 104. In an affidavit in that action, a Rushmore vice president

testified that Brown's application was missing certain documentation that the Amended Complaint alleges Brown had included in three of her mailings. *Id.* ¶¶ 110–11.

Rushmore insists that the Amended Complaint fails to allege that Brown ever submitted a complete application because it concedes that Rushmore repeatedly asked Brown for more information. This argument must fail. The Amended Complaint clearly alleges that Brown submitted complete applications to Rushmore, both before and after it commenced a foreclosure action against her, and that Rushmore willfully and wrongfully proceeded as though she had not. Further, it asserts that a Rushmore executive submitted an affidavit in Brown's foreclosure action falsely denying that Rushmore had received documents that the Amended Complaint asserts Plaintiff had already sent. These allegations are sufficient to state a plausible claim under § 1024.41(g). *See Dionne v. Fed. Nat'l Mortg. Ass'n*, No. 15-cv-056-LM, 2016 WL 3264344, at *5 (D.N.H. June 14, 2016) (denying a motion to dismiss a similar claim where the plaintiffs alleged that they provided all of the information the servicer requested but the lender maintained that they had not filed a complete application). The Court is cognizant that the definition of "complete" at § 1024.41(b)(1) appears to leave significant discretion to the servicer to determine what paperwork is needed in an application. But Brown here claims that she repeatedly submitted all of the documents that Rushmore told her that it needed. It cannot be the case that a servicer may repeatedly move the goalposts of "completeness" so that it can initiate a foreclosure regardless of what a borrower has provided at the servicer's request.

The Amended Complaint fails to state a claim with respect to the Riffes, however, because it alleges that Rushmore referred the Riffes' loan to foreclosure counsel before they had submitted any application for loss mitigation, let alone a complete one. According to the Amended Complaint, Rushmore engaged a law firm, the BWW Law Group LLC, to assist it with

collection and commence a foreclosure "sometime around March 2015." ECF No. 25 ¶ 151. While the Amended Complaint asserts that the Riffes were improperly charged for the law firm's services and were assessed other improper fees, it does not claim that the Riffes began any loan modification procedures until October 2015. *Id.* ¶ 155. And the pleading is clear that no foreclosure action ever took place. *Id.* ¶ 151. Thus, because no completed loss mitigation action was pending, and no foreclosure action was initiated, the borrower protections at § 1024.41 are not implicated. The Riffes' RESPA claim will therefore be dismissed.

Defendants finally argue that even if Brown has plausibly alleged a RESPA claim, she nonetheless may not proceed because she has failed to adequately allege damages. Under 12 U.S.C. § 2605(f), "an individual plaintiff must plead either actual damages as a result of the RESPA violation or 'a pattern or practice of noncompliance' with RESPA requirements." *Offiah v. Bank of Am., N.A.*, No. DKC 13-2261, 2014 WL 4295020, at *3 (D. Md. Aug. 29, 2014). Brown alleges economic and non-economic damages in the Amended Complaint. She first claims "[e]conomic damages incurred . . . in the form of costs of time incurred to communicate with Rushmore . . . improper late fees, and foreclosure costs and interest added to Brown's account which BCAT 2014-4TT is not legally entitled to collect (as an unlicensed mortgage lender)." ECF No. 25 ¶ 113a. "The improper foreclosure and other costs added to Brown's loan by Rushmore arise from both (i) unlicensed status of BCAT 2014-4TT and (ii) Rushmore's improper commencement of this action while Brown's completed actions for loan mitigation were pending." *Id.*

These allegations are inadequate to the extent that they stem from BCAT's lack of a license, which as discussed previously was not unlawful. That leaves only a general allegation of "foreclosure costs," which is insufficiently specific to proceed without some indication of the

amounts Brown actually had to pay or when or to whom she had to pay them. The Amended Complaint also asserts economic damages of approximately $50.00, however, which stem from the "costs to transmit information to Rushmore, acting on behalf of BCAT 2014-4TT related to [Brown's] QWRs and loss mitigation applications which Rushmore has largely disregarded." *Id.* ¶ 113b. Courts have somewhat split on whether the costs of mailing correspondence to a servicer can constitute actual damages under § 2605(f). *See Robinson v. Nationstar Mortg. LLC*, No. TDC-14-3667, 2019 WL 4261696, at *8 (D. Md. Sept. 9, 2019) (collecting cases). The Court agrees with and adopts the approach taken by Judge Chuang of this Court in *Robinson v. Nationstar Mortgage, LLC*, which holds that such administrative costs are actual damages if they were incurred "in response to the RESPA violation." *Id.*

Here, Brown alleges that she had to repeatedly send loss mitigation applications to Rushmore because it unlawfully refused to acknowledge the completeness of her prior mailings and then began foreclosure proceedings despite her completed applications. In other words, Brown had to continually expend funds to attempt to move her loan along the loss mitigation track while Rushmore was unlawfully moving it along the foreclosure track. This progression culminated with Brown sending a complete loss mitigation application three days after Rushmore initiated a foreclosure action against her. ECF No. 125 ¶ 103. Had Rushmore properly acknowledged Brown's first allegedly complete application, Brown would not have had to expend funds for additional mailings. Therefore, Brown's alleged administrative costs were incurred in response to Rushmore's alleged RESPA violation and thus qualify as actual damages.

In addition to economic damages, "[a]ctual damages may also include 'non-pecuniary damages, such as emotional distress and pain and suffering.'" *Robinson*, 2019 WL 4261696, at *8 (quoting *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010)). A

plaintiff must allege a "plausible causal connection between her emotional damages and the alleged RESPA violations." *Darby v. PNC Mortg., Nat'l Ass'n*, No. DKC 16-0210, 2016 WL 7212568, at *3 n.4 (D. Md. Dec. 13, 2016). Here, Brown alleges emotional damages "related to Rushmore's botched servicing and collection of her loan manifested by fear, anxiety, anger, embarrassment, stress, worry, and sleeping issues." *Id.* ¶ 113c. "She fears that [Rushmore's attorneys] . . . will wrongfully take her home and continue to ignore her valid QWRs and valid requests for loss mitigation." *Id.* While the QWR element of this allegation is insufficient, Brown has asserted a sufficient causal link between her fears of the wrongful taking of her home through foreclosure and Rushmore's alleged failure to acknowledge and act on her complete mitigation applications. Therefore, in addition to her economic damages, Brown's alleged emotional damages are also sufficient to meet the requirement of § 2605(f).[14]

### C. Declaratory Judgment

Finally, Defendants move to dismiss Plaintiffs' request for a declaratory judgment that Brown, Sharma, and the Riffes remain entitled to the FHA borrower protections they enjoyed before HUD sold their loans through DASP. The Amended Complaint specifically seeks a declaration from the Court under the Declaratory Judgment Act, 28 U.S.C. § 2201, that three claims are true: that HUD had no right to strip the FHA protections from Plaintiffs' loans without notice to Plaintiffs and without complying with the Administrative Procedure Act ("APA"); that BCAT as the current owner of their loans has no greater rights than HUD did; and that Rushmore must service the loans consistent with those protections. ECF No. 25 ¶ 288.

Generally, "[a] court may exercise jurisdiction over a declaratory judgment action when: '(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and

---

[14] Because the Court finds these actual damage claims adequate, it need not consider Plaintiffs' additional "pattern or practice" damages allegations. ECF No. 25 ¶ 284.

reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.'" *Hogs & Heroes Found., Inc. v Heroes, Inc.*, 202 F. Supp. 3d 490, 494 (D. Md. 2016) (quoting *Volvo Const. N. Am., Inc. v CLM Equip Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004)).

As Defendants argue persuasively, Plaintiffs' request for a declaratory judgment cannot proceed because there is no actual controversy between the parties to this action. What Plaintiffs ultimately seek, according to their Opposition brief, is "[a] retrospective declaration that HUD's past conduct was unlawful." ECF No. 43 at 41. This request stems from an allegation in the Amended Complaint that:

> As a result of HUDs [sic] failure to comply with the Administrative Procedures Act [sic] in its creation of the DASP program before stripping the FHA rights from the Named Plaintiffs' loans without their consent or even any notice, BCAT 2014-4TT and RMAC TRUST 2016-CTT have acquired greater, purported interests in the loans of the Named Plaintiffs and putative class members then [sic] HUD had the right to give to anyone—including BCAT 2014-4TT's and RMAC TRUST 2016-CTT's predecessors in interest. BCAT 2014-4TT and RMAC TRUST 2016-CTT may not claim any greater rights than their predecessors had in the loans.

ECF No. 25 ¶ 73.

It is evident from this allegation that Plaintiffs' grievance here is not with the Defendants it named in this action but with HUD. Tellingly, despite some suggestions to the contrary elsewhere in their Opposition brief, Plaintiffs concede that their loans no longer bear the borrower protections they held before HUD sold them. Specifically, Plaintiffs assert that "[o]nce [mortgage] notes are sold [through DASP], homeowners no longer have FHA-insured mortgages" and "have—unbeknownst to them—lost all of the FHA Benefits." ECF No. 43 (citing ECF No. 25 ¶¶ 73–74).

In other words, Plaintiffs do not claim that their loans retain the protections and that Defendants are unlawfully failing to recognize them, which could perhaps be the subject of a declaratory judgment action, but rather that it was unlawful for HUD to remove the protections in the manner it chose. Plaintiffs' controversy is thus with HUD and not with the Defendants here. Further, even if this issue could be raised in a suit against these Defendants, the only factual allegation supporting it is that a report by HUD's Inspector General concluded that DASP should have been implemented using APA rulemaking procedures. ECF No. 25 ¶ 72. With no other support for their claim, Plaintiffs have made no more than a bare allegation of an APA violation, and accordingly have failed to state a claim.

Plaintiffs make two alternative argument that on scrutiny simply collapse into their main claim. First, they argue that their original FHA-insured loans granted them contractual rights to borrower protections that were "incorporated into the loan documents" and that those rights "cannot unilaterally be taken from them from [sic] the original lenders or any assignee of the original lender." ECF No. 43 at 40–41. Again, however, that grievance is with the operation of DASP, which the Amended Complaint alleges stripped those protections from Plaintiffs' loans, and not with any conduct by Defendants, who merely acquired the loans under the terms of the program.

Plaintiffs also claim that as "assignees" of their loans, Defendants can have no "greater rights" than the "assignor," presumably referring to the right to enforce and collect on the mortgages without having to honor FHA borrower protections. ECF No. 43 at 42. But Defendants are not purely assignees of Plaintiffs' loans. Rather, according to the Amended Complaint, they purchased the loans after they were modified by HUD through DASP. Plaintiffs' alternative arguments thus reduce merely to their primary claim that DASP was

unlawfully implemented. Their claim seeking a declaratory judgment will therefore be dismissed.

### D. Manner of Dismissal

In their Motions to Dismiss, Defendants request that all of Plaintiffs' claims be dismissed with prejudice. "The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013) (quoting *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638–39 (D. Md. 2009)). While a plaintiff "should generally be given a chance to amend his complaint . . . before the action is dismissed with prejudice," *id.* at 825–26 (quoting *FinServ Cas. Corp. v. Settlement Funding, LLC*, 724 F. Supp. 2d 662, 674–75 (S.D. Tex. 2010)), "dismissal with prejudice is proper if there is no set of facts the plaintiff could present to support his claim," *id.* at 826 (citing *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008)).

Dismissal with prejudice is appropriate for Plaintiffs' Licensing Claims because they rely entirely on the mistaken proposition that the Defendant trusts are unlawfully operating as unlicensed mortgage servicers. Any amendment of those claims to add further factual allegations would therefore be futile. Plaintiffs' request for a declaratory judgment will also be dismissed with prejudice because of the lack of an actual controversy between the parties. This issue could not be remedied even if Plaintiffs added further allegations about the allegedly unlawful procedure HUD followed in implementing DASP. As for the RESPA claims, given the timeline of the Riffes' interactions with Rushmore and the lack of any foreclosure action in their case, their dual tracking claim could not be made viable through amendment. But it is conceivable that Brown could state a claim with respect to her purported QWRs by adding further allegations to demonstrate the alleged violations. That claim will therefore be dismissed without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Wilmington's Motion for Extension of Time, ECF No. 36, grant in part and deny in part Rushmore's Motion to Dismiss, ECF No. 38, grant U.S. Bank's Motion to Dismiss, ECF No. 39, grant Wilmington's Motion to Dismiss, ECF No. 41, and grant Plaintiffs' Motion for Leave to file excess pages, ECF No. 42, and Motion to Substitute Party, ECF No. 52. The only claim that may proceed is Plaintiff Brown's claim against Rushmore for allegedly dual tracking her loan in violation of RESPA. All other claims are dismissed with prejudice except for Brown's RESPA QWR claim, which is dismissed without prejudice. A separate Order shall issue.


Date: <u>March 20, 2020</u>                                  <u> /s/                                              </u>
                                                                        GEORGE J. HAZEL
                                                                        United States District Judge